No. 23-1671

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DANA NESSEL, Attorney General of the State of Michigan, on behalf of the People of the State of Michigan,

  *Plaintiff-Appellant*,

*v.*

ENBRIDGE ENERGY LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P.,

  *Defendants-Appellees*.

On Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Janet T. Neff

## CONSENTED-TO BRIEF FOR AMICUS CURIAE
## GREAT LAKES BUSINESS NETWORK

Andy Buchsbaum
Buchsbaum & Associates LLC
1715 David Court
Ann Arbor, MI 48105
(734) 717-3665
buchsbauma@gmail.com
Bruce T. Wallace
126 South Main Street
Ann Arbor, MI 48104
(734) 662-4426
bwallace@hooperhathaway.com

Counsel, Great Lakes Business Network

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ............................................................................................ 1

INTEREST OF THE AMICUS CURIAE ...................................................... 2

ARGUMENT ................................................................................................. 12

  I.    Removal is barred because Enbridge filed for removal at least two years
  after removability was ascertained. ..................................................... 12

  II.   Because Congress has explicitly reserved primary authority to the state in
  this case, this case does not present a substantial question of federal law that
  gives rise to federal jurisdiction. ......................................................... 17

    A.   Because the Federal Pipeline Safety Act preserves the authority for State
    officials to make location and routing decisions for Line 5, the state's claim
    does not raise a federal issue, and removal would upset the Congressionally-
    established federal-state balance ...................................................... 19

    B.   The Pipeline Safety Act does not prevent the State from revisiting its 70-
    year-old decision about the location of Line 5. ............................... 22

    C.   The 1977 Transit Treaty also preserves state authority over pipelines and
    thus is not a federal issue justifying removal.................................. 25

CONCLUSION ............................................................................................. 27

CERTIFICATE OF COMPLIANCE........................................................... 29

CERTIFICATE OF SERVICE .................................................................... 30

# TABLE OF AUTHORITIES

Page

## Cases

*Caterpillar v. Williams*,
    482 U.S. 386, 392 (1987) ................................................................. 17

*Collins v. Gerhardt*,
    211 N.W. 115, 118 (Mich. 1926) ...................................................... 24

*Eastman v. Marine Mechanical Corp.*,
    438 F.3d 544, 549-50 (6th Cir. 2006) ............................................... 18

*Empire Healthchoice Assurance, Inc. v. McVeigh*,
    547 U.S. 677, 699 (2006) ................................................................. 17

*Estate of Cornell v. Bayview Loan Servicing, LLC*,
    980 F.3d 1008, 1014 (6th Cir. 2018) ............................................... 18

*Glass v. Goeckel*,
    703 N.W.2d 58, 64 (Mich. 2005) ..................................................... 22

*Grable & Sons v. Darue Engineering*,
    545 U.S. 308, 314 (2005) ................................................................. 18

*Idaho v. Coeur d'Alene Tribe of Idaho*,
    521 U.S. 261, 283 ............................................................................. 26

*Illinois Cent. R. Co. v. Illinois*,
    146 U.S. 387 (1892) ................................................................... 22, 24

*Jones v. IPX International Equatorial Guinea, S.A.*,
    920 F.3d 1085 (6th Cir. 2019) .......................................................... 16

*Mikulski v. Centerior Energy Corp.*,
    501 F.3d 555, 560 (6th Cir. 2007) .................................................... 17

*Panhandle Eastern Pipeline Co. v. Madison Cnty.*,
    898 F.Supp. 1302, 1315 (S.D. Ind. 1995) ....................................... 22

*Portland Pipe Line Corp. v. City of S. Portland*,
   288 F.Supp.3d 321, 429-30 (D. Me. 2017) ........................................................ 20

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,
   608 F.3d 200, 210 (5th Cir. 2010) .................................................................... 20

*Wash. Gas Light Co. v. Prince George's Cnty. Council*,
   711 F.3d 412 (4th Cir. 2013) ............................................................................ 20

**Statutes**

28 U.S.C. § 1441(a) .............................................................................................. 17

28 U.S.C. § 1446(b)(1) ......................................................................................... 12

28 U.S.C. § 1446(b)(3) ......................................................................................... 13

49 U.S.C. § 60104(c) ...................................................................................... 19, 20

49 U.S.C. § 60104(e) ...................................................................................... 19, 22

**Other Authorities**

*About GLBN*, Great Lakes Bus. Network, https://glbusinessnetwork.com/great-
   lakes-business-network/ (last visited May 2, 2023) ............................................ 3

Agreement between the Government of Canada and the Government of the United
   States of America Concerning Transit Pipelines, U.S.-Can., Jan. 28, 1977, 28
   U.S.T. 7449 ...................................................................................................... 26

*Alternatives Analysis for the Straits Pipeline–Final Report*, Dynamic Risk, 2-127
   (Oct. 26, 2017), https://mipetroleumpipelines.org/document/alternatives-
   analysis-straits-pipeline-final-report (showing risk factor of 4.5 per ten thousand
   per year, or 1.6 per hundred over 35 years, which is 1-in-60) ............................. 6

Beth LeBlanc, *Enbridge-contracted Vessels Among Those Suspected in Damage to
   Line 5*, The Detroit News (July 23, 2020)
   https://www.detroitnews.com/story/news/local/michigan/2020/07/23/enbridge-
   contracted-vessels-suspected-cause-line-5-damage/5471556002/ ........................ 7

Brief for Plaintiff-Appellant at 64-66, *Nessel v. Enbridge Energy Limited,* No. 23-1671, 2023 WL 2482922 (W.D. Mich. Feb. 21, 2023)...................................... 14

*Dave Bartkowiak, Jr., Michigan's Beer Industry Chugs Along: $9.9 Billion to State's Economy, CLICK ON DETROIT (July 9, 2021)* https://www.clickondetroit.com/features/2021/07/09/michigans-beer-industry-chugs-along-99-billion-to-states-economy/#//. .................................................... 9

David J. Schwab, Univ. of Mich. Water Ctr., Straits of Mackinac Contaminant Release Scenarios: Flow Visualization and Tracer Simulations, 1 (2014), http://graham.umich.edu/media/files/mackinac-report.pdf .................................. 6

