No. 23-1671

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

DANA NESSEL, Attorney General of the State of Michigan, on behalf of the People of the State of Michigan,

*Plaintiff-Appellant,*

v.

ENBRIDGE ENERGY, LIMITED PARTNERSHIP; ENBRIDGE ENERGY COMPANY, INC.; AND ENBRIDGE ENERGY PARTNERS, L.P.,

*Defendants-Appellees.*

On Permissive Interlocutory Appeal from the U.S. District Court
for the Western District of Michigan | No. 1:21-cv-01057-JTN-RSK

## CORRECTED BRIEF OF APPELLEES

Phillip J. DeRosier
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinsonwright.com

Peter H. Ellsworth
Jeffery V. Stuckey
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
pellsworth@dickinsonwright.com
jstuckey@dickinsonwright.com

Alice Loughran
David H. Coburn
Mark C. Savignac
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
aloughran@steptoe.com
dcoburn@steptoe.com
msavignac@steptoe.com

John J. Bursch
BURSCH LAW PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

*Counsel for Defendants-Appellees*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1671 _____     Case Name: Nessel v. Enbridge Energy _____

Name of counsel: Alice E. Loughran _____

Pursuant to 6th Cir. R. 26.1, Enbridge Energy LP, Enbridge Energy Co., Inc., Enbridge Energy
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Yes. Enbridge Energy Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P., are each indirect subsidiaries of Enbridge Inc., a publicly traded company.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> See Response above

## CERTIFICATE OF SERVICE

I certify that on       11/17/2023       the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Alice E. Loughran _____

_____

_____

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

Statement of the Issues..................................................................1

Introduction ...............................................................................1

Statement of the Case.................................................................3

     A.    Line 5's critical role serving energy markets in the United
          States and Canada.............................................................3

     B.    Michigan officials sue Enbridge in state court to shut down
          Line 5.............................................................................5

     C.    Michigan's shutdown order sparks strong reactions from the
          Government of Canada. ...................................................7

     D.    Enbridge sues Michigan officials in federal court (*Enbridge v.
          Whitmer*) and removes *Michigan v. Enbridge* to federal court...........8

     E.    Enbridge removes the Attorney General's action within 30
          days of the district court's order in *Michigan v. Enbridge*...............13

Summary of Argument ..................................................................14

Standard of Review ......................................................................17

Argument ....................................................................................18

I.    The district court properly rejected the Attorney General's
    procedural challenges to Enbridge's notice of removal. ............................18

     A.    The notice of removal was timely because it was filed within
          30 days after the district court's order in *Michigan v. Enbridge*
          provided "unambiguous information that the case is
          removable."....................................................................18

     B.    The denial of the Attorney General's remand motion was also
          proper in the narrow and extraordinary circumstances of this
          case..............................................................................24

     C.    Enbridge did not waive its right to remove. .....................................29

II.    The district court has subject-matter jurisdiction in this case, just as it did in *Michigan v. Enbridge* ..................................................................31

    A.    One or more of the Attorney General's claims requires the resolution of substantial federal issues, so federal jurisdiction exists in this case. ..........................................................32

    B.    The Attorney General's action is also removable under federal common law based on the foreign-affairs doctrine. ..........................50

Conclusion ....................................................................................................55

Certificate of Compliance with Rule 32(a)

Certificate of Service

Designation of Relevant District Court Documents

## Cases

*Al Shimari v. CACI Int'l, Inc.*,
   679 F.3d 205 (4th Cir. 2012) .......................................................................... 49

*Arkansas v. Texas Gas Transmission Corp.*,
   171 F. Supp. 413 (E.D. Ark. 1959) .............................................. 38, 39, 40, 49

*Bad River Band of Lake Superior Tribe of Chippewa Indians v. Enbridge*, No. 19-cv-602-wmc, 2022 WL 17249085 (W.D. Wis. Nov. 28, 2022), *appeal pending*, No. 23-2309 (Seventh Circuit) ................... 37

*Berera v. Mesa Med. Grp., PLLC*,
   779 F.3d 352 (6th Cir. 2015) ................................................................. *passim*

*Bonelli Cattle Co. v. Arizona*,
   414 U.S. 313 (1973) ....................................................................................... 39

*Brown v. Demco, Inc.*,
   792 F.2d 478 (5th Cir. 1986) ........................................................................ 25

*Cogdell v. Wyeth*,
   366 F.3d 1245 (11th Cir. 2004) ................................................................... 30

*Colo. River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976) ...................................................................................... 27

*Columbia Gas Transmission, LLC v. Singh*,
   707 F.3d 583 (6th Cir. 2013) ................................................................. 48, 50

*County of Marin v. Roberts*,
   84 Cal. Rptr. 425 (Cal. Ct. App. 1970) ........................................................ 36

*Douglas v. Seacoast Prods., Inc.*,
   431 U.S. 265 (1977) ........................................................................... 36, 38, 39

*Empire Healthchoice Assurance, Inc. v. McVeigh*,
   547 U.S. 677 (2006) ...................................................................................... 47

*Farm & City Ins. Co. v. Johnson*,
190 F. Supp. 2d 1232 (D. Kan. 2002) ..................................................... 25, 28

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
545 U.S. 308 (2005) ..............................................................................*passim*

*Grubb v. Donegal Mut. Ins. Co.*,
935 F.2d 57 (4th Cir. 1991) ........................................................................ 31

*Gully v. First Nat'l Bank*,
299 U.S. 109 (1936) .........................................................................31, 39, 46

*Gunn v. Minton*,
568 U.S. 251 (2013) .............................................................................. 45, 50

*Hernandez v. Six Flags Magic Mountain, Inc.*,
688 F. Supp. 560 (C.D. Cal. 1988) ......................................................... 24, 25

*Holder v. City of Atlanta*,
925 F. Supp. 783 (N.D. Ga. 1996)............................................................... 25

*Hudak v. Elmcroft of Sagamore Hills*,
58 F.4th 845 (6th Cir. 2023) ....................................................................... 35

*Int'l Union of Operating Eng'rs, Local 18 v. NLRB*,
837 F.3d 593 (6th Cir. 2016).................................................................. 25, 26

*Jackson v. United States*,
751 F.3d 712 (6th Cir. 2014)....................................................................... 17

*Loftin v. Rush*,
767 F.2d 800 (11th Cir. 1985), *abrogated on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ......................24, 25, 28

*Lucas v. Bd. of Cnty. Road Comm'rs of Wayne Cnty.*,
348 N.W.2d 660 (Mich. Ct. App. 1984) ...................................................... 26

*Merrell Dow Pharmaceuticals Inc. v. Thompson*,
478 U.S. 804 (1986) ................................................................................... 21

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
578 U.S. 374 (2016) ................................................................................... 32

*Mikulski v. Centerior Energy Corp.*,
501 F.3d 555 (6th Cir. 2007) ................................................................. 35, 46

*Miller v. Bruenger*,
949 F.3d 986 (6th Cir. 2020) ............................................................................ 32

*Mims v. Arrow Fin. Servs., LLC*,
565 U.S. 368 (2012) ......................................................................................... 32

*Olympic Pipe Line Co v. City of Seattle*,
2003 WL 27392855 (W.D. Wash. Aug. 21, 2003) .......................................... 44

*Premier Holiday Int'l, Inc. v. Actrade Capital, Inc.*,
105 F. Supp. 2d 1336 (N.D. Ga. 2000) ........................................................... 25

*Robertson v. U.S. Bank, N.A.*,
831 F.3d 757 (6th Cir. 2016) ........................................................................... 30

*Rock Hemp Corp. v. Dunn*,
51 F.4th 693 (7th Cir. 2022) ............................................................................ 30

*Rose v. Giamatti*,
721 F. Supp. 906 (S.D. Ohio 1989) ................................................................. 31

*Rothner v. City of Chicago*,
879 F.2d 1402 (7th Cir. 1989) .......................................................................... 30

*Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*,
429 U.S. 363 (1977) ......................................................................................... 39

*United States v. Montgomery*,
998 F.3d 693 (6th Cir. 2021) ........................................................................... 29

*United States v. Rands*,
389 U.S. 121 (1967) ......................................................................................... 36

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
583 F. Supp. 2d 259 (D.R.I. 2008) ............................................................. 36, 38

*White v. White*,
32 F. Supp. 2d 890 (W.D. La. 1998) ............................................................... 28

**Statutes**

28 U.S.C. § 1331 ...............................................................21, 32, 33

28 U.S.C. § 1332(a) ..................................................................21

28 U.S.C. § 1441(a) ..................................................................21

28 U.S.C. § 1446 .................................................................. 17, 24

28 U.S.C. § 1446(b) ..........................................................18, 24, 30

28 U.S.C. § 1446(b)(1) ...............................................................18

28 U.S.C. § 1446(b)(3).................................................. 18, 19, 23, 29

43 U.S.C. § 1311(b)(1) ...............................................................36

43 U.S.C. § 1314(a) .............................................................. 36, 39

49 U.S.C. § 60104(c) .................................................................43

49 U.S.C. § 60117(p) .................................................................43

Federal Submerged Lands Act...................................................*passim*

**Treaties**

Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 .......................................................................*passim*

**Federal Regulations**

49 C.F.R. § 190.236 ..................................................................43

## STATEMENT OF THE ISSUES

1. Whether Enbridge timely removed this action.

2. Whether the district court properly ruled that extraordinary circumstances warranted retaining the case in any event.

3. Whether the district court had subject-matter jurisdiction.

## INTRODUCTION

This is one of three closely-related lawsuits between Enbridge and Michigan state officials. The suits arise from efforts by state officials to shut down Enbridge's Line 5, an international pipeline that has provided energy to millions in the Midwest and Canada for 70 years. (Op., R. 23, PageID#612.) Line 5 extends over 645 miles from Wisconsin to Ontario, with a 4.5-mile segment crossing the state-owned bottomlands of the Straits of Mackinac under a 1953 easement from Michigan. A 1977 U.S.-Canada treaty safeguards Line 5's continued operation.

The Michigan Attorney General initiated this action (*Nessel v. Enbridge*) in state court in 2019. (Op., R. 23, PageID#613.) Enbridge has not filed an answer, and no discovery has taken place. Michigan later filed a second lawsuit (*Michigan v. Enbridge*) in state court, repeating the same basic facts and claims alleged in the Attorney General's complaint. Enbridge removed that case to federal court and filed its own action (*Enbridge v. Whitmer*) against state officials.