Defs.' Objs. and Resps. to Pls.' Fourth Set of Interrogs., at 5, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC) ............................................................................................ 10

Expert Rebuttal Report of Graham Brisben at at 61-62, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC) ............................................................................................ 11

Expert Rebuttal Report of Sarah Emerson at 6 fig. 2, 19-20, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC) ............................................................................................ 11

Expert Report of Neil K. Earnest at 12, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC) .............. 10

Expert Report of Sarah Emerson at 20, 38, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC) ............................................................................................................ 10

Haley Hansen, *What's Craft Beer Worth to the State of Michigan?*, Lansing State Journal (May 15, 2019), https://www.lansingstatejournal.com/story/news/2019/05/15/craft-beer-worth-state-michigan-state-economy-msu/1166262001/ ................................................. 3

*History of the Bridge*, Mackinac Bridge Authority
   https://www.mackinacbridge.org/history/history-of-the-
   bridge/#:~:text=The%20bridge%20was%20officially%20begun,the%20turbulent
   %20Straits%20of%20Mackinac (last visited May 2, 2023) .............................. 23

Jeff Alexander & Beth Wallace, *Sunken Hazard*, National Wildlife Federation
   (Oct. 8, 2012), https://www.nwf.org/Educational-Resources/Reports/2012/10-08-
   2012-Sunken-Hazard................................................................................. 5

*Lager for the Lakes*, Bell's Brewery https://bellsbeer.com/news/lager-for-the-
   lakes-bells-new-beer-thats-crisp-refreshing-and-timeless/ ................................... 4

*Mackinac Strat Ship Traffic,* ShipTraffic.net,
   http://www.shiptraffic.net/2001/04/mackinac-strait-ship-traffic.html (last visited
   May 2, 2023) ....................................................................................... 5

Mark Tower, *Broken Cables Capped as Straits of Mackinac Spill Response
   Continues*, MLive (Apr. 30, 2018), https://www.mlive.com/news/grand-
   rapids/2018/04/broken_cables_capped_as_strait.html.......................................... 7

Mich. Sea Grant, *The Dynamic Great Lakes Economy, Employment Trends from
   2009 to 2018*,  (Oct. 2020), https://www.michiganseagrant.org/wp-
   content/uploads/2020/10/MICHU-20-715-Great-Lakes-Jobs-Report-fact-
   sheet.pdf ............................................................................................... 8

Mich. Tech. Inst., *Independent Risk Analysis for Straits Pipelines, Final*  (Sept. 15,
   2018), https://mipetroleumpipelines.org/document/independent-risk-analysis-
   straits-pipelines-final-report....................................................................... 7

Press Release, Drew YoungDyke, Seven Years Later, Kalamazoo River Oil Spill
   Cleanup Still Ongoing, National Wildlife Federation (June 9, 2017),
   https://www.nwf.org/Home/Latest-News/Press-Releases/2017/6-9-17-Seven-
   Years-Later-Kalamazoo-River-Oil-Spill-Cleanup-Still-Ongoing......................... 5

*Richard Bergmann, Bridge Street Tap Room*, Great Lakes Bus.
   Network,  https://glbusinessnetwork.com/partners/glbn-members/ (last visited
   September 20, 2023). ............................................................................... 4

Robert B. Richardson & Nathan Brugnone, *Oil Spill Economics: Estimates of the
   Economic Damages of an Oil Spill in the Straits of Mackinac in Michigan*, 2,

(May 2018), (available at https://forloveofwater.org/wp-content/uploads/2018/05/FLOW_Report_Line-5_Final-release-1.pdf)............... 9

*Seaway Fact Sheet*, Dept. of Transp., https://www.seaway.dot.gov/sites/seaway.dot.gov/files/docs/Seaway%20Fact%20Sheet.pdf (last visited May 2, 2023) ................................................................ 23

Tr. of Earnest Testimony at 91:18–92:2, 130:6–11, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC) ............................................................................................................. 10

U.S. Bureau of Economic Analysis, 2020 – Michigan, Outdoor Recreation Satellite Account (ORSA), https://outdoorindustry.org/wp-content/uploads/2015/03/ORSA-Michigan.pdf (last visited Feb. 10, 2022)......... 8

## INTRODUCTION

The Great Lakes Business Network ("Business Network"), composed of more than 200 businesses concentrated geographically around the Great Lakes and predominated by local Michigan companies, urges that this lawsuit, the outcome of which is vital to their survival, be heard in a Michigan state court, where it was initially filed.[1] The business owners, candidly and justifiably calculating their own self-interest, want the state court to weigh the actual, nearly inevitable destruction of the enterprises, jobs, tax base, and prosperity that they have painstakingly created over generations, against the purely hypothetical, and decidedly speculative, economic losses that the oil and gas industry predicts from the decommissioning of a 70-year-old pipeline, barely a single segment of which has been replaced or upgraded. We are not a political or advocacy organization. We are business realists, with responsibilities to the employees, investors, customers, and local and state governments that we support. We want and believe we are entitled to have this critical case heard in state court in Michigan. For the legal reasons set forth below, we support the State's choice of forum in this case. We assume no

---

[1] Neither party objects to the Business Network's filing of this amicus brief. No party or its counsel authored any part of this brief or contributed money to support its preparation or submission. No person other than the Business Network contributed money to prepare or submit this brief.

particular outcome, but we believe that evidence relevant to the following factors should be ruled upon in state court:

1. the disastrous history of Enbridge pipelines generally and in Michigan;

2. the terrifying record of near misses to the Line 5 pipeline in the Straits of Mackinac;

3. expert analysis of both the likelihood of rupture in Lake Michigan and the specific resulting destruction to the shorelines of Lakes Michigan and Huron when rupture occurs; and

4. the protections that Michigan public trust law uniquely affords to avoid these calamitous consequences.

Our business calculations support decommissioning Line 5. Our understanding of the applicable law dictates that this critical relief be decided in a Michigan state court. And our membership is unanimously committed to this outcome.