1

Michigan challenged federal jurisdiction in *Michigan v. Enbridge*. (Op., No. 1:20-cv-01142, R. 80, PageID#1021-35.) But the district court held that the State's title to the Straits bottomlands was burdened by the Federal Submerged Lands Act, which reserved federal control over those bottomlands for interstate commerce and international affairs. (*Id.*, PageID#1029-30.) Because the State's complaint required resolution of significant federal issues, the district court held that "this case is properly in federal court" pursuant to the embedded-federal-question doctrine articulated in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 321 (2005). (*Id.*, PageID#1021.)

In response, Michigan officials dismissed their *Michigan v. Enbridge* lawsuit so they could evade federal jurisdiction and press forward with the same controversy in state court through the Attorney General's action in *Nessel v. Enbridge*. (Op., R. 23, PageID#619.) As Michigan's Governor explained, "the federal court has now decided to keep the lawsuit … I believe the people of Michigan, and our state courts, should have the final say." (Press Release, No. 1:20-1141, R. 39-1, PageID#254.)

Enbridge then removed the Attorney General's action to federal court. As the district court held, Enbridge's removal was timely because it was filed within 30 days of the court's order in the closely-related *Michigan v. Enbridge* case, which first provided unambiguous information that the case was removable. (Op., R. 23, PageID#620.) The court also concluded that timeliness is a procedural requirement

that is properly excused in these extraordinary circumstances. (*Id.*, PageID##615, 618.) The federal district court is already considering the merits of the serious federal issues in summary judgment briefing in the closely-related *Enbridge v. Whitmer* case, and there is an overriding need to avoid inconsistent judgments between state and federal courts. (*Id.*, PageID##617 n.9, 618.) Because the court had § 1331 federal question jurisdiction, it denied the Attorney General's motion to remand. (*Id.*, PageID#621.) The Attorney General now appeals.

## STATEMENT OF THE CASE

### A. Line 5 plays a critical role serving energy markets in the United States and Canada.

Line 5 is part of a network of connecting pipelines that originate in Western Canada and transport petroleum products to refineries in the Midwest, Ontario, and Quebec. Line 5 runs from northwestern Wisconsin through Michigan's Upper and Lower Peninsulas and then into Canada. (Op., No. 1:20-1142, R.80, PageID#1022). It has been serving American and Canadian energy markets for 70 years. (*Id.*) This map depicts Line 5's route:



CBC NEWS

Line 5 transports approximately 540,000 barrels per day of light crude oil and natural gas liquids. (Compl. at ¶ 16, R. 1-1, PageID#27.) It supplies virtually all propane used in Ontario and most of Michigan. (Canada Amicus Br., No. 1:20-1142, R. 45, PageID##553-54.) It serves ten oil refineries in the United States and Canada. Most of the output is transportation fuels. (*Id*., PageID#554.) Line 5's natural-gas-liquids product consists primarily of propane and butane. Propane is mostly consumed by the residential (home heating) and agricultural sectors, while butane is used primarily for gasoline production. (*Id*.) Line 5 and its associated facilities provide thousands of workers in the United States and Canada with jobs and benefits. (Union Amicus Br., No. 1:20-1142, R. 48, PageID##640-45.)

Line 5 crosses the Straits of Mackinac pursuant to a 1953 easement issued by the State of Michigan, which owns the Straits bottomlands. At the Straits, Line 5 splits into two parallel pipelines—the "Straits Pipelines"—that run on the bottomlands and reunite on the far side of the Straits. (Compl. at ¶¶ 1, 10, 13, 15, R.1-1, PageID##20, 23-24.)

### B. Michigan officials sue Enbridge in state court to shut down Line 5.

The Michigan Attorney General filed this action (*Nessel v. Enbridge*) in state court in June 2019 on behalf of the People of the State of Michigan. (Compl., R. 1-1, PageID#49.) According to her complaint, a release of petroleum products at the Straits was "foreseeable" in the Straits due to the "inherent risks of pipeline operations" and potential "anchor strikes" from shipping traffic. (*Id.* at ¶ 1, PageID#23.) In her three-count complaint, the Attorney General asserted that the 1953 easement was void under Michigan's public trust doctrine; that Enbridge's operations in the Straits violate the Michigan Environmental Protection Act; and that such operations constitute a public nuisance under state law. (*Id.* at 22-70, PageID##29-48.)

The parties filed cross motions for summary disposition. (Op., R. 23, PageID#613.) The motions remained pending for over two years. As a result, Enbridge never answered the complaint in state court, and no discovery has taken place. On June 25, 2020, the state court ordered a temporary shutdown of the Straits

Pipelines after Enbridge discovered minor damage to the anchoring system. Five days later, the state court lifted the TRO with respect to the Straits Pipelines' west segment. The court authorized Enbridge to restart the east segment after complying with its federal safety regulator's requirements. In so doing, the state court did not rule on the merits of Enbridge's federal preemption arguments and has otherwise issued no substantive rulings in the case.

In November 2020, the State of Michigan and its Governor, both represented by the Attorney General, filed a second lawsuit, *Michigan v. Enbridge*, in state court. (Compl., No. 1:20-cv-01142, R. 1-1, PageID##19-107.) Simultaneously, they served a Notice of Revocation and Termination of Easement signed by the Governor of Michigan and the Director of Department of Natural Resources. (*Id.*, PageID##53-72). The Notice asserted the State was revoking and terminating the 1953 easement based on the public trust doctrine and on alleged safety violations of the easement terms. (*Id.*) According to the Notice, Enbridge was required to cease operating in the Straits within 180 days. (*Id.*, PageID#72.)

Like the *Nessel v. Enbridge* complaint, the *Michigan v. Enbridge* complaint alleged a violation of the state public-trust doctrine based on alleged safety risks from pipeline operations in the Straits. (*Id.*, PageID##26-30.) The State made clear the factual basis for the public trust theory: The State holds "title to all unpatented bottomlands of navigable waters within its boundaries, including those in the Great

Lakes at the Straits of Mackinac." (*Id.*, PageID#21.) In a second count, the State alleged that Enbridge's operations violated safety standards in the 1953 easement itself. (*Id.*, PageID#22.) The complaint sought an order directing Enbridge to cease operating the Straits Pipelines within 180 days. (*Id.*, PageID#37.)

**C.     Michigan's shutdown order sparks strong reactions from the Government of Canada.**

In response, Canada's Minister of Natural Resources declared that Line 5 "is vital to Canada's energy security," and that the pipeline's continued operation was "non-negotiable."[1] Canadian Prime Minister Trudeau raised Line 5 directly with the U.S. President and members of his cabinet.[2] As Canadian officials explained, Line 5 is protected by a 1977 treaty between the United States and Canada—the "1977 Transit Treaty"—guaranteeing the uninterrupted flow of hydrocarbons between the two countries.[3]

Canada's House of Commons created a special committee to conduct hearings on the Line 5 shutdown order and present recommendations to safeguard Canadian

---

[1] *See* Remand Opp., No. 1:20-cv-01142, R. 47, PageID#595, quoting testimony from the Honorable Seamus O'Regan, Minister of Natural Resources.

[2] *See id.*

[3] *See* Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731.

interests.[4]  The special committee's interim report explained that "central Canada's supplies of gasoline, heating fuel, and jet fuel depend on Line 5," "that Line 5 is the only pipeline that supplies propane to Southern Ontario," and that "Line 5 supplies four refineries in Ontario and two in Quebec."[5]  The committee's interim report detailed the shortages of energy products, price increases, and job losses in Canada that would result if Line 5 were shut down.[6]  The special committee recommended that the Government of Canada consider taking "legal action aimed at ensuring the continued operation of Line 5"—including filing an amicus brief in *Michigan v. Enbridge* and invoking the 1977 Transit Treaty's dispute-resolution provisions.[7]

**D.    Enbridge sues Michigan officials in federal court (*Enbridge v. Whitmer*) and removes *Michigan v. Enbridge* to federal court.**

Enbridge removed *Michigan v. Enbridge* to federal court.  (Notice of Removal, No. 1:20-cv-01142, R. 1, PageID##1-14.)  It also filed its own action in federal court to enjoin the state officials from violating federal law by forcing a shutdown.  (Compl., No. 1:20-cv-01141, R. 1, PageID##1-20.)  Enbridge's

---

[4] *See* Remand Op., No. 1:20-cv-01142, R. 47, PageID#595, citing and quoting *Enbridge's Line 5: An Interim Report, Report of the Special Committee on the Economic Relationship between Canada and the United States* (Apr. 15, 2021), https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/report-1/.

[5] *See* Interim Report at 5-6, cited and quoted in Remand Op., No. 1:20-cv-01142, R. 47, PageID#595.

[6] *See id.*, Interim Report at 5-10.

[7] *See id.*, Interim Report at 11.

complaint alleged that the state actors were engaged in ongoing violations of federal law, including the U.S. Supremacy Clause, the Foreign Affairs Doctrine, and the Interstate Commerce Clause. (*Id.*, R. 1, PageID##10-18.)

In removing *Michigan v. Enbridge* from state court to federal court, Enbridge argued that the district court had federal-question jurisdiction under the *Grable* doctrine, under federal common law based on foreign affairs, and under the federal officer removal statute. (Notice of Removal, No. 1:20-cv-01142, R. 1, PageID##5-13; Amended Notice of Removal, No. 1:20-cv-01142, R. 12, PageID##238-40.) The State moved to remand for lack of subject matter jurisdiction. (Mot. to Remand, No. 1:20-cv-01142, R. 41, PageID##465-467; Remand Br., No. 1:20-cv-01142, R. 42, PageID##468-509.)

Shortly thereafter, the state court entered an order staying the proceedings in the Attorney General's action. (Order, Case No. 19-474-CE, Jan. 20, 2021, cited in R. 11-1, PageID#306, Item 8.) According to the court's order, both parties agreed that the Attorney General's state-court action should be held in abeyance because the parties "have asked the federal court to address [issues that] may potentially impact this Court's proceedings …." (*Id.*) The state court action remained in abeyance for over a year while the parties briefed the federal court and participated in the federal mediation program. (Notice of Appointment of Mediator, No. 1:20-cv-01141, R. 20; Order, No. 1-20-cv-01141, R. 37.)