## INTEREST OF THE AMICUS CURIAE

Amicus curiae, the Great Lakes Business Network ("Business Network") is an unincorporated association of prominent businesses and business leaders in the Great Lakes region. The Business Network seeks to provide for "thriving

ecosystems, economies, and communities" in the Great Lakes area.[2] Each member business depends on the purity and quality of the Great Lakes and their reputations as healthy and beautiful lakes. Of particular concern to the Business Network is Line 5 and its high likelihood of rupture. Any oil spill in the Great Lakes would gravely injure the businesses and communities that depend on the water.

The Business Network has attracted member-businesses from a wide array of industries, all of which are significant to the Michigan economy. The Business Network has steadily grown from 11 founding businesses to over 200. Larger member-businesses, such as Bell's Brewery, Patagonia, and Cherry Republic, have broad market reach in their respective industries across the region. However, each and every business in the Business Network contributes to the region's rich economy, and all of them depend on the health and reputation of the Great Lakes for survival.

The craft beer industry, which is valued to be a $1 billion per year industry in Michigan,[3] is just one industry that depends on the vitality of the Great Lakes. Richard Bergmann, the owner of Bridge Street Tap Room and a Business Network

---

[2] *About GLBN*, Great Lakes Bus. Network, https://glbusinessnetwork.com/great-lakes-business-network/ (last visited May 2, 2023).
[3] Haley Hansen, *What's Craft Beer Worth to the State of Michigan?*, Lansing State Journal (May 15, 2019), https://www.lansingstatejournal.com/story/news/2019/05/15/craft-beer-worth-state-michigan-state-economy-msu/1166262001/.

member, credits the environmental health of the Great Lakes with sustaining his

business. Upon joining the Business Network, Bergmann stated:

> We draw our water from the Charlevoix municipal system, sourced directly
> from Lake Michigan. Water of the highest quality is what makes it possible
> for us to succeed and employ 65 people, while helping to build the economic
> base for Charlevoix and the surrounding area.[4]

Bell's Brewery, too, depends on the health and vitality of the Great Lakes to

remain marketable. One of its more popular brews is Lager for the Lakes, which it

says was "inspired" by the Great Lakes. "[F]resh water is so vital in many

ways…The name is intentional: it's a reminder that great beers require clean

water."[5]

Bell's Breweries was gravely threatened by the Kalamazoo River oil spill in

2010, which resulted after Enbridge Line 6B had been so neglected by Enbridge

that it corroded and then ruptured beneath a major tributary to the Kalamazoo

River, causing over $1 billion worth of damage. This oil spill was one of the

largest inland oil spills in U.S history and took more than 7 years to clean up.

Many businesses that depended on those waters did not survive.[6]

---

[4] *Richard Bergmann, Bridge Street Tap Room*, Great Lakes Bus.
Network, https://glbusinessnetwork.com/partners/glbn-members/ (last visited
September 20, 2023).
[5] *Lager for the Lakes*, Bell's Brewery https://bellsbeer.com/news/lager-for-the-
lakes-bells-new-beer-thats-crisp-refreshing-and-timeless/
[6] Press Release, Drew YoungDyke, Seven Years Later, Kalamazoo River Oil Spill
Cleanup Still Ongoing, National Wildlife Federation (June 9, 2017),

As failed clean-up efforts dragged on and environmental groups including the National Wildlife Federation began prying additional information out of Enbridge regarding its larger network of pipelines, Business Network members took note of the haunting similarities between the Enbridge-operated pipelines in Kalamazoo and the segment of Line 5 beneath the Straits of Mackinac. These two 20-inch pipes on the lakebed or unevenly suspended above it are 15 years older than, and have been subject to almost the exact same lack of maintenance as, the ruptured pipeline in Kalamazoo. Line 6B sent over one million gallons of oil into the Kalamazoo River over the course of 17 hours. [7]

These businesses have good reason to fear such a catastrophe. Line 5 is rendered highly vulnerable to rupture by its location beneath the Straits of Mackinac. The Straits are a point of convergence for multiple lanes of high-volume domestic and international shipping traffic, funneling ships between two of the most heavily-trafficked lakes in the world. [8] Line 5 lies directly below that point of convergence, in relatively shallow water, perpendicular to ship traffic. It is

---

https://www.nwf.org/Home/Latest-News/Press-Releases/2017/6-9-17-Seven-Years-Later-Kalamazoo-River-Oil-Spill-Cleanup-Still-Ongoing.

[7] Jeff Alexander & Beth Wallace, *Sunken Hazard*, National Wildlife Federation (Oct. 8, 2012), https://www.nwf.org/Educational-Resources/Reports/2012/10-08-2012-Sunken-Hazard.

[8] To view a live traffic density map of the Mackinac Strait, see *Mackinac Strat Ship Traffic,* ShipTraffic.net, http://www.shiptraffic.net/2001/04/mackinac-strait-ship-traffic.html (last visited May 2, 2023).

perilously sized and situated to catch within the shanks and flukes of a typical

shipping anchor. The currents at this spot interact unpredictably, making surface

turbulence common and often severe, thus increasing the risk of inadvertent anchor

release.[9]

A strike from an anchor or cable drag is highly likely in this location. In

2015, the State of Michigan commissioned an analysis of the Straits pipelines by

Dynamic Risk Assessment Systems, Inc., which was paid for by Enbridge. Its

October 2017 Final Report estimated that the chance of rupture in the Straits

pipeline is not in one in one million, or one in ten thousand, or even one in a

thousand, the usual risk factors for environmental harm—but *one in sixty*,[10] the

dominant threat to rupture being inadvertent anchor drops.[11] This figure is almost

certainly an overly optimistic assessment, considering that Line 5 was twice struck

by an anchor or cable drag within the first four years after the Report's publishing.

First, less than eight months after the report's publication, a tugboat inadvertently

dropped and dragged its anchor across the lakebed at the Straits, severing several

---

[9] David J. Schwab, Univ. of Mich. Water Ctr., Straits of Mackinac Contaminant Release Scenarios: Flow Visualization and Tracer Simulations, 1 (2014), http://graham.umich.edu/media/files/mackinac-report.pdf.