In *Michigan v. Enbridge*, the Government of Canada filed an amicus brief in opposition to the State's remand motion. (Canada Amicus Br., No. 1:20-cv-01142, R. 45, PageID##545-64.) Canada advised the federal court that "Line 5 is vital to Canada's energy security and economic prosperity" and that "the shutdown ordered by Michigan would have immediate and severe impacts in Canada." (*Id.*, PageID##550-51, 553.) "Line 5 supplies approximately 66% of Quebec's crude oil needs and about 50% of the feedstock used by Ontario's refineries to make gasoline and other fuels." (*Id.*, PageID#554.) "In western Canada, the loss of Line 5 would have a devastating impact on the industry and economy." (*Id.*) According to the amicus brief, "businesses, employees, consumers, and potentially the environment, would suffer" if Line 5 were shut down. (*Id.*, PageID##563-564.)

The Government of Canada further advised the district court that Michigan's shutdown order violates the 1977 Transit Treaty. (*Id.*, PageID#555.) "As one of the two Parties to the 1977 Treaty, Canada is uniquely placed to address its significance to this litigation." (*Id.*, PageID#556.) Article II of the Transit Treaty expressly prohibits public authorities from instituting "any measures" that interfere with the operations of international hydrocarbon transit pipelines such as Line 5. (*Id.*, PageID#558.) And Michigan's shutdown order undeniably interfered with Line 5's operations. "These weighty issues of international law and foreign policy should be resolved at the national governments/Treaty level, not preemptively" by Michigan.

(*Id.*, PageID#561.)  "Michigan's apparent position that it can invoke the 'public trust' doctrine to act unilaterally with respect to an international pipeline … threatens to undermine important aspects of that cooperative international relationship." (*Id*., PageID#553.)

In a supplemental amicus brief, the Government of Canada advised the federal court that it had formally invoked the 1977 Transit Treaty's dispute resolution provision—Article IX.  (Canada Supp. Amicus Br., No. 1:20-cv-01142, R. 82, PageID#1048.)  According to the Government of Canada, a "judicial shutdown order while the Article IX dispute resolution process is ongoing would undermine that process …." (*Id.*, PageID#1049.)

On November 16, 2021, the district court denied remand in *Michigan v. Enbridge*.  (Op., No. 1:20-cv-01142, R. 80, PageID##1021-35.)  The court determined that it had § 1331 jurisdiction under the embedded federal question doctrine of *Grable*, 545 U.S. 308.  (*Id*., PageID##1028-35.)  While *Grable* only encompasses a "slim category" of removal cases, the court found that this case fell within that category. (*Id.*, PageID##1028, 1035.)  The State asserts in the Complaint that it has a sovereign right to control the Straits bottomlands, but the federal government has burdened that right by reserving its paramount constitutional powers over the bottomlands for interstate commerce and international affairs.  (*Id*., PageID##1029-30.)  Those federal questions were substantial because the State's

causes of action "threaten to upset long-standing federal-state relations, second-guess policy decisions made by Congress and the Executive Branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution." (*Id.*, PageID#1032 (cleaned up).) And the exercise of jurisdiction in this case would not disturb the balance of state and judicial responsibilities because so few cases involve a pipeline easement dispute on state bottomlands. (*Id.*, PageID#1034.) The federal court concluded that it is an "appropriate forum for deciding these disputed and substantial federal issues." (*Id.*, PageID#1035.)[8]

In response, Michigan officials "shifted" their "legal strategy" "to give Michigan state courts the final say in" the Straits Pipelines controversy, notwithstanding the federal court's contrary order. (Press Release, No. 1:20-cv-01141, R. 39-1, PageID#254.) On November 30, 2021, the Governor of Michigan issued a press release expressing her "disagree[ment]" with the federal court's decision. (*Id.*) The same day, she voluntarily dismissed the State's action to "clear[] the way for the lawsuit filed by Attorney General Dana Nessel to go forward in Michigan state court." (*Id.*) The Attorney General, in turn, asked the state court to lift the stay that had been in place for over a year so that her action could proceed.

---

[8] Having found jurisdiction under *Grable*, the district court did not address Enbridge's other asserted bases for jurisdiction.

**E.** **Enbridge removes the Attorney General's action within 30 days of the district court's order in *Michigan v. Enbridge*.**

After receiving the district court's order in *Michigan v. Enbridge*, Enbridge removed the Attorney General's case to federal court. (Notice of Removal, R. 1, PageID##1-17.) This case was assigned to the same judge who is presiding over *Enbridge v. Whitmer*. The Attorney General moved to remand back to state court, arguing that the removal was untimely. (Mot. to Remand, R. 10, PageID##267-268; Remand Br., R. 11, PageID##269-303.) Enbridge explained that the removal was timely under Sixth Circuit precedent because the order denying remand in *Michigan v. Enbridge* provided for the first time "solid and unambiguous information" that the case was removable, *see Berera v. Mesa Medical Group, PLLC*, 779 F.3d 352, 364 (6th Cir. 2015), and Enbridge removed within 30 days of that decision.

Simultaneously, the parties pressed forward in the federal court with dispositive motions in *Enbridge v. Whitmer*. Again, the Government of Canada filed an amicus brief in partial support of Enbridge. (Canada Amicus Br., No. 1:20-cv-01141, R. 70.) The briefing on both motions was completed in April 2022 and remains pending.

On August 18, 2022, the district court denied the Attorney General's motion to remand. (Op., R. 23, PageID#611.) As the district court explained, "[t]his remand motion cannot be taken in isolation, or apart from the Court's first remand decision, as Plaintiff admits." (*Id.*, PageID#616.) The removal here was "timely and proper"

because the order denying remand in the related State action "established for the first time that [federal district court] is an appropriate forum for deciding the substantial federal issues at stake in the Straits Pipelines controversy … The remand order in *Michigan v. Enbridge* did present a watershed event for removal purposes in th[is] closely parallel case." (*Id.*, PageID#620.) The district court also recognized that timeliness is a procedural requirement that was properly excused in these exceptional circumstances. (*Id.*, PageID#618.) The Attorney General "does not want this case in federal court" and, "in seeking to reopen the state court case, [she] desires a race to judgment and a collision course between the state and federal forum, even as much has this Court held that federal jurisdiction is proper in this Court …." (*Id.*, PageID##617 & n.9, 619.) "The Court will not accept the State's invitation to undermine its previous decision and perpetuate a forum battle." (*Id.*, PageID#619.) Finally, the district court held, as it had in *Michigan v. Enbridge*, that there is federal jurisdiction under *Grable*. (*Id.*, PageID##613, 623.)

## SUMMARY OF ARGUMENT

**1**. Enbridge timely removed this case to federal court. A notice of removal generally "shall be filed within 30 days after the receipt by the defendant … of a copy of the initial pleading." 28 U.S.C. § 1446(b)(1). But "if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after the receipt by the defendant … of a copy of an order … from which it may first

be ascertained that the case is one which is or has become removable." *Id.* § 1446(b)(3). In its leading precedent construing the removal time limits, this Court held that "[t]he 30-day period in § 1446(b)(1) starts to run only if the initial pleading contains solid and unambiguous information that the case is removable." *Berera v. Mesa Medical Group, PLLC*, 779 F.3d 352, 364 (6th Cir. 2015) (cleaned up). Otherwise, § 1446(b)(3) applies and the notice is due "'within 30 days after receipt … of a copy of an … order or other paper' that contains solid and unambiguous information that the case is removable." *Id.* (quoting § 1446(b)(3)).

The Attorney General's complaint did not provide Enbridge with "solid and unambiguous information that the case [wa]s removable." A case is only removable if there is federal jurisdiction over the case, and the presence of federal jurisdiction here was not unambiguous. There is no diversity jurisdiction, and the typical basis for federal-question jurisdiction was absent because the complaint purports to advance only state-law claims. Enbridge did have *colorable* arguments for federal jurisdiction, based on the *Grable* doctrine, federal common law, and the federal-officer removal statute. But none of these grounds was free from ambiguity. That changed only when the district court issued its order upholding the removal in the parallel *Michigan v. Enbridge* case under the *Grable* doctrine. Only when that order was issued did removability in this case become unambiguous. And Enbridge timely removed within 30 days thereafter.

**2.** Moreover, the district court properly exercised its equitable discretion to retain the case given the extraordinary circumstances presented here. It is undisputed that removal time limits are non-jurisdictional. And courts have long held that although untimely removal will almost always result in a remand, a court has power to review a case removed after the deadline in extraordinary circumstances. Considering the extraordinary circumstances here—including the compelling federal interests at stake, the risk of waste and inconsistent judgments from parallel state and federal litigation, and the State's gamesmanship in seeking to evade federal-court jurisdiction—the district court acted well within its discretion in denying remand.

**3.** As the district court rightly held both here and in *Michigan v. Enbridge* (the case the State chose to dismiss rather than appeal the jurisdictional ruling), there is federal jurisdiction under the *Grable* doctrine. *Grable*'s narrow exception to the well-pleaded complaint rule supports federal jurisdiction where a plaintiff's claim is couched in terms of state law but cannot succeed unless the court decides a substantial question of federal law in favor of the plaintiff. In *Grable*, the state-law quiet-title action required the plaintiff to prove the invalidity of an IRS tax sale, a matter of federal law. Similarly, the claims here are premised on the State's asserted ownership of the Straits bottomlands, but that ownership is burdened by the Federal Submerged Lands Act. The Attorney General must therefore establish that the

federal-law burdens created by the Pipeline Safety Act and the Transit Pipelines Treaty with Canada do not foreclose her claims.

There is also federal jurisdiction under federal common law. As the Second and Fifth Circuits have held, a case with significant implications for the foreign relations of the United States implicates the uniquely federal interest in foreign affairs and thus creates federal-question jurisdiction as a matter of federal common law. This case is a paradigm of such jurisdiction, where the Attorney General's claims would put the United States in breach of its Transit Pipelines Treaty with Canada and cause substantial economic harm in both nations. Indeed, the Government of Canada has invoked the Treaty's formal dispute-resolution process with the United States. A state court cannot impede that process, for foreign affairs is the exclusive province of the Federal Government.

## STANDARD OF REVIEW

Timeliness of removal under 28 U.S.C. § 1446 is reviewed *de novo*. *Berera v. Mesa Med. Grp., PLLC*, 779 F.3d 352, 357 (6th Cir. 2015). The district court's determination that this case fits within the equitable exception to timely removal is reviewed for an abuse of discretion. *Jackson v. United States*, 751 F.3d 712, 718 (6th Cir. 2014).