[10] *Alternatives Analysis for the Straits Pipeline–Final Report*, Dynamic Risk, 2-127 (Oct. 26, 2017), https://mipetroleumpipelines.org/document/alternatives-analysis-straits-pipeline-final-report (showing risk factor of 4.5 per ten thousand per year, or 1.6 per hundred over 35 years, which is 1-in-60).

[11] *Id.* at ES-25.

electrical transmission cables and denting both Line 5 pipelines.[12] It took nearly

two weeks for Enbridge to fully understand the damage, and Enbridge refused to

shut down the pipelines in the meantime. Two years later, an unknown vessel

dragged a cable over Line 5, tangling an anchor support on the west leg and

sharply yanking the support and the pipeline to the side.[13] It is only a matter of

time before the lines are dealt a fatal blow.

Thus, it is not a question of what happens *if* the lines fail, but what happens

*when* the lines fail. And when the pipeline does eventually fail, the damage to the

Great Lakes will be immense. Michigan Technological University used a NOAA

oil dispersal model for the Straits to analyze the scale of contamination from a

rupture and concluded that up to 2,000 kilometers of shoreline and 1,700 square

kilometers of the open waters of Lakes Huron and Michigan would be blanketed

by the oil spill.[14]

---

[12] Mark Tower, *Broken Cables Capped as Straits of Mackinac Spill Response Continues*, MLive (Apr. 30, 2018), https://www.mlive.com/news/grand-rapids/2018/04/broken_cables_capped_as_strait.html.

[13] Beth LeBlanc, *Enbridge-contracted Vessels Among Those Suspected in Damage to Line 5*, The Detroit News (July 23, 2020) https://www.detroitnews.com/story/news/local/michigan/2020/07/23/enbridge-contracted-vessels-suspected-cause-line-5-damage/5471556002/.

[14] *See* Mich. Tech. Inst., *Independent Risk Analysis for Straits Pipelines, Final* (Sept. 15, 2018), https://mipetroleumpipelines.org/document/independent-risk-analysis-straits-pipelines-final-report.

More than the environmental health of the Great Lakes is at stake here. The very livelihoods of members of the Business Network, as well as surrounding communities, would be imperiled by a Line 5 rupture. When Line 5 ruptures in the Straits of Mackinac it will cause cataclysmic damage to the health, image, and reputation of the Great Lakes. This damage will seep into and decimate the rich business economy in Michigan that depends upon the health and safety of the Great Lakes.  Most, if not all, Michigan businesses (including numerous GLBN members) will suffer lost profits. Many businesses will never recover.

The vitality and survival of Michigan's and the Great Lakes region's outdoor recreation industry is uniquely bound to the environmental health and safety of the Lakes.  According to the Bureau of Economic Analysis, in 2020, outdoor recreation in the State of Michigan accounted for 108,673 jobs, with wages totaling $4.6 billion and $9.5 billion value added to the Michigan GDP.[15]  In 2014, "over 113 million visitors spent over $22 billion in Michigan alone" visiting the Great Lakes.[16] According to the National Beer Wholesalers Association, the craft beer industry—in which many Business Network members participate and lead—

---

[15] U.S. Bureau of Economic Analysis, 2020 – Michigan, Outdoor Recreation Satellite Account (ORSA), https://outdoorindustry.org/wp-content/uploads/2015/03/ORSA-Michigan.pdf (last visited Feb. 10, 2022).
[16] Mich. Sea Grant, *The Dynamic Great Lakes Economy, Employment Trends from 2009 to 2018*, (Oct. 2020), https://www.michiganseagrant.org/wp-content/uploads/2020/10/MICHU-20-715-Great-Lakes-Jobs-Report-fact-sheet.pdf.

supports 66,900 jobs in Michigan and contributes more than $9.9 billion to the state's economy.[17]

When Line 5 ruptures, each of the eight Great Lakes States and the United States as a whole will feel the negative economic impact from the damage it will cause to the Great Lakes. This is confirmed by the Michigan Tech study that concluded that a Line 5 rupture could result in at least $1.878 billion in economic damages due to lost tourism income, harm to fisheries and fishing, other recreational damage, and public health costs.[18] However, even that number dramatically underestimates the economic impact to the state's Pure Michigan brand and the tourism and recreation dollars that would be lost. A subsequent study from a Michigan State University expert puts the damage from a major spill much higher, at $5.6 billion.[19]

We expect that Enbridge and its supporting amici will posit that the national economic concerns from shutting down Line 5—jobs, energy security, and consumer prices—would over-ride the damage a Line 5 rupture will cause

---

[17] Dave Bartkowiak, Jr., *Michigan's Beer Industry Chugs Along: $9.9 Billion to State's Economy, CLICK ON DETROIT* (July 9, 2021) https://www.clickondetroit.com/features/2021/07/09/michigans-beer-industry-chugs-along-99-billion-to-states-economy/#//.

[18] *Alternatives Analysis for the Straits Pipeline–Final Report*, *supra* note 11, at 31.

[19] Robert B. Richardson & Nathan Brugnone, *Oil Spill Economics: Estimates of the Economic Damages of an Oil Spill in the Straits of Mackinac in Michigan*, 2, (May 2018), (available at https://forloveofwater.org/wp-content/uploads/2018/05/FLOW_Report_Line-5_Final-release-1.pdf).

Business Network members and other Michigan businesses. But those national economic concerns are not only exaggerated—they are disproved by Enbridge's own experts. In a case involving the shutdown of Line 5 heard in the federal district court in Wisconsin, Enbridge's economic expert testified that if Line 5 shuts down, because of the availability of refined product, the price of gasoline at the pump would increase only one half to one cent per gallon.[20] Enbridge's experts further testified that virtually all of the 400,000-450,000 barrels per day supplied to refineries by Line 5 would be replaced by market forces – some immediately and the rest within 18 months: 200,000 barrels per day by waterborne transport to refineries in Montreal, where it would be shipped to other refineries in the region;[21] 100,000 barrels per day in existing excess capacity in another Michigan pipeline, Line 78, that does not transit the Straits;[22] and at least 110,000 barrels per day that Enbridge can add to Line 78 simply by adding pumping capacity (without laying

---

[20] Expert Report of Neil K. Earnest at 12, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC) [hereinafter "*Bad River Band*"].