## I. The district court properly rejected the Attorney General's procedural challenges to Enbridge's notice of removal.

### A. The notice of removal was timely because it was filed within 30 days after the district court's order in *Michigan v. Enbridge* provided "unambiguous information that the case is removable."

The Attorney General's main argument is that Enbridge's notice of removal was untimely. The time to remove to federal court is governed by 28 U.S.C. § 1446(b). Section 1446(b)(1) says that a notice of removal "shall be filed within 30 days after the receipt by the defendant … of a copy of the initial pleading." 28 U.S.C. § 1446(b)(1). Here, the Attorney General's complaint was served on July 12, 2019, and the notice of removal was filed on December 15, 2021. But § 1446(b)(3) adds that "if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after the receipt by the defendant … of a copy of an … order … from which it may first be ascertained that the case is one which is or has become removable." Enbridge's removal was timely under § 1446(b)(3).

That conclusion follows directly from *Berera v. Mesa Medical Group, PLLC*, 779 F.3d 352 (6th Cir. 2015). Interpreting § 1446(b)'s time limits, this Court held there that "[t]he 30-day period in § 1446(b)(1) starts to run only if the initial pleading contains *solid and unambiguous* information that the case *is removable*." *Id.* at 364 (cleaned up; emphases added). Otherwise, § 1446(b)(3) governs timeliness and

opens a 30-day removal window when the defendant later receives information showing that the case is unambiguously removable: "If the initial pleading lacks solid and unambiguous information that the case is removable, the defendant must file the notice of removal 'within 30 days after receipt … of a copy of an amended pleading, motion, order or other paper' that contains solid and unambiguous information that the case is removable." *Id.* (quoting § 1446(b)(3)). This Court's interpretation is consistent with the statutory text—specifically, § 1446(b)(3)'s key term "ascertained"—because to "ascertain" a fact is to learn or confirm that fact *for certain*, i.e., without uncertainty or ambiguity.

Here, Enbridge did not have unambiguous information that this action— framed in terms of state-law claims—was removable until it received the district court's order upholding the removal in the parallel case of *Michigan v. Enbridge*. It is undisputed that Enbridge then filed its notice of removal within 30 days of that order. The removal was therefore timely under §1446(b)(3) and *Berera*.

The Attorney General has never seriously grappled with *Berera*, and she does not even cite it in her opening brief. The core of her argument is that Enbridge was aware even before the district court's order in *Michigan v. Enbridge* that colorable grounds existed for removing this action. *See* Opening Br. 47. But under this Court's controlling decision in *Berera*, colorable grounds are irrelevant. *Berera*

requires "*unambiguous* information that the case *is* removable." 779 F.3d at 364 (emphases added). Enbridge lacked such information.

The Attorney General points out that Enbridge removed the *Michigan v. Enbridge* case. *See* Opening Br. 48. But that does not show that this case (or that one) was *unambiguously* removable before the district court upheld the removal in *Michigan v. Enbridge*. Enbridge's removal in *Michigan v. Enbridge* simply shows that Enbridge believed that it had a reasonable basis for removal. And that is not the *Becera* standard for starting the 30-day clock.

Until the district court's decision on the removal in *Michigan v. Enbridge*, removability in that case was ambiguous and, indeed, hotly disputed. The Attorney General does not seriously contend otherwise. Nor could she, for the State—represented by the Attorney General—argued vociferously that *Michigan v. Enbridge* was *not* removable at all. (*E.g.*, Remand Br., No. 1:20-cv-01142, R. 42, PageID##486-506.) Indeed, even after the district court's ruling on remand in that case, the Attorney General stated that she "did *and still does* vigorously dispute these legal arguments" in favor of removal. (Conf. Request, R. 7 at 3 n.2, PageID#139 n.2, emphasis added). That is a concession that this action was *not* unambiguously removable prior to the district court's ruling in *Michigan v. Enbridge*. After all, the Attorney General can hardly argue this suit *was* unambiguously removable when filed while simultaneously arguing it is *not* removable *even now*. Yet she does just

that. *Compare* Remand Br., R. 11 at 9, PageID#287 (asserting that "the case was removable when filed"), *with* Opening Br. 53-75 (urging that this case is *not* removable because there is no federal jurisdiction).

Federal jurisdiction is a prerequisite to removal in any case. *See* 28 U.S.C. § 1441(a). Enbridge maintains—and the district court correctly held—that there is federal jurisdiction here under *Grable*. Nonetheless, removability was ambiguous prior to the district court's ruling in *Michigan v. Enbridge* because no rule or precedent unambiguously dictated that the suit *was* removable, whether under *Grable* or otherwise. Because federal jurisdiction was not unambiguous before the ruling in *Michigan v. Enbridge*, removability could not be unambiguous, either. This case is just like *Berera* itself, where the ambiguity over removability likewise arose from ambiguity over the existence of federal jurisdiction. 779 F.3d at 357-66. The parties' ongoing dispute over jurisdiction is merely a symptom of the reality that the issue was not free from doubt until the district court's ruling resolved the ambiguity.

In the vast majority of cases, removability is clear from the face of the complaint—generally because the plaintiff expressly advances a claim created by federal law or because the parties are diverse and the amount in controversy exceeds the statutory threshold. *See* 28 U.S.C. §§ 1331, 1332(a); *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808 (1986) ("the vast majority of cases brought under [28 U.S.C. § 1331] are those in which federal law creates the

cause of action"). In that majority of cases, the 30-day timer begins to run when the defendant receives the complaint. This is the rare case in which removability is unclear at the outset. The complaint purports to assert claims under state law only, and the parties are not diverse, so the clearest bases for federal jurisdiction are absent. The district court rightly upheld removal under *Grable*, but *Grable* is a *narrow* exception to the well-pleaded complaint rule that governs most cases. And, as Justice Thomas remarked, "[w]hatever the virtues of the [*Grable*] standard, it is anything but clear." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 321 (2005) (Thomas, J., concurring).

In ruling in Enbridge's favor on the *Grable* doctrine, the district court emphasized that the federal government has "[1] burdened the State's ownership interest in the bottomlands [2] by way of a 1977 Transit Treaty with Canada." (Opinion and Order, No. 1:20-cv-01142, R. 80, PageID#1030.) Those critical components of the *Grable* analysis were not unambiguous at the time the Attorney General filed her Complaint. It was not until the State filed its complaint in November 2020 and ordered the Straits Pipelines to be shut down by May 2021 that the Government of Canada expressed serious concerns about upsetting foreign relations. *See supra* notes 1-7 and accompanying text. As Canada's Minister of Natural Resources observed, Canadian officials engaged in a "full court press at the

political and diplomatic levels" after Michigan issued a mandatory shutdown date.[9] And the Government of Canada did not formally invoke the 1977 Transit Treaty until October 2021—by which time the state court had already entered an order holding the Attorney General's state court action in abeyance pending the federal proceedings.

For these reasons, it is unsurprising that removability here was unclear—that is, ambiguous—until the district court's order in *Michigan v. Enbridge* resolved the ambiguity. And Plaintiff does not point to a single case conflicting with the district court's determination that its remand denial in *Michigan v. Enbridge* was "a watershed event for removal purposes" (Op., R. 23, PageID#620) that opened a 30-day window for Enbridge to remove under § 1446(b)(3) and *Berera*.

Finally, the Attorney General asserts that "[i]f the case was removable on December 15, 2021, it was removable when Enbridge received the complaint on July 12, 2019." Opening Br. 53. The Attorney General ignores the controlling legal standard. Enbridge does not suggest that this case was *not* removable before the district court's removal ruling in *Michigan v. Enbridge*. Rather, that ruling was the "order … from which it [could] first *be ascertained* that the case *is* one which is … removable." 28 U.S.C. § 1446(b)(3) (emphases added). Under § 1446(b)(3) and

---

[9] Interim Report, cited and quoted in Remand Op., No. 1:20-cv-01142, R. 47, PageID#595.

*Berera*, which open the removal window upon receipt of "*unambiguous* information that the case is removable," that is dispositive. 779 F.3d at 364 (emphasis added).

**B.      The denial of the Attorney General's remand motion was also proper in the narrow and extraordinary circumstances of this case.**

The district court also properly denied the Attorney General's remand motion based on the narrow and extraordinary circumstances of this case. (R. 23, PageID##618-20, 623.) As the district court recognized, the 30-day time limit for removal under § 1446 is not jurisdictional. (R. 23, PageID#618.) "[R]emand is only *mandatory* where a case is removed improvidently and the court is without jurisdiction." *Hernandez v. Six Flags Magic Mountain, Inc.*, 688 F. Supp. 560, 562 (C.D. Cal. 1988). As the Eleventh Circuit has held, remand is not mandatory "in all cases where a removal petition is untimely." *Loftin v. Rush*, 767 F.2d 800, 805 (11th Cir. 1985), *abrogated on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). "The timeliness of a removal petition is not jurisdictional and [courts] therefore have the power to review even an untimely petition." *Id*.

In *Loftin*, the Eleventh Circuit refused to remand on mere "technical" grounds a case that had been removed "far beyond the 30-day time limit established by 28 U.S.C. § 1446(b)." *Loftin*, 767 F.2d at 805. The court recognized that the plaintiff had not "waive[d] the timeliness issues but, rather, has advanced it promptly." *Id.* While the failure to waive requires a remand to the district court "in most instances," the appellate court found exceptional circumstances warranting retaining the case.

*Id*. "We are unwilling to allow a modal defect [in the removal] to pretermit our substantive inquiry." *Id*. There were important, overriding federal issues: The state court had entered a garnishment judgment against the United States greater than allowed by statute. *See id*. at 804.

The Fifth Circuit follows the same approach. *E.g.*, *Brown v. Demco, Inc.*, 792 F.2d 478, 482 (5th Cir. 1986) ("We establish no inexorable time limit. Exceptional circumstances might permit removal even when a later-joined defendant petitions more than precisely thirty days after the first defendant is served."). "[A]lthough allowing an untimely petition is clearly the exception and not the rule, where the court has jurisdiction, it has the power to consider such a petition." *Hernandez*, 688 F. Supp. at 562; *Farm & City Ins. Co. v. Johnson*, 190 F. Supp. 2d 1232, 1236 (D. Kan. 2002) ("the court has the power to retain a case untimely removed"); *Premier Holiday Int'l, Inc. v. Actrade Capital, Inc.*, 105 F. Supp. 2d 1336 (N.D. Ga. 2000) (court has the discretion to deny remand even where the removal was untimely); *Holder v. City of Atlanta*, 925 F. Supp. 783 (N.D. Ga. 1996) (untimely removal notice does not require remand without any possibility for retention by the federal court).