[21] Tr. of Earnest Testimony at 91:18–92:2, 130:6–11, *Bad River Band*; Expert Report of Sarah Emerson at 20, 38, *Bad River Band*.

[22] Tr. of Earnest Testimony, *supra* note 22, at 99:11–20; Expert Report of Neil K. Earnest, *supra* note 21, at 65; Expert Report of Sarah Emerson, *supra* note 22, at 24–26.

new pipe).[23] And even more capacity exists through the expansion of rail.[24] Because the refineries supplied by Line 5 now would receive a full complement of oil from other sources, there would be no job loss or energy security concerns. These phantom economic losses from a Line 5 shutdown cannot compare to the concrete, real, and massive damage that Business Network members and other Great Lakes businesses would suffer.

Business Network members recognize the threat Line 5 poses to the Great Lakes, its businesses, and our own livelihoods, and we consequently support the efforts by the Michigan Attorney General to shut down Line 5 in the Straits. We are encouraged that the federal laws—as indicated in the very statutes and treaty cited by Enbridge and the District court—reflect our concerns. Those federal laws provide for state primacy in situations where pipelines threaten local resources, businesses, and citizens. In order to protect interests like ours, states—not the federal government—are expressly authorized to make siting decisions under the Pipeline Safety Act and the 1977 Transit Treaty.

---

[23] Defs.' Objs. and Resps. to Pls.' Fourth Set of Interrogs. at 5, *Bad River Band* (describing actions needed to expand each segment of Line 78); Expert Rebuttal Report of Graham Brisben at 61-62, *Bad River Band* ("The Line 78 expansion would mostly involve increasing the pressure of the pipeline by adding compression (vs. replacing with bigger pipe or twinning the pipeline).") (showing expansion of Line 78A from 570,000 bpd to 680,000 bpd of capacity would allow for full use of downstream pipelines Line 78B, Line 17, and Line 79).
[24] Expert Rebuttal Report of Sarah Emerson at 6 fig. 2, 19-20, *Bad River Band*.

11

**ARGUMENT**

The District Court's refusal to remand Michigan Attorney General Nessel's state court public trust claim must be reversed for two independent reasons:

- Enbridge removed the case two years past the mandatory statutory deadline (answering the first two questions certified for appeal); and

- Even if the removal had been timely, the federal courts have no grounds for exercising federal jurisdiction in this case (addressing the third certified question).

## I. Removal is barred because Enbridge filed for removal at least two years after removability was ascertained.

As the Attorney General's Brief demonstrates in detail, the District Court erred in excusing Enbridge's two-year violation of the removal statute's deadline.  The removal statute is clear: "The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant . . . of the initial pleading setting forth the claim for relief upon which such action or proceeding is based. . . ." 28 U.S.C. § 1446(b)(1). Enbridge received service of the Michigan Attorney General's complaint on July 12, 2019. Enbridge did not file its removal action until December 15, 2021, more than two years later. There is no dispute

over this timing. Enbridge's removal notice is over two years too late. The case
must be remanded.[25]

Enbridge has attempted to manufacture exceptions to this undisputed
violation of the statute's deadlines, but the federal courts and particularly the Sixth
Circuit do not recognize any of them. The Attorney General's brief ably addresses
all of the exceptions Enbridge raises; we will address one here: Enbridge's attempt
to employ another subsection of the removal statute, 28 U.S.C. § 1446(b)(3), which
allows a defendant to file for removal "within thirty days after receipt by defendant
. . . of a copy of an amended pleading, motion, order or other paper from which it
may first be ascertained that the case is one which is or has become removable."
Enbridge has argued and the District Court erroneously held that Enbridge could
not have ascertained the case was removable until November 16, 2021, when the
District Court denied the motion to remand another removed case by another
plaintiff, the State of Michigan.

It defies logic and law to conclude that Enbridge could not ascertain the
removability of the Attorney General's case until the District Court ruled on the
removability of the State of Michigan's case a full two years after the Attorney
General's case had been filed. The central cause of action was the same: the state's

---

[25] This violation of the 30-day deadline bars Enbridge from raising any claims of
federal jurisdiction as grounds for removal, including federal officer removal.

application of the Michigan public trust doctrine to the state-issued easement to Enbridge. As detailed in the Attorney General's brief, Enbridge raised the same federal issues as defenses throughout the state court proceedings for a full year after the Attorney General's state court complaint: in summary disposition, in oral argument, and defending (unsuccessfully) against an emergency temporary injunction to shut down the dual pipelines because they had been damaged by cables dragged across them.[26] Then Enbridge doubled down, transforming those defenses into a federal cause of action in December 2020, when it sued the Governor and the State of Michigan for relief from the same state public trust doctrine using the same federal claims. Once Enbridge raised these federal defenses in the instant state court case, made claims of the existence of a federal cause of action in a parallel case, and then robustly litigated both of them, it essentially admitted that it had everything it needed to notice removal in the instant case—over a full year before it did so.

And if somehow any question remained about when Enbridge had ascertained the removability of the Attorney General's case, that question was set to rest on December 15, 2021, a full year before Enbridge removed the instant case. On December 15, 2021 Enbridge removed a similar public trust action

---

[26] Brief for Plaintiff-Appellant at 64-66, *Nessel v. Enbridge Energy Limited,* No. 23- 1671, 2023 WL 2482922 (W.D. Mich. Feb. 21, 2023).

brought by the State of Michigan citing the same federal issues (the Pipeline Safety Act, the 1977 Transit Treaty, and federal common law) that claim to be the basis of removal in the instant case. To be clear: Enbridge did not merely seek removal in the parallel case at that time. The removal actually occurred on December 15, 2021 with the filing of Enbridge's notice of removal.  On that date, Enbridge's filing of the removal notice deprived the state court and granted the federal district court jurisdiction of the case; no judicial decision was required. There could be no clearer ascertainment of the removability of the instant case than Enbridge's actual and successful removal of the same state issue claiming the same federal grounds a full year earlier than its notice of removal in the instant case. The District Court opinion a year later may have held (erroneously, we believe) that the Enbridge's removal in the parallel case was proper, but it certainly was not the first time when removal could be ascertained.[27]  And the District Court opinion could not possibly be a litigation event that justified resetting the deadline clock (even if such a revival exception were allowed in the Sixth Circuit, which it is not): it opined on the event that occurred a year before, when the actual removal occurred.