As this Court has recognized, many filing deadlines are not jurisdictional. *E.g.*, *Int'l Union of Operating Eng'rs, Local 18 v. NLRB*, 837 F.3d 593, 596 (6th Cir. 2016) (30-day deadline for intervening is not jurisdictional). While "courts

generally enforce these deadlines as well, they retain authority to waive them or, for that matter, to permit the parties to waive them." *Id.* The Attorney General quibbles with the authorities that the district court cited in ruling that "overriding federal interests or compelling equitable circumstances" may justify relaxation of the admittedly non-jurisdictional requirements for removal—yet she never points to *any* authority holding that a case must be remanded in the face of such overriding circumstances.

Here, the district court relied on several factors for retaining the case. First, the court emphasized the importance of maintaining a "uniform and consistent administration of this controversy." (Op., R. 23, PageID#618.) Were the district court to remand this action, the closely related *Enbridge v. Whitmer* action would remain in the federal district court. The two cases are nearly identical, involving overlapping questions of law and fact, and the same parties or privies.[10] "A hearing has been held in *Enbridge v. Whitmer*, orders entered, and the parties' dispositive motions are pending before the Court." (*Id.*, PageID#617.) Remanding the case would result in a waste of judicial resources and potentially lead to inconsistent

---

[10] The Attorney General's office represents the Defendants in *Enbridge v. Whitmer*. While it is true that, under Michigan law, the Attorney General is an independently elected executive officer, Mich. Const. art. V, §§ 3, 21, she remains "constitutionally subservient to the Governor." *Lucas v. Bd. of Cnty. Road Comm'rs of Wayne Cnty.*, 348 N.W.2d 660, 663 (Mich. Ct. App. 1984).

judgments in the same Straits Pipelines controversy. (*See id.*, PageID#623) (relying on the interest in "avoiding duplicative labor and inconsistent results").

Second, the court observed that there are "important federal interests at stake in having this dispute heard in federal court." (*Id.*) In fact, the district court had already ruled in *Michigan v. Enbridge* that there were "disputed and substantial federal issues at stake" and that "federal jurisdiction is proper in this Court." (*Id.*, PageID#619.) "Nothing has changed since the first order denying remand; as in the earlier case, a federal forum is a proper place to decide this controversy." (*Id.*). The federal court has a "virtually unflagging obligation … to exercise the jurisdiction given" to it. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976).

Finally, the district court found that the Attorney General had engaged in forum manipulation, setting up a regrettable "race to judgment and a collision course between the state and federal forum …." (Op., R. 23, PageID#619.) Significantly, before the federal court's order in *Michigan v. Enbridge*, the Attorney General agreed that her action in state court should be held in abeyance pending a ruling from the federal court on the overlapping issues. Yet, once the federal district court determined that the controversy should be heard in the federal forum, the state actors voluntarily dismissed the State action to evade federal court and "press[] forward expeditiously" with the Attorney General's action in state court. (Press Release, No.

1:20-cv-01141, R. 39-1, PageID#254.) The district court rightly rejected this gambit: "This Court will not accept the State's invitation to undermine its previous decision and perpetuate a forum battle." (*Id.*).

Each of these grounds provides an independent basis for retaining the removed case despite any claimed procedural defects in the removal. *E.g.*, *Loftin*, 767 F.2d at 805; *Farm & City Ins. Co.*, 190 F. Supp. 2d at 1237 (refusing to remand based on an untimely removal because "judicial economy" and the case raised "substantial questions of federal law which are best addressed by a federal court"); *White v. White*, 32 F. Supp. 2d 890, 893-94 (W.D. La. 1998) (holding that "forum manipulation" constituted exceptional circumstances that warranted excusing an untimely removal petition). Combined, they provide substantial basis for this matter to remain in federal court.

Significantly, the Attorney General challenges only the district court's authority to consider equitable factors in deciding whether to retain the removed case. She makes no argument that the district court *abused its discretion* in finding that equity warrants retention of the case in these narrow and exceptional circumstances. The Court should decline to create a split with the Eleventh and Fifth Circuits, and it should reject the Attorney General's challenge to the district court's timeliness ruling.

**C.    Enbridge did not waive its right to remove.**

The Attorney General briefly argues that Enbridge "constructively waive[d]" its right to remove by participating in the state-court action.  Opening Br. 41.  But "waiver is the '*intentional* relinquishment or abandonment of a *known* right.'" *United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)) (emphases added).  The Attorney General acknowledges that constructive waiver of the right to remove "must be 'clear and unequivocal.'"  Opening Br. 42 (quoting *Regis Associates v. Rank Hotels (Mgmt.) Ltd.*, 894 F.2d 193, 195 (6th Cir. 1990)).  There was no clear and unequivocal waiver of a known right here.

To the contrary, as discussed above, the district court's order upholding removal in *Michigan v. Enbridge* rendered this action unambiguously removable and opened a 30-day window in which Enbridge had the right to remove under § 1446(b)(3).  Enbridge promptly removed within 30 days of that order.  Nor does the Attorney General suggest that Enbridge took any action in state court to waive its right to removal during those 30 days.  Rather, her argument is that Enbridge had already waived its right to remove by participating in the state-court action *before* the district court issued its order opening the § 1446(b)(3) removal window.  But Enbridge cannot have made a "clear and unequivocal" or "intentional" waiver of a "known right" to remove under § 1446(b)(3) before the district court issued the order

that gave Enbridge the right to remove. "The intent of § 1446(b) is to make sure that a defendant has an opportunity … to remove upon being given notice in the course of the case that the right exists." *Berera*, 779 F.3d at 364 (citation omitted). The Attorney General's argument would deprive Enbridge of that right and render *Berera* a dead letter.

Whereas Enbridge premised its removal on this Court's ruling in *Berera*, the Attorney General largely ignores *Berera* and bases her argument on a string of out-of-Circuit district court rulings. *See* Opening Br. 42-43. But this court and other courts of appeal recognize that merely participating in a state-court action—including by filing a dispositive motion or opposing a TRO—does *not* amount to a clear and unequivocal waiver of the right to remove. *E.g., Robertson v. U.S. Bank, N.A.*, 831 F.3d 757, 761 (6th Cir. 2016) ("Because a motion for a temporary injunction is necessarily resolved before a court reaches the merits of a case, [defendant] did not show any intent to litigate on the merits [in state court] by opposing the [plaintiffs'] motion."); *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 701 (7th Cir. 2022) ("Appellees' decision to file motions to dismiss and begin discovery does not evince a clear and unequivocal intent to remain in state court …."); *Cogdell v. Wyeth*, 366 F.3d 1245, 1249 (11th Cir. 2004) ("the removing defendant did not waive its right of removal by filing a motion to dismiss the plaintiff's complaint while the case was still pending in state court"); *Rothner v. City of Chicago*, 879

F.2d 1402, 1404, 1418 (7th Cir. 1989) (no waiver even though the defendant opposed a TRO in state court and filed an interlocutory appeal from the order); *Rose v. Giamatti*, 721 F. Supp. 906, 922-23 (S.D. Ohio 1989).

Enbridge filed a motion for summary disposition under Michigan civil procedural rules—the equivalent of a federal motion for judgment on the pleadings—but the state court never acted on that motion. *See Grubb v. Donegal Mut. Ins. Co.*, 935 F.2d 57 (4th Cir. 1991) (defendant did not waive its right to remove by allowing a summary judgment hearing to proceed before removing the action to federal court). Enbridge has not filed an answer in state court, and there has been no discovery or trial on the merits.

Because Enbridge took no action to evince a clear and unequivocal waiver of a known right to remove, the Attorney General's waiver argument must be rejected.

## II. The district court has subject-matter jurisdiction in this case, just as it did in *Michigan v. Enbridge*.

In addition to challenging the district court's holding on the timeliness of removal, the Attorney General continues to dispute whether there is subject-matter jurisdiction in this case. Her central argument is that there is no substantial federal question at issue "because the only federal issues Enbridge has identified are its preemption defenses." Opening Br. 54.

But there are two independent bases for exercising federal-question jurisdiction in this case. *First*, there is *Grable* jurisdiction because the Attorney

General's nominal state claims necessarily turn on a substantial and disputed issue of federal law: the scope of federal authority over the Straits bottomlands. *Second*, removal is proper under federal common law because of the unique and significant foreign policy issues implicated by this litigation. Accordingly, this case properly belongs in federal court.

### A. One or more of the Attorney General's claims requires the resolution of substantial federal issues, so federal jurisdiction exists in this case.

Federal courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This statutory "arising under" requirement is satisfied in either of two categories of cases. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 383 (2016); *Miller v. Bruenger*, 949 F.3d 986, 991 (6th Cir. 2020). The first, and most common, category is where federal law creates the cause of action. *Merrill Lynch*, 578 U.S. at 383. However, "[e]ven when a right of action is created by state law, if the claim requires resolution of significant issues of federal law, the case may arise under federal law for 28 U.S.C. § 1331 purposes." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 379 n.9 (2012). This case falls within the bounds of this second category of cases.

The seminal case describing this second category of "arising under" cases is *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). Like the Attorney General here, Grable filed a state law action

in state court asserting title to property. *Id.* at 311. Darue, like Enbridge, removed the case to federal court, arguing that Grable's claim of title required interpretation of a federal statute. *Id.* Grable's claim turned on whether the IRS properly notified Grable of its seizure of Grable's property under federal tax law. *Id.*

The district court concluded that the claim "pose[d] a significant question of federal law," and this Court and a unanimous Supreme Court affirmed. *Id.* at 311-12. The Supreme Court recognized that, while federal question jurisdiction is most frequently invoked in cases involving federal causes of action, "[t]here is, however, another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction" for "state-law claims that implicate significant federal issues." *Id.* at 312. This doctrine reflects "the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* Federal jurisdiction in such cases requires "not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Id.* at 313. Further, federal jurisdiction must be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Id.* at 313-14. So, "the question is, does a state-law claim necessarily raise a stated federal

issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314.