The District Court committed these errors because of its stated unhappiness with plaintiff's efforts to keep the case in state court. The District Court believed

---

[27] Indeed, if a judicial decision is a prerequisite to ascertain removability, then removability could never be ascertained in the vast majority of cases and the 30-day deadline would be read out of the statute.

that her court should decide what she believes are weighty federal issues (which as discussed below really are reserved for the states) and accuses the Attorney General of forum manipulation. That accusation is perhaps the most baffling part of the lower court opinion. Removal is not the rule; it is the exception. "[A] plaintiff's choice of forum is given deference," *Jones v. IPX International Equatorial Guinea, S.A.*, 920 F.3d 1085 (6th Cir. 2019), and the Attorney General chose state court because the causes of action are exclusively under state law. Enbridge litigated this case for over a year in state court: filing motions, making arguments at hearings, presenting evidence, and defending against an emergency motion to shut down Line 5. Only after Enbridge lost that motion in July, 2021—when the state judge ordered it to shut down part of the pipeline for several months—did Enbridge seek a federal forum, and then for a different case. Seeking to conflate two different cases to avoid a statutory deadline is the very definition of forum manipulation, and the District Court opinion has blessed it.[28]

We now turn to the District Court's second set of errors concluding that federal jurisdiction must lie in a state public trust and nuisance action.

---

[28] The District court erroneously stated that the state court action is concluded because the state court closed the docket. In fact, the state court closed the docket because the federal removal had deprived it of jurisdiction. If the case is remanded, the state court litigation would resume where it had left off: with the state court considering cross-motions for summary disposition.

## II. Because Congress has explicitly reserved primary authority to the state in this case, this case does not present a substantial question of federal law that gives rise to federal jurisdiction.

Removal of a state court action to federal court is governed by 28 U.S.C. §

1441(a) and normally allows removal only when the federal district court has

original jurisdiction.

> Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant.  Absent diversity of citizenship, federal-question jurisdiction is required. The presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *See Gully* v. *First National Bank*, 299 U.S. 109, 112-13 (1936). The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law.

*Caterpillar v. Williams*, 482 U.S. 386, 392 (1987) (footnote omitted).

Where, as in this case, a federal question is absent from the face of the

complaint, removal is rare. The exceptions to the well-pleaded complaint rule are a

"special and small category" of claims. *Empire Healthchoice Assurance, Inc. v.

McVeigh*, 547 U.S. 677, 699 (2006).  The exception claimed by Enbridge in this

case is the "substantial-federal-question," or *Grable* doctrine, which holds removal

may be allowed "where the vindication of a right under state law necessarily

turn[s] on some construction of federal law."  *See Mikulski v. Centerior Energy

Corp.*, 501 F.3d 555, 560 (6th Cir. 2007).

The Sixth Circuit has a three-prong inquiry for determining whether a federal issue, unstated in a complaint, can force a case into federal court: (1) does "a state-law claim necessarily raise a stated federal issue," (2) that is "actually disputed and substantial," and (3) "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Estate of Cornell v. Bayview Loan Servicing, LLC*, 980 F.3d 1008, 1014 (6th Cir. 2018) (quoting *Grable & Sons v. Darue Engineering*, 545 U.S. 308, 314 (2005)).  The party seeking removal bears the burden of demonstrating that a federal court has jurisdiction and all doubts are resolved in favor of remand. *Eastman v. Marine Mechanical Corp.*, 438 F.3d 544, 549-50 (6th Cir. 2006).

Here, it is undisputed that Attorney General Nessel's state law claims raise no federal issues on their face. The Attorney General's claims all revolve around the easement the State of Michigan issued Enbridge to house Line 5 and whether that easement should be terminated under the state's public trust doctrine. There is no federal element. Enbridge attempts to manufacture requirements that the state law action requires the resolution of two federal laws: the Pipeline Safety Act ("PSA") and the 1977 Transit Treaty between the U.S. and Canada. As discussed in Attorney General Nessel's brief, those issues are defenses and so cannot be

18

considered as "necessarily arising." That conclusion is dispositive. It alone requires a reversal of the District Court decision and a remand.

We offer here additional grounds for remand because the Enbridge claims suffer another fatal defect: under the PSA and the 1977 Transit Treaty, Congress expressly authorizes states to take precisely the kinds of actions that Attorney General Nessel took in this case. Congress' authorization of Attorney General Nessel's revocation of Enbridge's easement under state law means that Enbridge's removal action fails under two of the required *Grable* tests: the state's claim cannot raise a federal issue when Congress has said there is no federal issue, and allowing removal to a federal forum would upset the balance Congress established when it preserved state authority over matters like these.

### A. Because the Federal Pipeline Safety Act preserves the authority for State officials to make location and routing decisions for Line 5, the state's claim does not raise a federal issue, and removal would upset the Congressionally-established federal-state balance.

The plain language of the PSA unambiguously preserves the State's right to prescribe the location or routing of a pipeline facility. 49 U.S.C. § 60104(c) provides that "[a] State authority may not adopt or continue in force *safety standards* for interstate pipeline facilities or interstate pipeline transportation." (emphasis added). However, the PSA makes clear that it "does not authorize the Secretary of Transportation to prescribe *the location or routing* of a pipeline facility." *Id.* § 60104(e) (emphasis added). The State of Michigan owns, and holds

in public trust, the Great Lakes bottomlands on which Enbridge's Easement for Line 5 is located. Attorney General Nessel has determined that the location of the dual lines on its bottomlands and the state easement authorizing that location are inconsistent with the public trust. This decision is not an attempt on the part of the State to tell Enbridge how it must operate its pipelines, nor an attempt at imposing a stricter "safety standard" on its operation. *Id.* § 60104(c).