Applying this test, the Supreme Court concluded that Grable's quiet-title action raised a substantial federal issue giving rise to federal jurisdiction. *Id.* Namely, Grable's assertion of superior title was premised on its claim that the IRS failed to give it adequate notice, as defined by federal tax law. *Id.* This federal issue was "an essential element" of Grable's quiet title claim, and the meaning of the federal tax law was "actually in dispute." *Id.* at 315. The meaning of the federal tax provision was also an "important issue of federal law that sensibly belongs in federal court" because the federal government "has a strong interest" in being able to satisfy delinquencies by conveying good title to purchasers, who "may find it valuable to come before judges used to federal tax matters." *Id.* And finally, "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id.*

This Circuit applies a four-prong test derived from *Grable* in determining whether a claim presents a substantial federal question. Under this test, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court

without disrupting the federal-state balance approved by Congress." *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 857 (6th Cir. 2023) (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)). Each of these requirements is met.

### 1. The Attorney General's claims "necessarily raise" federal questions.

The first prong of the substantial-federal-question test requires that a federal question be a "necessary element" of one of the plaintiff's state-law claims. *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 565 (6th Cir. 2007). A state-law claim may necessarily raise a question of federal law "if the vindication of a right under state law depends on the validity, construction, or effect of federal law." *Id.* In this case, as in *Grable*, the Attorney General asserts title to property through state-law causes of action. However, as in *Grable*, the scope of the State of Michigan's property rights necessarily turns on the interpretation of federal laws that burden those rights. Thus, the Attorney General's claims cannot be resolved without interpretation of federal law.

The Attorney General's claims hinge on her assertion that the State owns the bottomlands at the Straits of Mackinac. (Compl., R. 1-1, PageID#23 (asserting that Line 5 lies "in open water on *State-owned bottomlands at the Straits of Mackinac*")). Acting on behalf of Michigan's citizens, she claims the right to terminate the 1953 Easement and force a shutdown of Line 5. *Id.*

But the scope of the State's ownership rights in the bottomlands—and thus, its authority to terminate the easement and force a shutdown—is subject to the Federal Submerged Lands Act.  Under that Act, the federal government "releases and relinquishes [title to bottomlands] unto said States … *except as otherwise reserved herein.*" 43 U.S.C. § 1311(b)(1) (emphasis added).  The Act then expressly burdens the scope of the States' property rights by retaining for the United States all "rights in and powers of regulation and control of [bottomlands] for the constitutional purposes of commerce … and international affairs, *all of which shall be paramount to … proprietary rights of ownership ... vested in and assigned to the respective States.*"  43 U.S.C. § 1314(a) (emphasis added); *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 283-84 (1977).  As a result, the State's "property was burdened from the beginning by this reservation of rights." *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 583 F. Supp. 2d 259, 283 (D.R.I. 2008); *see also United States v. Rands*, 389 U.S. 121, 122-23 (1967); *County of Marin v. Roberts*, 84 Cal. Rptr. 425, 486 (Cal. Ct. App. 1970).  This burden on the State's title governs the scope of the State's ownership interest in the Straits bottomlands.

Here, the federal government exercised its "paramount" authority—and thus burdened the State's title to the bottomlands—in two ways.  The first is by way of a 1977 Transit Treaty with Canada, which expressly governs not only the "pipeline [and] any part thereof" but also "all … real [] property … connected therewith."

Agreement between the Government of the United States and the Government of Canada concerning Transit Pipelines, art. I(a), Jan. 28, 1977, 28 U.S.T. 7449. The Treaty declares: "No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." *Id.*, art. II(1). The exception for measures provided for in Article V is inapplicable here, as that article only addresses "*temporary* reduction[s] of the flow of hydrocarbons," *id.* art. V(2) (emphasis added), whereas, in this case, the Attorney General seeks to force Enbridge to "cease operation of the Straits Pipelines" and "permanently decommission" them. (Compl., R. 1-1, PageID#24.)[11] The Attorney General's assertion of the State's ownership interest and right to terminate the Easement conflicts directly with the burden the Treaty imposes on the State's title.

---

[11] The Attorney General tries to find an exception for her lawsuit in Article IV of the Transit Treaty. *See* Opening Br. 64 & n.8. In contrast to Article II's broad scope—applying to any "measures" taken by any "public authorities"—Article IV narrowly addresses "regulations" imposed by "appropriate regulatory authorities." By its terms, Article IV(1) merely preserves regulatory authority to those "appropriate" agencies already having such authority under each Party's national laws—i.e., in the United States, PHMSA. And here Enbridge does not seek to "bring a cause of action to enforce" the Transit Treaty. *Cf. Bad River Band of Lake Superior Tribe of Chippewa Indians v. Enbridge*, No. 19-cv-602-wmc, 2022 WL 17249085, at *5 (W.D. Wis. Nov. 28, 2022) (dismissing Enbridge's counterclaims and ruling that a private party cannot bring a cause of action to enforce it), *appeal pending*, No. 23-2309 (Seventh Circuit).

The most analogous case is *Arkansas v. Texas Gas Transmission Corp.*, 171 F. Supp. 413 (E.D. Ark. 1959). There, the state of Arkansas filed suit against Texas Gas in state court, asserting ownership over half the Mississippi River riverbed. *Id.* at 415. The state sought to force Texas Gas to remove its pipeline from bottomlands over which it claimed sole ownership. *Id.* Texas Gas removed the case to federal court, and the district court denied the state's motion to remand, concluding that it had federal question jurisdiction. *Id.* at 416. The court explained that the state's assertion that it was the "sole owner" of the riverbeds conflicted with the Submerged Lands Act. *Id.* at 416-17. In claiming sole ownership, the state asserted "that [its] ownership is paramount and superior to the rights of the United States." *Id.* This conflict between the state's assertion and the Submerged Lands Act sufficiently raised a federal issue, as the scope of the state's ownership interest was "an element, and an essential one," of the state's claim. *Id.* at 417 (quoting *Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936)).

The *Texas Gas* court's reasoning has withstood the test of time. First, the burden imposed by the federal government's "paramount" authority under the Submerged Lands Act has not changed since the Act's passage in 1953. Since then, courts have repeatedly acknowledged that a state's pre-existing rights in submerged lands are subject to the federal government's paramount constitutional powers. *Douglas*, 431 U.S. at 283-84; *Weaver's Cove*, 583 F. Supp. 2d at 282-83. The

Attorney General's cited cases—*Bonelli* and *Corvallis*—are not to the contrary. Rather, they merely stand for the simple proposition that, under the Submerged Lands Act, the states retained their pre-existing rights in navigable waterways. *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 371 n.4 (1977); *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 318 (1973). They do not purport to alter the Act's plain text or otherwise dispute the well-established doctrine that the federal government expressly retained "all constitutional powers of regulation and control" over the bottomlands for constitutional purposes. *Douglas*, 431 U.S. at 284; 43 U.S.C. § 1314(a).

Second, *Texas Gas* is consistent with *Grable*. *Grable* was not creating a new means for establishing "arising under" jurisdiction but was instead relying on a "longstanding … variety of federal 'arising under' jurisdiction." *Grable*, 545 U.S. at 312. Indeed, in articulating a clear test for substantial-federal-question jurisdiction, the Court explicitly relied on numerous cases that have shaped the doctrine over the last century. *Id.* at 312-14. One of these cases was *Gully v. First National Bank*, 299 U.S. 109 (1936), where Justice Cardozo explained that federal-question jurisdiction over a state-law claim requires a "'common-sense accommodation of judgment to [the] kaleidoscopic situations' that present a federal issue, in 'a selective process which picks the substantial causes out of the web and lays the others ones aside.'" *Grable*, 545 U.S. at 313 (quoting *Gully*, 299 U.S. at

117-18). *Texas Gas* likewise applied Justice Cardozo's version of the substantial federal question test in reasoning that the state's claim of ownership asserted a substantial federal question. *Grable*'s new articulation of an old test does not undermine *Texas Gas*' reasoning.

Other circuits have similarly concluded that state-law claims requiring interpretation of a federal statute to resolve an assertion of title necessarily raise federal issues. In *Nicodemus v. Union Pacific Corp.*, a group of landowners sued a railroad company, which held easements to run its railway over their land, over its practice of "licensing" telecommunications companies to run their fiber-optic cables along its right-of-way originating in "federal-land grant statutes." 440 F.3d 1227, 1233-34 (10th Cir. 2006). The landowners asserted state-law claims that "hinge[d] on whether [the railroad's] use of the right-of-way ha[d] exceeded the purpose for which it was granted." *Id.* at 1234. But because the right-of-way originated in federal law, the scope of the plaintiff's ownership was necessarily a federal question. *Id.* at 1234-35. Applying *Grable*, the Tenth Circuit concluded that the federal burden on the landowners' title necessarily raised a substantial federal question such that the case arose under federal law. *Id.* at 1234-37.

Likewise, in *Hornish v. King County*, the Ninth Circuit held that a state-law claim necessarily raised a substantial federal question because it sought "a declaration of rights" over land burdened by a federal railroad easement. 899

F.3d 680, 689-90 (9th Cir. 2018). Because the scope of the property rights required an interpretation of a federal law governing the easement's scope, the state-law claims necessarily raised a federal question. *Id.* The court explained that "the vindication of [Plaintiffs'] right[s] under state law necessarily turn[s] on the construction of federal law" because "resolution of this dispute turns on an interpretation of the [federal] Trails Act." *Id.* at 690. As a result, the plaintiffs' state-law claims arose under federal law such that the federal courts had federal question jurisdiction.

Lastly, in *North Carolina v. Alcoa Power Generating, Inc.*, North Carolina brought a declaratory judgment action against Alcoa in state court seeking a declaration that it owned a riverbed that Alcoa had purportedly acquired. 853 F.3d 140, 143 (4th Cir. 2017). When Alcoa removed, the district court denied the state's motion to remand, and the Fourth Circuit affirmed. *Id.* at 145-50. The state's claim to title hinged entirely on whether the river was navigable when North Carolina became a state, and navigability is a question of federal law. *Id.* at 146. Thus, because the state's claim of ownership required interpretation of federal law, it necessarily raised a substantial federal question. *Id.* at 149-50.

The Attorney General ignores these circuit authorities and turns a blind eye to the federal issues raised by her own claims. She asserts that she "can prove all of her claims without reference to federal law," and that Enbridge has asserted "nothing

more than ordinary preemption defenses." Opening Br. 59. Not so. The fact that the Attorney General's claims are "creature[s] of state law," *id.*, is of no significance when proof of those claims turns on the interpretation of federal law. Because her claims seek to "permanently decommission the Straits Pipelines" (Compl., R. 1-1, PageID#24), they cannot be resolved without an interpretation of the federal laws burdening the State's ownership of the Straits bottomlands. This case necessarily raises federal questions.