The caselaw interpreting the PSA confirms this plain reading of the statute. In *Wash. Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412 (4th Cir. 2013), the court ruled that the PSA does not preempt state and local government authority to determine the location of pipeline infrastructure consistent with their land use and zoning laws. Even where the stated reasons for the new zoning plans were to "[r]estore, protect, and enhance the environment" surrounding sensitive areas, a locational decision taking such factors into account does not convert the decision into a safety standard. *Id.* at 421.

In fact, it is within the discretion of local officials to completely prohibit pipeline companies from using their preferred location altogether. *Id.* Such prohibitions are not safety standards. *Portland Pipe Line Corp. v. City of S. Portland*, 288 F.Supp.3d 321, 429-30 (D. Me. 2017) ("[A] prohibition is not a standard," and "[u]nder their police power, states and localities retain their ability to prohibit pipelines altogether in certain locations."). This remains true even in

20

instances where prohibitions are based on pipeline safety concerns. In *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210 (5th Cir. 2010), the Fifth Circuit rejected a pipeline operator's challenge to a city zoning law that required a 300-foot setback between natural gas compressor stations and any public roads in order to "minimize the possibility of a fire" setting the structure ablaze. Though the law was enacted primarily to account for safety concerns, the decision to prohibit the structure close to public roads was inherently about the pipeline's location. Both the Fourth and Fifth Circuit agree: locational decisions that take safety into account are not themselves safety standards and are therefore not governed by the PSA.

Attorney General Nessel's state law public trust claim to revoke the 1953 easement because of its violation of the state's public trust responsibilities is expressly and inherently locational. The claim seeks to revoke the easement on two grounds: that the easement was void from its inception because the issuer of the easement never made findings that an easement in that location was consistent with the Michigan public trust law; and the location of the pipeline (perpendicular to a busy shipping channel where anchor strikes have already occurred) creates an unreasonable risk of an oil spill that would devastate the Great Lakes and the public trust rights in the Lakes. Attorney General Nessel's public trust claim

imposes no conditions, safety or otherwise; it seeks to revoke the easement because the pipeline is located in the wrong place.

Even if this express locational purpose were not enough, Attorney General Nessel's state action cannot be anything but locational because of its basis in the Michigan public trust doctrine. As a common law state property doctrine, the public trust doctrine applies only to certain critical locations where the state owns property for the benefit of the people: here, the bottomlands of the Great Lakes. The U.S. Supreme Court declared that location, and not others, as being subject to the public trust doctrine in the seminal *Illinois Central* case. *Illinois Cent. R. Co. v. Illinois*, 146 U.S. 387 (1892). The Michigan Supreme Court followed suit in *Glass v. Goeckel*, 703 N.W.2d 58, 64 (Mich. 2005), holding that "the state . . . has an obligation to protect and preserve the waters of the Great Lakes and the lands beneath them for the public."

**B.  The Pipeline Safety Act does not prevent the State from revisiting its 70-year-old decision about the location of Line 5.**

Enbridge has argued elsewhere that locational decisions under 49 U.S.C. § 60104(e) apply only to new pipelines, as opposed to existing pipelines like Line 5. But the language of the PSA makes no distinction between new and existing pipelines, saying only that the PSA "does not authorize the Secretary of Transportation to prescribe *the location or routing* of a pipeline facility." The "location . . . of a pipeline facility" is not bounded in time. Location is where the

22

pipeline is now, not just where the pipeline was originally placed. *See Panhandle Eastern Pipeline Co. v. Madison Cnty.*, 898 F.Supp. 1302, 1315 (S.D. Ind. 1995) (County decision to order pipeline company to change the location of its pipeline and bury the pipeline deeper is not preempted by the PSA).

Enbridge's claim that the PSA locational carveout only applies to new pipelines would lead to absurd practical results. When the 1953 Easement was granted, the infrastructure near the Straits of Mackinac was sparse. In fact, construction of the Mackinac Bridge did not begin until 1954 and did not open to traffic until 1957.[29] The Bridge allowed for increased commercial activities as many businesses, including several members of the Business Network, began to settle near the Straits. Several years after the construction of the Bridge, the St. Lawrence Seaway opened in 1959.[30] This marked the first time that international shipping could traverse the Great Lakes on their way to and from major ports like Chicago and Milwaukee, and today commercial vessels make over 3,000 trips through the seaways annually.[31] The Straits of Mackinac thus became an important waterway

---

[29] *History of the Bridge*, Mackinac Bridge Authority https://www.mackinacbridge.org/history/history-of-the-bridge/#:~:text=The%20bridge%20was%20officially%20begun,the%20turbulent%20Straits%20of%20Mackinac (last visited May 2, 2023).
[30] *Seaway Fact Sheet*, Dept. of Transp., https://www.seaway.dot.gov/sites/seaway.dot.gov/files/docs/Seaway%20Fact%20Sheet.pdf (last visited May 2, 2023).
[31] *Id.*

for the transportation of commercial materials and is today one of the busiest

shipping channels in the nation. The 1953 Easement could not have contemplated

this commercial boom, which leaves Line 5 in the way of shipping traffic and

Michiganders who recreate in the water near popular tourist attractions like

Mackinac Island. To suggest that State officials cannot reroute a pipeline in light of

the economic and infrastructural growth near the Straits defies logic.

Indeed, the public trust doctrine requires the Attorney General to remedy the

problems associated with the 1953 Easement. As the "trustee of public rights" to

the Great Lakes bottomlands, Michigan officials are obligated with a "high,

solemn, and perpetual trust, which it is the duty of the state to forever maintain."