The Attorney General's assertions about the equal-footing doctrine are also inapposite. Enbridge does not dispute that, under the equal-footing doctrine and the Submerged Lands Act, Michigan took title to the bottomlands of navigable waters within its borders. But *federal law* establishes that the State's title is not unlimited and is instead burdened by the federal government's "paramount" authority in certain constitutional areas. Because the Attorney General's claims depend on the scope of the State's ownership rights in the Straits bottomlands, the federal government's burden on the State's title is relevant.

The second way the federal government exercised its "paramount" authority under the federal Submerged Lands Act is through the Pipeline Safety Act. This

second exercise of authority necessarily raises a second federal issue that must be resolved before the Attorney General can prevail.[12]

The PSA prohibits states from imposing safety regulations on interstate pipeline operations. *See* 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."). No state regulation of pipeline safety is allowed, regardless of whether the federal agency has issued a regulation covering the same subject as the state standard. *See id.* (stating that a state authority "*may not*" impose pipeline safety regulations). Additionally, Congress has vested a federal agency, the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), with exclusive jurisdiction to issue emergency orders requiring pipeline closures when an unsafe condition or practice "constitutes or is causing an imminent hazard." 49 U.S.C. § 60117(p); 49 C.F.R. § 190.236.

The Attorney General's complaint seeks to force a shutdown of Line 5 due to the "inherent risks of pipeline operations" and potential "anchor strikes" from shipping traffic. (Compl., R. 1-1, PageID#23.) A court cannot grant the Attorney General the relief she seeks without interpreting the PSA and determining whether

---

[12] Counts I, II, and III all rest on the State's asserted authority over the bottomlands, meaning that the federal question of the scope of the burden on the State's ownership is necessarily raised by all three counts. That said, Enbridge need only show that one claim in the Attorney General's complaint supports federal question jurisdiction. *Nicodemus*, 440 F.3d at 1235 n.8.

it precludes the Attorney General from using the State's property rights to shut down Line 5 based on alleged safety risks. Thus, a second federal issue is necessarily raised by the Attorney General's claims, further confirming that this case belongs in federal court.

The Attorney General asserts that the PSA leaves the siting and routing of interstate oil pipelines to state law. Opening Br. 62 (citing 49 U.S.C. § 60104(e)). True enough. *Id.* But that authority is irrelevant here, where Line 5's "siting" and "routing" were definitively settled in 1953, when Michigan approved the routing of Line 5 and granted the easement allowing Line 5 to be built across the Straits. *See* Opinion and Order of Michigan Public Service Commission, D-3903-53.1 (March 31, 1953) (authorizing the construction, operation and maintenance of Line 5 in Michigan, including the Straits Pipelines); *see also Olympic Pipe Line Co v. City of Seattle*, 2003 WL 27392855, at *4 (W.D. Wash. Aug. 21, 2003) (rejecting a similar argument). This action has nothing to do with "siting" or "routing" Line 5; it is an effort to shut down a pipeline already sited and routed based on safety concerns. That is precisely what the PSA governs.

### 2. The federal issues in this case are actually disputed.

There is no doubt the federal issues in this case are "actually in dispute." *Grable*, 545 U.S. at 315. The Attorney General directly disputes Enbridge's argument that federal law burdens the State's property interest in the Straits

bottomlands. She claims that "the scope of the State's property interest in the Great Lakes bottomlands at issue is not disputed" and that the State's "ownership of these bottomlands is stipulated in the 1953 Easement itself." Opening Br. 60 (internal quotation marks omitted). These assertions directly oppose Enbridge's position and show that the federal issue in this case—the extent to which federal law burdens the State's ownership of the Straits bottomlands—is actually disputed.

### 3. The federal questions at issue are substantial and are of great "importance … to the federal system as a whole."

A party asserting substantial-federal-question jurisdiction must demonstrate that the issue is "a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, 545 U.S. at 313. In considering whether a federal issue is substantial, it is necessary to look "to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. Again, this case presents a paradigmatic substantial federal issue.

In *Grable*, the federal issue at stake was the proper interpretation of the notice requirement in federal tax law. The Court concluded that such issues governing IRS property sales belong in federal court because they are "important issue[s] of federal law." *Grable*, 545 U.S. at 315. It reasoned that parties to similar disputes "may find it valuable to come before judges used to federal tax matters." *Id.*

Here too, the federal issues necessarily raised by the Attorney General's claims "sensibly belong in federal court." This case raises important issues relating

to foreign affairs, a power exclusively entrusted to the federal government. The 1977 Transit Treaty commits the United States to eschew all measures that would interfere with Line 5's international transmission of hydrocarbons. Further, parties in similar cases that turn on interpretations of federal treaties or the PSA will find it valuable to come before judges more experienced in foreign affairs and federal laws.

The Attorney General notes that this Court has identified four factors that can "affect the substantiality of the federal interest" in a case. *Mikulski*, 501 F.3d at 570; Opening Br. 63. These factors include: (1) "whether the case includes a federal agency, and particularly, whether that agency's compliance with the federal statute is in dispute"; (2) "whether the federal question is important (i.e., not trivial)"; (3) "whether a decision on the federal question will resolve the case (i.e., the federal question is not merely incidental to the outcome)"; and (4) "whether a decision as to the federal question will control numerous other cases (i.e., the issue is not anomalous or isolated)." *Mikulski*, 501 F.3d at 570. These factors are not controlling, and "no single factor is dispositive" but instead "must be considered collectively, along with any other factors that may be applicable in a given case." *Id*. Yet all four factors support a conclusion that the federal issues in this case are substantial.

*First*, this case "includes" both a federal agency and the federal government. *See id*. The fact that neither the agency nor the government is a party is not

dispositive; in *Grable* itself, the IRS was not a party. There, the dispute "centered on" the actions of the IRS. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006). Similarly here, the dispute centers on the 1977 Transit Treaty, ratified by the President with the Senate's consent, plus PHMSA's exclusive jurisdiction to regulate pipeline safety. That is more than sufficient federal involvement to render the federal issues in this case substantial.

*Second*, this case involves "important (i.e., not trivial)" issues of federal law and foreign affairs. This lawsuit is just one piece of a coordinated effort by Michigan state officials to force a shutdown of a major channel of interstate and international commerce. The Attorney General persists in these efforts despite express prohibitions in both the 1977 Transit Treaty and the PSA. Such actions will have wide-ranging effects both domestically and internationally. (Canada Amicus Br., No. 1:20-cv-01142, R. 45, PageID##550-51.) The Attorney General cannot seriously contend that these federal issues of national and international significance are not important.

*Third*, the Attorney General does not, and cannot, deny that a resolution of the federal question will resolve this case. If the Treaty bars a shutdown of Line 5, this litigation will end.

*Fourth*, whether a decision on the federal issues in this case will control other cases will depend on whether similar suits are brought against other pipelines

covered by the Treaty. If that comes to pass, the resolution of this case will undoubtedly control similar cases. Regardless, the first three factors here are more than sufficient to show that the federal interests in this case are at least as substantial as the tax question at issue in *Grable*.

The Attorney General does not dispute that these factors are present. Instead, she contends that her claims present a "'fact-bound and situation-specific' set of issues regarding a 1953 pipeline easement that is highly unlikely to control in any other case." Opening Br. 67 (citing *Columbia Gas Transmission, LLC v. Singh*, 707 F.3d 583, 590 (6th Cir. 2013)). But *Columbia Gas* involved a private landowner who sued over a fact-specific dispute over the scope of an easement. *See Columbia Gas*, 707 F.3d at 585-86. The Attorney General's claims, by contrast, require resolution of important federal law claims based on the state's asserted title in the bottomlands.

### 4. The federal-state balance approved by Congress and the Constitution demands that this case be resolved in federal court.

*Grable*'s final requirement is that a case is able to be heard in federal court "without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. This requirement prevents a wave of traditional state-law cases from inappropriately shifting to federal court. In *Grable*, the Court concluded that resolution of that case would not disrupt any

congressionally approved federal-state balance "because it will be the rare state title case that raises a contested matter of federal law." *Id.* at 315.

So too here: It is the rare state-law case that raises issues concerning the effect of the federal government's paramount authority on a state's assertion to ownership of bottomlands covered by the Submerged Lands Act. Opening the federal courthouse doors to such questions will have only a "microscopic effect" on federal court dockets. *Id.* In fact, the last case to raise this precise issue was decided in *1959. See Texas Gas*, 171 F. Supp. at 415-17.

The reality is that allowing cases of this nature to be heard in federal court will *promote* the Constitution's federal-state balance. Under this balance, "the federal government has exclusive power over foreign affairs, and … states have very little authority." *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012). Forcing this category of cases into state court will disrupt the well-established balance by vesting elected judges in single states with authority over the foreign affairs of the entire country. Such a reality is untenable under traditional principles of federalism.

The Attorney General's contrary arguments misconstrue the nature of the federal issues in dispute. She invokes a "parade of horribles," claiming that "any dispute over the terms of an easement involving an interstate pipeline could be moved to federal court." Opening Br. 68. But allowing federal jurisdiction in this

case will only open federal courts to a "special and small category of cases," *Gunn*, 568 U.S. at 263, those implicating the federal government's burden on a state's claim of ownership to bottomlands. This case is distinguishable from *Columbia Gas*, where a private landowner sought federal jurisdiction solely on the basis that it was regulated under federal law. *Columbia Gas*, 707 F.3d at 587. In that case, federal law did not burden the property right but instead was merely a factor in determining the scope of the easement. *Id*. at 587-91. But here, the Submerged Lands Act expressly burdens the State's claim to title, and whether the Attorney General can prove her claim depends on the extent of that federal burden. This issue will only arise in a limited set of cases involving a state's claim of ownership over bottomlands that conflicts with the federal government's paramount authority. That is a far cry from *Columbia Gas*, where accepting the plaintiff's argument would have allowed any state-law cause of action involving a federally regulated party to be heard in federal court. The issues in this case adequately "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312.

**B.** **The Attorney General's action is also removable under federal common law based on the foreign-affairs doctrine.**

There is an additional basis for federal-question jurisdiction: federal common law based on the foreign-affairs doctrine. Though it has been long established that there is "no federal general common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78

(1938), it is equally well-settled that a modified form of federal common law persists in "some limited areas," *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). These few instances exist when Congress explicitly authorizes federal courts to develop substantive law and also when "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Id.* (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)). When a case is governed by federal common law, it "arises under" federal law for purposes of § 1331. *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972).