*Collins v. Gerhardt*, 211 N.W. 115, 118 (Mich. 1926). In keeping with this

perpetual duty, the State must revisit prior decisions that have become obstacles to

the public trust doctrine at present. This principle is embedded in the ruling in

*Illinois Central*. Initially, the city of Chicago had granted Illinois Central the

exclusive right to build infrastructure along the Lake Michigan shoreline. This

grant of authority was codified by the Illinois State legislature in 1869. *Illinois*

*Cent. R. Co.*, 146 U.S. at 447. However, the Illinois legislature repealed this law in

1873, stripping Illinois Central of its right to build along the water and land that the

Court would reserve for the state. *Id.* at 449. The Court found that this revocation

of authority was proper, as the states must have the ability to protect and preserve

24

the navigable waters of the U.S. for public use. This ruling authorizes, and in fact *requires*, states to review past decisions that violate their perpetual duties under the public trust doctrine. Because the location of infrastructure along Lake Michigan threatened Illinois' ability to perform its duties as trustee of the Great Lakes, the U.S. Supreme Court held that the state could not be forced into continued violation because a locational decision had already once been made. Likewise, Michigan officials cannot be forced into continued violations of the public trust doctrine due to the decision to place a pipeline in the Straits of Mackinac 70 years ago.

### C. The 1977 Transit Treaty also preserves state authority over pipelines and thus is not a federal issue justifying removal.

As discussed earlier and in the Attorney General's brief, the 1977 Transit Treaty is a defense and thus cannot be the basis of removal. In addition, like the PSA, the 1977 Transit Treaty expressly preserves the authority of "appropriate governmental authorities" like Michigan to issue regulations, terms, conditions, and requirements of fossil fuel pipelines like Line 5 for the purposes of environmental protection and safety. Because Attorney General Nessel's state lawsuit is to protect the Great Lakes, her action is exempted from the very Treaty that Enbridge claims is the basis for federal jurisdiction under the first and third prongs of *Grable*. In ratifying the Treaty and its state law exemption, Congress has spoken: the state is to have primacy in such matters.

Article II of the 1977 Transit Treaty prohibits any "public authority in the territory of either party" from "impeding" or "interfering" with the transmission of hydrocarbons in transit. Agreement between the Government of Canada and the Government of the United States of America Concerning Transit Pipelines, U.S.-Can., Jan. 28, 1977, 28 U.S.T. 7449. But the Treaty's provisions are limited by an express savings clause that reserves the authority of "governmental authorities" in both countries to regulate pipelines and hydrocarbons in transit, so long as the regulations are applied "equally" to all pipeline operations in the authorities' jurisdiction. *Id.* at art. IV. Specifically, Article IV of the Treaty states,

> **Notwithstanding the provisions of Article II** [regarding impeding the flow of oil in pipelines] …. Pipeline[s] shall be subject to regulations by the appropriate governmental authorities… with respect to such matters as the following: (a). pipeline safety…; (b) environmental protection…

*Id.* at art. IV(1) (emphasis added). The treaty further defines that the regulations by appropriate governmental authorities include "regulations, requirements, terms and conditions." *Id.* at art. IV(2).

Attorney General Nessel's legal action to protect the Great Lakes by requiring Enbridge to stop operating its hazardous pipeline on state-owned bottomlands is precisely the type of action that the Treaty preserves for states. Enbridge does not—and could not—deny that Michigan and Attorney General Nessel are "appropriate governmental authorities" or that the state has authority over the lakebed in the Straits. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521

26

U.S. 261, 283 (holding that "lands underlying navigable waters have historically been considered sovereign lands" and that "[s]tate ownership of them has been considered an essential attribute of sovereignty" (internal quotation omitted)). Nor does Enbridge argue that the Attorney General's requirements at issue here—implementing the public trust doctrine—are discriminatory. Michigan's public trust doctrine is a generally applicable and non-discriminatory law that is deeply rooted in U.S. Supreme Court and Michigan Supreme Court precedent.

So once again Congress has spoken to preserve state authority. The 1977 Transit Treaty cannot possibly be raised as a federal issue arising under the Attorney General's state law claim (the first prong of *Grable*) because Article IV of the Treaty itself exempts Attorney General Nessel's actions from being governed by the Treaty. And under the third *Grable* prong, holding otherwise would upset the balance of power that Congress has set under Article IV, which maintains state authority over pipelines.

## CONCLUSION

For the aforementioned reasons, amicus Great Lakes Business Network respectfully requests this Court to reverse the District Court decision and remand this case to state court.

Respectfully submitted,

*(s) Andy Buchsbaum*

27

Andy Buchsbaum
Buchsbaum & Associates LLC
1715 David Court
Ann Arbor, MI 48105
(734) 717-3665
buchsbauma@gmail.com

Bruce T. Wallace
126 South Main Street
Ann Arbor, MI 48104
(734) 662-4426
bwallace@hooperhathaway.com

Counsel, Great Lakes Business Network

## CERTIFICATE OF COMPLIANCE
Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This brief contains 6,402 words, which is within the type volume limitation of 6,500 words set forth in Federal Rule of Appellate Procedure 29(a)(5).

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Respectfully submitted,

Dated: September 22, 2023          *(s) Andy Buchsbaum*

Andy Buchsbaum
Buchsbaum & Associates LLC
1715 David Court
Ann Arbor, MI 48105
(734) 717-3665
buchsbauma@gmail.com

Bruce T. Wallace
126 South Main Street
Ann Arbor, MI 48104
(734) 662-4426
bwallace@hooperhathaway.com

Counsel, Great Lakes Business Network

29

## CERTIFICATE OF SERVICE

I certify that on September 22, 2023, the foregoing document was served on all

parties or their counsel of record through the CM/ECF system if they are registered

users or, if they are not, by placing a true and correct copy in the United States

mail, postage prepaid, to their address of record (designated below).


Respectfully submitted,

Dated: September 22, 2023         *(s) Andy Buchsbaum*

Andy Buchsbaum
Buchsbaum & Associates LLC
1715 David Court
Ann Arbor, MI 48105
(734) 717-3665
buchsbauma@gmail.com

Bruce T. Wallace
126 South Main Street
Ann Arbor, MI 48104
(734) 662-4426
bwallace@hooperhathaway.com

Counsel, Great Lakes Business Network