Foreign relations is a well-accepted area of "uniquely federal interest." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 116 (2022). Indeed, "the Supreme Court has found in the Constitution a *mandate* to fashion a federal law of foreign relations." *Republic of Philippines v. Marcos*, 806 F.2d 344, 352-53 (2d Cir. 1986) (emphasis added). Cases involving foreign relations are uniquely federal in nature and "must be treated exclusively as an aspect of federal law." *Id.* at 353. As such, "there is federal question jurisdiction over actions having important foreign policy implications." *Id.* at 353.

When a case "arises under" federal common law, it may be removed to federal court. The Fifth Circuit's decision in *Torres v. Southern Peru Copper Corp.*, 113 F.3d 540 (5th Cir. 1997), is on point. There, Peruvian citizens filed an action in state court under state law alleging injuries from sulfur dioxide emissions in Peru. *Id.* at

541-42.  The Fifth Circuit concluded that the case raised substantial questions of federal common law because it "implicat[ed] important foreign policy concerns." *Id*. at 543.  The litigation implicated some of Peru's "most vital interests" and would affect that country's relations with the United States.  *Id*. at 542-43.  The court explained that mining was "critical to that country's economy, contributing up to 50% of its export income and 11% of its gross domestic product," and the defendant before it was the largest company in that business.  *Id*.  Because the case was necessarily governed by federal common law, federal question jurisdiction existed, and removal was proper.  *Id*.[13]

The same is true here, as this case similarly implicates important foreign policy concerns.  Though the Attorney General contends that "[t]he control of public trust Great Lakes bottomlands is a matter of state common law" (Opening Br. 70), in reality, it is a matter of foreign policy involving important and unique federal interests.  The Attorney General's actions threaten the United States' ability to fulfill its obligation under the 1977 Transit Treaty; they also "pose[] grave concerns for Canada." (Canada Amicus Br., No. 1:20-cv-01142, R. 45, PageID#551.)  Bilateral

---

[13] Several district courts have also found removal proper in analogous cases.  *E.g.*, *Grynberg Prod. Corp. v. British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993); *Sequihua v. Texaco, Inc.*, 847 F. Supp. 61, 62-63 (S.D. Tex. 1994); *In re World War II Era Japanese Forced Labor Litigation*, 114 F. Supp. 2d 939, 943 (N.D. Cal. 2000).

treaties such as this one are "at the heart of the U.S.-Canada relationship" and are critically important to both nations' foreign policy. (*Id.*) For decades, the United States and Canada have dealt with environmental issues in the Great Lakes through international agreements.[14] Further, Line 5 plays a significant role in Canada's energy security and economic prosperity. (*Id.*) Line 5 provides over 50% of the crude oil in Ontario and Quebec (via Line 9) and supplies ten refineries on both sides of the U.S.-Canada border.[15] These economic implications are not limited to the Canadian end of Line 5: If Line 5 is shut down, thousands of jobs will be lost, and thousands of homes will be without heat on both sides of the border.[16]

This litigation has already forced the United States and Canada to confront the foreign policy issues at stake. Canada has invoked the formal dispute resolution mechanisms in the 1977 Transit Treaty in direct response to Michigan officials' actions. (Canada Amicus Br., No. 1:20-cv-01142, R. 45, PageID#551.) The two sovereigns are actively engaged in discussions to resolve the issues and avoid a

---

[14] *E.g.*, 1972 Agreement on Great Lakes Water Quality, Apr. 15, 1972, U.S.-Can., 23 U.S.T. 301; Agreement Concerning the Transboundary Movement of Hazardous Waste, Oct. 28, 1986, Can.-U.S., T.I.A.S. No. 11,099; Canada-United States Joint Inland Pollution Contingency Plan, July 25, 1994, U.S.-Can.

[15] Interim Report at 23, cited in Remand Op., No. 1:20-cv-01142, R. 47, PageID#595.

[16] Testimony of the Honorable Seamus O'Regan, Minister of Natural Resources, https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/meeting-3/evidence#Int-11166045.

shutdown. (*Id.*) In addition, the Government of Canada has filed amicus briefs in both *Michigan v. Enbridge* and *Enbridge v. Whitmer*, urging the court "to act in a manner that will ensure that Line 5 is not subject to a unilateral compelled shutdown." (*Id.* at PageID#550; Gov't of Canada Amicus Br., No. 1:20-cv-01141, R. 70.) Canada's actions illustrate the substantial foreign policy implications involved in this case and show that there is not just a compelling need for application of federal common law but a mandate that it be resolved in federal court.

In asserting federal common law inapplicable, the Attorney General invokes the well-pleaded-complaint rule: "a defendant's invocation of federal common law as a basis for removal jurisdiction must fail in the absence of complete preemption." Opening Br. 71. But the well-pleaded complaint rule does not bar removal in cases where, as here, federal common law displaces state law. Under the well-pleaded-complaint rule, federal-question jurisdiction only exists if "a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). But when federal common law governs, state law no longer exists: "if federal common law exists, it is because state law *cannot be used*." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981) (emphasis added). Claims governed by federal common law are inherently federal because federal law is the *exclusive* source of law in that area. *Id.* In other words, even where the complaint is nominally rooted in state-law, the complaint arises

under federal law. And because the Attorney General's complaint here properly arises under federal law, the case may be removed to federal court as if it pled claims under a federal statute.[17]

## CONCLUSION

The Court should affirm the district court's order denying the Attorney General's motion to remand.

| | |
|---|---|
| /s/ Phillip J. DeRosier | /s/ Alice E. Loughran |
| Phillip J. DeRosier | Alice E. Loughran |
| DICKINSON WRIGHT PLLC | David H. Coburn |
| 500 Woodward Avenue, Suite 4000 | Mark C. Savignac |
| Detroit, MI 48226 | STEPTOE & JOHNSON LLP |
| (313) 223-3866 | 1330 Connecticut Avenue, NW |
| pderosier@dickinsonwright.com | Washington, DC 20036 |
| | (202) 429-3000 |
| Peter H. Ellsworth | aloughran@steptoe.com |
| Jeffery V. Stuckey | dcoburn@steptoe.com |
| DICKINSON WRIGHT PLLC | msavignac@steptoe.com |
| 123 W. Allegan Street, Suite 900 | |
| Lansing, MI 48933 | |
| (517) 371-1730 | /s/ John J. Burch |
| pellsworth@dickinsonwright.com | John J. Bursch |
| jstuckey@dickinsonwright.com | BURSCH LAW PLLC |
| | 9339 Cherry Valley Avenue SE, #78 |
| | Caledonia, MI 49316 |
| | (616) 450-4235 |
| | jbursch@burschlaw.com |

*Counsel for Defendants-Appellees*

---

[17] *See* U.S. Amicus Br. 26-28, filed in *BP P.L.C. v. Mayor and City of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020) (removal is proper under federal common law even when a complaint is "nominally couched as state-law claims"), https://www.scotusblog.com/case-files/cases/bp-p-l-c-v-mayor-and-city-council-of-baltimore/.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,949 words, excluding material exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b).

2.      This brief complies with the typeface and type-style requirements of Federal Rule of Civil Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced, 14-point Times New Roman typeface using Microsoft Word 2016.


Dated: November 20, 2023

/s/  Alice E. Loughran

Alice E. Loughran
STEPTOE & JOHNSON LLP
(202) 429-6202

**CERTIFICATE OF SERVICE**

I certify that on November 20, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ Alice E. Loughran
Alice E. Loughran
STEPTOE & JOHNSON LLP
(202) 429-6202

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellees hereby designate the following portions of the record

on appeal:

| Description of Entry | Date | Docket No. | PageID#s |
|---|---|---|---|
| Notice of Removal | 12/15/21 | R. 1 | 1-17 |
| Ex. A to Notice of Removal (State Court Complaint) | 12/15/21 | R. 1-1 | 19-63 |
| Plaintiff's Request for Pre-Motion Conference | 12/21/21 | R. 7 | 136-256 |
| Motion to Remand | 1/14/22 | R. 10 | 267-268 |
| Brief in Support of Motion to Remand | 1/14/22 | R. 11 | 269-303 |
| State Court Register of Actions | 1/14/22 | R. 11-1 | 306-319 |
| Opinion and Order Denying Remand | 8/18/22 | R. 23 | 611-623 |

Defendants-Appellees further designate the following portions of the related

district court record in *Michigan v. Enbridge*, case no. 1:20-cv-1142:

| Description of Entry | Date | Docket No. | PageID#s |
|---|---|---|---|
| Notice of Removal | 11/24/20 | R. 1 | 1-14 |
| Ex. A to Notice of Removal (State Court Complaint) | 11/24/20 | R. 1-1 | 15-107 |
| Plaintiffs' Motion to Remand | 6/1/21 | R. 41 | 465-467 |
| Brief in Support of Motion to Remand | 6/1/21 | R. 42 | 468-509 |

1

| | | | |
|---|---|---|---|
| Brief by Amicus Government of Canada in Support of Defendants | 6/1/21 | R. 45 | 545-564 |
| Defendants' Response to Motion to Remand | 6/1/21 | R. 47 | 585-633 |
| Brief by Amici North America's Trade Unions et al. in Support of Defendants | 6/1/21 | R. 48 | 634-649 |
| Order Denying Motion to Remand | 11/16/21 | R. 80 | 1021-1035 |
| Supplemental Amicus Brief by the Government of Canada | 11/16/21 | R. 82 | 1047-1050 |

Defendants-Appellees further designate the following portions of the related district court record in *Enbridge v. Whitmer*, case no. 1:20-cv-1141:

| Description of Entry | Date | Docket No. | PageID#s |
|---|---|---|---|
| Complaint for Declaratory and Injunctive Relief | 11/24/20 | R. 1 | 1-20 |
| Notice of Appointment of Mediator | 3/19/21 | R. 20 | 131-132 |
| Order | 9/21/21 | R. 37 | 240-242 |
| Ex. 1 to Request for Pre-trial Conference (Governor's Press Release) | 11/30/21 | R. 39-1 | 253-256 |
| Brief by Amicus Government of Canada in Partial Support of Defendants | 4/5/22 | R. 70 | 479-514 |