No. 23-1671

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DANA NESSEL, ATTORNEY GENERAL OF THE STATE OF MICHIGAN, ON
BEHALF OF THE PEOPLE OF THE STATE OF MICHIGAN
Plaintiff-Appellant,

v.

ENBRIDGE ENERGY, LIMITED PARTNERSHIP, et al.,
Defendants-Appellees.

On Appeal from the U.S. District Court for the Western District of
Michigan, Southern Division
No. 1:21-cv-01057, Judge Janet T. Neff

**CONSENTED-TO BRIEF FOR *AMICI CURIAE*
NORTH AMERICA'S BUILDING TRADES UNIONS and UNITED
STEELWORKERS, AFL-CIO-CLC
IN SUPPORT OF ENBRIDGE ENERGY, LIMITED
PARTNERSHIP, ET AL., DEFENDANTS-APPELLEES**

Jonathan D. Newman
SHERMAN DUNN, P.C.
900 7TH Street, N.W.,
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

*Counsel for North America's
Building Trades Unions*

David R. Jury, General Counsel
UNITED STEELWORKERS
60 Boulevard of the Allies,
Room 807
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org

*Counsel for United Steelworkers*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1671 _____    Case Name: Nessel v Enbridge et al _____

Name of counsel:  Jonathan D. Newman _____

Pursuant to 6th Cir. R. 26.1, North America's Building Trades Unions _____
Name of Party

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

None.

CERTIFICATE OF SERVICE

I certify that on _____ November 24, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Jonathan D. Newman _____
900 7th Street, N.W., Ste 1000 _____
Washington, D.C. 20001 _____

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1671 _____      Case Name: Nessel v Enbridge et al _____

Name of counsel: David R. Jury _____

Pursuant to 6th Cir. R. 26.1, United Steelworkers, AFL-CIO-CLC _____
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> None.

---

CERTIFICATE OF SERVICE

I certify that on _____ November 24, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/David R. Jury _____
60 Boulevard of the Allies, Room 807 _____
Pittsburgh, PA 15222 _____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF THE AMICI ................................................................... 1

INTRODUCTION .................................................................................. 2

STATEMENT OF THE CASE .............................................................. 4

    A.   Thousands of Solid Middle Class Jobs are Dependent Upon Line 5 as are the Energy Needs of the Upper Midwest and Canada. ....................................................................................... 4

    B.   The Attorney General's State Litigation and Enbridge's Removal to Federal Court ...................................................... 13

ARGUMENT ........................................................................................ 15

    I.   Enbridge Timely Filed its Notice of Removal. ......................... 15

    II.  The Complaint Satisfies the *Grable* Test for Federal Jurisdiction. .............................................................................. 23

        A. Whether a complaint "necessarily raise[s] a stated federal issue" does not depend on the plaintiff's "artful pleading." ...................................................................... 25

        B.  The scope of interests implicated by this dispute demonstrate that the federal issues are "substantial." .... 28

CONCLUSION ..................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Arkansas v. Tex. Gas Transmission Corp.*,
171 F. Supp. 413 (E.D. Ark. 1959)………..…………………………..26

*Berera v. Mesa Med. Grp., PLLC*,
779 F.3d 352 (6th Cir. 2015)…………………………………15-16, 19

*Chapman v. Powermatic, Inc.*,
969 F.2d 160 (5th Cir. 1992)…………………………………………20

*Dietrich v. Boeing Co.*,
14 F.4th 1089 (9th Cir. 2021)………………………………………17

*Empire HealthChoice Assurance, Inc. v. McVeigh*,
547 U.S. 677 (2006)…………………………………………………...28

*Federated Dep't Stores, Inc. v. Moitie*,
452 U.S. 394 (1981)…………………………………………………...25

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005)………………………………………………23, 25, 28

*Graiser v. Visionworks of Am., Inc.*,
819 F.3d 277 (6th Cir. 2016)………………………………………19-21

*Gunn v. Minton*,
568 U.S. 251 (2013)…………………………………………………24, 28

*Harden v. Field Mem. Cmty. Hosp.*,
265 Fed. Appx. 405 (5th Cir. 2008)………………………………17

*Knudson v. Sys. Painters, Inc.*,
634 F.3d 968 (8th Cir. 2011)………………………………………17

*Kuxhausen v. BMW Fin. Servs. NA LLC*,
707 F.3d 1136 (9th Cir. 2013)………………………………………19

*Lovern v. Gen. Motors Corp.*,
121 F.3d 160 (4th Cir. 1997)………………………………………20-21

*Lowry v. Ala. Power Co.*,
    483 F.3d 1213 (11th Cir. 2007)…………………………………………17

*Mikulski v. Centerior Energy Corp.*,
    501 F.3d 555 (6th Cir. 2007)………………………………..………..28

*Moltner v. Starbucks Coffee Co.*,
    624 F.3d 34 (2d Cir. 2010) (per curiam)………………………………16

*Northrop Grumman Tech. Servs., v. DynCorp Int'l LLC*,
    865 F.3d 181 (4th Cir. 2017) …………………………………………...17

*Paros Props. LLC v. Colo. Cas. Ins. Co.*,
    835 F.3d 1264 (10th Cir. 2016) …..…………………………....……...17

*R.I. Fishermen's All., Inc. v. R.I. Dept. of Env't. Mgmt.*,
    585 F.3d 42 (1st Cir. 2009) …………………………………………….27

*Romulus v. CVS Pharm., Inc.*,
    770 F.3d 67, 69 (1st Cir. 2014) …..………………………………….…16

*Rowe v. Marder*,
    750 F. Supp. 718, 721 (W.D. Pa. 1990), *aff'd*, 935 F.2d 1282
    (3d Cir.1991) …………………………………………………16, 20

*Sarauer v. Machinists Dist. No. 10*,
    966 F.3d 661 (7th Cir. 2020)…………………………………………….27

*Walker v. Trailer Transit, Inc.*,
    727 F.3d 819, 825 (7th Cir. 2013) ……………………………………..17

**Statutes**

26 U.S.C. § 6335…………………………………………………………..25

28 U.S.C. § 1446……………………………………………………1.5-16, 22

28 U.S.C. § 1446(a)……………………………………………………16

28 U.S.C. § 1446(b)……………………………………………………15, 20

28 U.S.C. § 1446(b)(3)...................................................................15, 20, 22

28 U.S.C. § 1331...........................................................................13, 23

43 U.S.C. § 1314(a)...........................................................................24

49 U.S.C. § 60104..............................................................................24

**Other Authorities**

Ohio Lucas County Prevailing Wage, *available at* https://www.actohio.org/issues/prevailing-wage/by-county/lucas-county/(last accessed November 18, 2023) ..........8

Transit Pipelines Agreement between the United States of America and Canada, signed at Washington January 28, 1977, 28 UST 7449 (Jan. 28,1977)...................................................................................24

# INTEREST OF THE AMICI

North America's Building Trades Unions ("NABTU") is a labor organization and federation composed of fourteen national and international unions that collectively represent more than three million men and women in the construction trades across the United States and Canada. Hundreds of thousands of these workers are regularly employed on and around pipelines that carry – and the facilities that process – vital sources of the energy on which the United States and Canada rely, including the Line 5 pipeline at issue. In this case, the Attorney General of Michigan filed a complaint seeking a permanent injunction to close the Line 5 pipeline below the Straits of Mackinac, which would effectively close Line 5 altogether. (State Court Complaint, R. 1-1, Page ID # 49). Closure of the Line 5 pipeline would adversely impact the employment of thousands of members of NABTU's affiliates and their families.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("USW") represents approximately 600,000 members in the United States and Canada in numerous industrial and other sectors, including the energy sector, where it represents employees working in oil

1

refineries, as well as those involved in maintaining and constructing pipelines. USW is the largest union in the American refining industry, representing production and maintenance workers at over seventy refining locations in the U.S., facilities that together contribute over two-thirds of the nation's domestic fuels. USW represents workers in refineries that are fed by Line 5 and whose employment would be placed in grave jeopardy if Line 5 were closed.

All parties have consented to the filing of this *amici curiae* brief. No party's counsel authored the brief in whole or in part, and no entity or person, aside from *amici curiae*, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

This case involves a dispute between the State of Michigan and Enbridge Energy Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P. ("Enbridge") over Enbridge's operation of its international Line 5 pipeline through the State of Michigan's Straits of Mackinac. The Attorney General of Michigan filed a lawsuit seeking: (1) a declaratory judgment that the 1953 Straits of Mackinac Pipeline Easement granted to Enbridge is void, and (2) a

permanent injunction shutting down the operation of Enbridge's Line 5 pipeline through the Straits of Mackinac, which would result in the closure of Line 5.

This case is about far more than the status of a single easement to operate Line 5 through the Straits of Mackinac.  It raises serious questions about the relative authority of a state and the federal government to regulate pipeline safety and control the flow of oil and gas. The questions are particularly significant here, where the pipeline travels through multiple states and traverses both the U.S. and Canada.

Line 5 is 645 miles long, and begins in Superior, Wisconsin.  It travels across the border into Canada before terminating in Sarnia, Ontario, Canada.  Along the way – both in the United States and Canada – the pipeline provides workers, families, and their communities with jobs, energy, and resources.  The issues of substantial federal concern that are raised in this case are identical to those pending in a related federal case, and are identical to those raised in a companion case in federal court that was dismissed by the State of Michigan.  These issues should be determined in federal court and the district court's denial of the motion to remand should be affirmed.

## STATEMENT OF THE CASE

### A. Thousands of Solid Middle Class Jobs are Dependent Upon Line 5 as are the Energy Needs of the Upper Midwest and Canada.

Line 5 traverses Wisconsin and Michigan and Ontario, Canada. But refineries in Michigan, Ohio, Pennsylvania, Ontario and Quebec also depend on the crude oil Line 5 delivers, and facilities in Wisconsin, Michigan, and Ontario rely on Line 5 to provide natural gas liquids (NGLs) to produce propane and butane essential to meeting consumer heating demands in those and other jurisdictions. Operating and maintaining the pipeline and its associated industrial facilities provides thousands of members of both NABTU and the USW (together "Union Amici") in the United States and Canada, with meaningful work and solid, middle-class wages and benefits.

For members of the building and construction trades, the work associated with Line 5 falls into two basic categories: (1) maintaining the current pipeline, and (2) servicing the heavy industry Line 5 supports. With respect to the pipeline itself, Enbridge operates pump stations and other facilities required for ongoing operations along Line 5's route. Members of the trades routinely service these facilities, ensuring the

pressure gauges and pumps are operating properly, as well as repairing and replacing equipment on an as-needed basis. These workers also monitor Line 5 itself, inspecting the pipeline and its structural components (including, for example, its supports) for problems like corrosion, dents, and cracks, and making necessary repairs, which can include anything from reinforcing a portion of pipe to full-scale replacement of a pipe segment.

In addition to work on the pipeline, Line 5 supports thousands of jobs in facilities that process and utilize the crude and NGLs it carries. This includes a wide variety of industrial facilities, but for purposes of this discussion, the Union Amici will focus on refineries and NGL fractionators.

Line 5 begins at its main terminal in Superior, Wisconsin, where USW represents approximately 140 Enbridge production and maintenance employees. Traversing Michigan, Line 5 is the exclusive source of NGLs to a fractionator in Rapid River, Michigan, which is the primary source of propane for the Upper Peninsula. The pipeline also provides nearly 30% of the crude processed by Marathon Oil's Detroit facility.

Crude oil transported by Line 5 also reaches two Ohio refineries: PBF Energy Toledo and the Cenovus Refinery. USW represents approximately 375 production and maintenance and office and technical employees at PBF Energy's Toledo Refinery, and 325 process, production, and maintenance employees at the Cenovus Refinery (formerly known, under prior ownership, as the bp-Husky Toledo Refinery).

In Canada, Line 5 is the major source of product to Sarnia, Ontario's vast industrial base. Line 5 serves as the only existing, feasible transportation mode to provide NGLs to Plains Midland Canada's Sarnia fractionator, which produces butane and propane. Line 5 crude oil also reaches the following: Imperial Oil's Sarnia operations, a complex that consists of a refinery, chemical plant, and petroleum research facility; the Suncor Sarnia refinery; and the Shell Sarnia refinery. Further into Canada, Line 5 feeds Enbridge pipelines that support the Imperial Nanticoke refinery in Ontario, and via Enbridge's Line 9 pipeline, the Suncor Montreal and Valero Levis refineries in the province of Quebec. And back into the U.S., Line 5 feeds another pipeline that supports United Refining's facility in Warren, Pennsylvania.

These are all large facilities, covering acres of land and housing a web of complex, heavy machinery that must operate consistently and, except in the case of required maintenance, without interruption to provide the energy and fuel needed to meet consumer demand. The skilled building trades men and women represented by NABTU's affiliates constantly monitor, maintain, and repair this equipment in facilities across the upper Midwest and in Canada. Thousands of these workers are employed on an on-going basis in these facilities, while thousands of others are brought in on an as-needed or regularly scheduled basis, when the plants are completely shut down to permit full-scale equipment overhauls.

If Line 5 ceased operation, the refineries in Michigan, Ohio, Ontario, Quebec, and Pennsylvania that depend on the products the pipeline carries would either have to significantly reduce production or close down completely. In either case, the impact on workers who depend on Line 5 for their employment would be dramatic.

Take just the two Ohio refineries. Data collected by NABTU's affiliated unions shows that in 2020 – a year when one would expect employment to have been affected by the pandemic – the workers they

represent performed 2,000,614 hours of routine and large-scale maintenance at the PBF Energy and Cenovus refineries in Toledo, Ohio, a number that roughly reflects full-time equivalent employment for 1,000 workers, which is in addition to the production and other maintenance work performed by USW members employed directly at these refineries.[1] Wage rates vary by trade and by experience level, but for perspective, the average hourly wage for building trades workers in Lucas County, the site of the refineries, is approximately $37.85.[2]  At that rate, loss of

---

[1] Because many construction trades workers often work intermittently, moving from job to job and employer to employer, and because wages and benefits are paid and reported on an hourly basis, employment in the industry is commonly tracked through hours of work rather than numbers of individual workers. Assuming the reported hours reflect full-time employment (40 hours a week for 50 weeks in a year), these numbers would represent work for 1,000 individuals. However, while the employees performing routine maintenance are likely employed on an on-going basis in these refineries, many more are brought in for large-scale, albeit short-term, projects, meaning the lives of far more than 1,000 individual workers would be affected by shuttering these plants.

[2] This figure was derived by averaging the second lowest of the trades' rates (Painter) at $28.59 per hour, and the second highest of the trades' rates (Pipefitters) at $47.11 per hour. *See* Ohio Lucas County Prevailing Wage, *available at* https://www.actohio.org/issues/prevailing-wage/by-county/lucas-county/(last accessed November 18, 2023).  The prevailing rate is often pegged to the unions' negotiated rates.

2,000,614 hours of work would translate into a loss of $75.72 million in wages at the Ohio refineries alone – a significant loss to the workers, their families, and their communities.

Shutting Line 5 would have a similarly devastating effect on the oil workers USW represents, because it is highly unlikely they would be able to find jobs with similar wage, benefit, and retirement savings structures elsewhere in their regional economy following a disruption in supply to the Toledo refineries.  The threats of disruption are tangible, and the potential for a replacement means of transporting the crude oil to the refineries is, at best, highly speculative.

The light crude oil Line 5 supplies to PBF Energy's Toledo Refinery is primarily refined into jet fuel that supplies the bulk of the fuel for Detroit Metro Airport. PBF Energy's Toledo Refinery processes approximately 189,000 barrels per day, or the equivalent of 900 to 1,000 tanker truck loads.  There are currently no viable alternative sources of crude oil for this facility, as its location lacks the infrastructure to receive the needed supply by rail or truck. For that reason, it is almost certain that if Line 5 were shut down, the production and maintenance employees at this facility would lose their jobs.  Those are good-paying,

family-sustaining jobs – with the straight-time hourly wage rates of senior production and maintenance employees ranging from $41.20 to $51.55 per hour – that allow USW members to contribute to the economic vitality of Toledo and its surrounding communities.

The Cenovus Toledo Refinery likewise receives crude oil transported on Line 5. Should Line 5 shut down, Cenovus would need to locate an alternative source for crude oil, and even if the facility did not close altogether, its operations would be disrupted, and with it, the financial stability of USW's members, whose straight time hourly rates for senior employees range from $44.76 to $55.55 per hour.

For NABTU's affiliates' members, the unavailability of jobs is not just about a loss of income, and it does not just affect their immediate financial security. In the construction industry, unions commonly negotiate collective bargaining agreements with multi-employer contracting groups to ensure that as the workers move from job to job and contractor to contractor, they work under similar conditions and accrue benefits that travel with them.

These agreements not only commit the employers to pay hourly wages commensurate with the employees' skills, but also to contribute to

jointly-trusteed employee benefit funds that pool the contributions for the benefit of all workers employed under the multi-employer contract. These funds provide employees with health insurance and pension benefits and finance the building trades' robust training programs.  Entitlement to and the amount of these vital benefits depend on the availability of work and the number of hours worked.  For example, eligibility for health insurance often depends on working a minimum number of hours during specified time periods. Retirement benefits are computed based on hours an individual works, so any break in employment reduces the resources on which a worker can expect to rely in retirement.  Moreover, the overall viability of the benefit funds covering these workers depends on the amount of work available in the area over time.

Returning to the example of NABTU members performing work at the Toledo refineries, at an average hourly benefit contribution of $25.36 (based on averaging the painters' and pipefitters' rates), the potential closure of these two refineries could place annual benefit contributions of $50.74 million in jeopardy, for a total of $126.46 million in potentially lost wages and benefits at just the Ohio refineries.  Combined with the loss of the USW-represented workers' production jobs, it is unlikely many

of these workers would soon find comparable work in the same geographic area, adding great strain to these workers and their families, as well as to the area's overall social safety net.

In addition to eliminating work for the current workforce, this level of dislocation would threaten the construction industry's ability to train for the future. The trades and their signatory contractors fund and operate a vast network of apprenticeship and other training programs. Because the programs are financed by contributions based on hours worked under the parties' collective bargaining agreements, their financial viability depends on the availability of work. But so too does the training, the heart of which is the ability to merge classroom and on-the-job instruction. Without jobs to staff, the vital on-the-job training element disappears, threatening the building trades' ability to bring new workers into industries that could provide them with solid, blue-collar careers.

The situation in the Ohio refineries is repeated in all the facilities dependent on Line 5 – the potential significant loss of good-paying, solid middle-class jobs that provide skilled workers in the U.S. and Canada with consistent employment, health insurance, pension benefits, and

other vital benefits, and opportunities for the next generation of working people to achieve the same.

**B. The Attorney General's State Litigation and Enbridge's Removal to Federal Court.**

This case began with a lawsuit filed by Michigan Attorney General Nessel in Ingham County Circuit Court. The Attorney General sought a declaratory judgment that the 1953 Straits of Mackinac Pipeline Easement granted to Enbridge is void, and a permanent injunction to shut down the operation of Line 5 through the Straits of Mackinac. (State Court Complaint, R. 1-1, Page ID # 48-49).

On December 15, 2021, Enbridge removed the case to the United States District Court for the Western District of Michigan, Southern Division because the district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. (Notice of Removal, R. 1, Page ID # 8-9). Enbridge stated that the case related to *Michigan v. Enbridge*, Case No. 1:20-cv-01142, W.D. Mich., in which the federal district court denied the State of Michigan's motion to remand a virtually identical case to state court after it had been removed. (Order Denying Motion to Remand, 1:20-cv-1142, R. 80, Page ID # 1021-1035). Enbridge's removal in this case was filed within thirty days of the district court's denial of the State of

Michigan's motion to remand in *Michigan v. Enbridge*. (*Id.*; Notice of Removal, R. 1, Page ID # 1-17).

The Attorney General filed a motion to remand on January 14, 2022. (Motion to Remand, R. 10, Page ID # 267-268). The district court denied that motion. In doing so, the district court recognized that "this case and *Michigan v. Enbridge* are 'closely parallel' cases." (Order Denying Motion to Remand, R. 23, Page ID # 616). The court held further that its order denying the motion to remand in *Michigan v. Enbridge* "established for the first time that [the district court] is an appropriate forum for deciding the substantial federal issues at stake in the [Line 5] controversy." (*Id.* at Page ID # 620). The Attorney General moved the district court to certify its order denying the motion to remand for interlocutory appeal. (Motion for Certification for Interlocutory Appeal, R. 24, Page ID # 624-25). On February 21, 2023, the district court granted the Appellant's motion to certify, and stayed the case pending the outcome of this interlocutory appeal. (Order Granting Motion to Certify, R. 32, Page ID # 767-769).

14

## ARGUMENT

## I.    Enbridge Timely Filed its Notice of Removal.

Removal of a case from state court to federal court is governed by federal statute – 28 U.S.C. § 1446. Section 1446(b) sets forth the requirements for removal and the time period in which a case should be removed. "Generally, the defendant must file the notice of removal 'within 30 days after the receipt by the defendant . . . of . . . the initial pleading setting forth the claim for relief upon which such action or proceeding is based.'" *Berera v. Mesa Med. Grp., PLLC*, 779 F.3d 352, 364 (6th Cir. 2015).  If, however, "the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant . . . of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."  28 U.S.C. § 1446(b)(3).

Section 1446 is silent with respect to the standard for determining whether the initial pleading "set forth" a federal claim, and if it did not, whether and when it could be "first ascertained" from a paper that the plaintiff was setting forth a removable claim.  This court and every other Circuit addressing the issue have adopted a standard that requires the

basis for removal to be unequivocal and clear before the thirty-day clock under Section 1446 begins to run.

In this Circuit, "[t]he 30-day period in § 1446(a) starts to run only if the initial pleading contains '*solid and unambiguous information* that the case is removable.'" *Berera*, 779 F.3d at 364 (emphasis added). And if "the initial pleading lacks *solid and unambiguous* information that the case is removable, the defendant must file the notice of removal 'within 30 days after receipt . . . of a copy of an amended pleading, motion, order or other paper' that contains *solid and unambiguous* information that the case is removable." *Id.* (emphasis added).

This Court's "solid and unambiguous" standard is similar to that applied in other Circuits for determining when the 30-day clock for removal begins. *Romulus v. CVS Pharm., Inc.*, 770 F.3d 67, 69 (1st Cir. 2014) (requiring "a clear statement" from plaintiffs' pleadings or other papers); *Moltner v. Starbucks Coffee Co.*, 624 F.3d 34, 38 (2d Cir. 2010) (per curiam) (requiring "a paper that explicitly specifies the amount of monetary damages sought" for removal based on diversity jurisdiction); *Rowe v. Marder*, 750 F. Supp. 718, 721 (W.D. Pa. 1990), *aff'd*, 935 F.2d 1282 (3d Cir. 1991) (the clock is triggered where

"the document informs the reader, to a substantial degree of specificity, [that] all the elements of federal jurisdiction are present."); *Northrop Grumman Tech. Servs., v. DynCorp Int'l LLC*, 865 F.3d 181, 187 n.5 (4th Cir. 2017) (basis for removal must be "unequivocally clear and certain"); *Harden v. Field Mem. Cmty. Hosp.*, 265 Fed. Appx. 405, 408 (5th Cir. 2008) (basis for removal must be "unequivocally clear and certain"); *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 825 (7th Cir. 2013) (requiring "specific and unambiguous notice that the case satisfies federal jurisdictional requirements and therefore is removable"); *Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 974 (8th Cir. 2011) (requiring the complaint to "explicitly state" a basis for federal jurisdiction to trigger the running of the 30-day clock); *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1091 (9th Cir. 2021) (basis for removal must "unequivocally clear and certain"); *Paros Props. LLC v. Colo. Cas. Ins*, 835 F.3d 1264, 1269 (10th Cir. 2016) ("The 30-day clock does not begin to tun until the plaintiff provides the defendant with 'clear and unequivocal notice' that the suit is removable"); *Lowry v. Ala. Power Co.*, 483 F.3d 1213 n.63, 1218 (11th Cir. 2007) (finding removal is proper only if the

documents presented by the defendant contain "an unambiguous statement that clearly establishes federal jurisdiction").

The Attorney General ignores this Court's "solid and unambiguous" standard and instead spends the bulk of her brief arguing that the district court erred by applying equitable considerations and finding that overriding federal interests required that the case remain in federal court. But the district court also found that its order denying the motion to remand in *Michigan v. Enbridge* clarified and established for the first time that the federal district court was the appropriate court for deciding the issues at stake. (Order Denying Motion to Remand, R. 23, Page ID # 620).

The Attorney General, however, asserts that it "strains credulity" that Enbridge did not have solid and unambiguous notice that the Attorney General's claims were removable until the district court's order in *Michigan v. Enbridge* denying the State's efforts to remand that case. Appellant's Opening Br. 47. The Attorney General contends that because Enbridge argued the bases for removal in moving to dismiss the state court action and because it removed the case in *Michigan v. Enbridge*, it follows that it had solid and ambiguous notice that the case was

18

removable prior to the district court's order in *Michigan v. Enbridge*. Appellant's Opening Br. 47-53. The Attorney General's argument fundamentally misunderstands the test for determining when the 30-day clock for removal begins, and if the Attorney General's argument were adopted, it would create an unworkable standard.

First, "whether a defendant can establish that federal jurisdiction exists and the question of when the thirty-day time period begins are not two sides of the same coin." *Graiser v. Visionworks of Am., Inc.*, 819 F.3d 277, 285 (6th Cir. 2016) (quoting *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1141 n.3 (9th Cir. 2013)). The thirty-day clock does not start when the defendant believes it could prevail on an argument that the case is removable, but rather when the defendant has received, either through the initial pleading or from a subsequent amended pleading, motion, order or other paper, "solid and unambiguous information that the case is removable." *Berera*, 779 F.3d at 364.

Stated differently, the "solid and unambiguous" standard is an objective standard, not a subjective one. It does not delve into whether the defendant subjectively believed that the case was removable and when the defendant may have developed such a belief. It instead asks

19

when the defendant received objective solid and unambiguous information that the case was removable. Only then does the 30-day clock begin. *See, e.g.*, *Rowe*, 750 F. Supp. at 721 (rejecting a subjective inquiry approach); *Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 162 (4th Cir. 1997) ("we will not require courts to inquire into the subjective knowledge of the defendant"); *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 163 (5th Cir. 1992) ("We adopt this rule because we conclude that it promotes certainty and judicial efficiency by not requiring courts to inquire into what a particular defendant may or may not subjectively know").

The subjective standard asserted by the Attorney General is unworkable. This Court in *Graiser* analyzed when the thirty-day clock under § 1446(b)(3) begins. 819 F.3d at 282. Plaintiffs in *Graiser* argued that the defendant could have ascertained that the case was removable if it had applied its own sales data and documents within its possession to calculate the amount in controversy. *Id.* at 281. This court rejected the plaintiffs' theory, holding instead that "the thirty-day clocks of § 1446(b) begin to run only when the defendant receives a document from the plaintiff from which the defendant can unambiguously ascertain

20

CAFA jurisdiction." *Id.* at 285. A contrary holding would create an unworkable standard that requires "guesswork and involves ambiguity" to determine when the defendant had enough information in its possession to ascertain that the case was removable. *Id.* at 283.

*Graiser* was a Class Action Fairness Act ("CAFA") case, and Union Amici understand that there is "no antiremoval presumption" in CAFA cases. *Graiser*, 819 F.3d at 283. Nevertheless, the rationale for a bright-line objective rule for when a defendant is on notice that a case is removable should not depend on the nature of the case, and the Attorney General's argument would create a standard as unworkable in a non-CAFA case as one under CAFA.

For example, under the Attorney General's theory, if a complaint is filed in state court seeking relief solely under state law, an internal memorandum created by counsel setting forth a basis for removal would presumably start the thirty-day clock. Such a rule would require courts to inquire into the subjective knowledge of the defendant and their counsel, which would in turn "degenerate into a mini-trial regarding who knew what and when." *Lovern*, 121 F.3d at 162.

Until the district court denied the motion to remand in *Michigan v. Enbridge*, Enbridge did not have solid and unambiguous information from an "amended pleading, motion, order or other paper" that the case was removable.[3] (Order Denying Motion to Remand, 1:20-cv-1142, R. 80, Page ID # 1021-1035). Enbridge removed within thirty days of receiving that objective solid and unambiguous information. (*Id.*; Notice of

---

[3]    The amici Tribal Nations' argument that the word "order" in Section 1446(b)(3) does not include an order in a related case is fundamentally flawed. Br. of Tribal Nations as Amicus Curiae at 16. First, the cases the Tribal Nations cite to support their claim involve unrelated cases. Here, *Michigan v. Enbridge* was not only a related case, but in the words of the district court, was "closely parallel." (Order Denying Motion to Remand, R.23, Page ID # 616). Second and more fundamentally, if an order from a court in another case is not an "order" under Section 1446(b)(3), then the 30-day clock was not started by the order denying the State of Michigan's motion to remand in *Michigan v. Enbridge*. Likewise, the Attorney General's argument that removal was not appropriate because "the Attorney General has never amended her complaint, nor has the removability of the case changed in any way since its inception" misses the point. Appellant's Opening Br. at 52. Section 1446(b)(3) pleadings, motions, orders or other papers start the 30-day clock under Section 1446 – they do not establish federal jurisdiction without which removal is improper. If the district court's denial of the motion to remand in *Michigan v. Enbridge* is not an order or paper under §1446(b)(3), and if the Attorney General has never amended her complaint in a way that supplied solid and unambiguous information that the case was removable, then all that demonstrates is that the 30-day clock never began, which would unquestionably make Enbridge's removal timely.

Removal, R.1, Page ID # 1-17). Therefore, Enbridge timely filed its notice to remove.

## II.    The Complaint Satisfies the *Grable* Test for Federal Jurisdiction.

Federal courts have jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "This provision . . . is invoked by and large by plaintiffs pleading a cause of action created by federal law, [but] [t]here is . . . another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). That is, "in certain cases federal-question jurisdiction will lie over state-law claims that implicate federal issues." *Id.* That longstanding construction of federal "arising under" jurisdiction under Section 1331 "captures the common-sense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers." *Id.*

A state law cause of action, therefore, may be brought under Section 1331 if it is "(1) necessarily raised, (2) actually disputed, (3) substantial,

and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton,* 568 U.S. 251, 258 (2013). In this case, the Attorney General's claim of authority to revoke the 1953 Easement necessarily depends on substantial federal issues arising under the 1953 Submerged Lands Act, 43 U.S.C. § 1314(a), the 1977 Transit Treaty,[4] and the Pipeline Safety Act, 49 U.S.C. § 60104. Enbridge's brief explains that these issues are both substantial and disputed; and that entertaining this dispute in federal court will promote, rather than disturb, the "congressionally approved" federal-state balance. Br. of Appellees at 35-50. The Union Amici fully endorse Enbridge's arguments and add two points that underscore the appropriateness of rejecting the Attorney General's claim that this case should be remanded to state court.

---

[4] Transit Pipelines Agreement between the United States of America and Canada, signed at Washington January 28, 1977, 28 UST 7449, 1988 U.S.T. LEXIS 146 (Jan. 28, 1977).

A.   **Whether a complaint "necessarily raise[s] a stated federal issue" does not depend on the plaintiff's "artful pleading."**

The dispute in *Grable* began when the Internal Revenue Service seized Grable & Sons Metal Products' property for failure to pay taxes and sold the property to Darue Engineering.  545 U.S. at 310.  Grable then sued Darue in state court, claiming that Darue's title to the property was invalid, specifically because the IRS had failed to provide Grable with notice required by 26 U.S.C. § 6335.  *Id.* at 311. Darue removed the case to federal court.  In affirming the lower courts' denial of Grable's attempts to remand the case, the Supreme Court noted that on its face, Grable's complaint "premised its superior title claim on a failure by the IRS to give it adequate notice, as defined by federal law." *Id.* at 314-15. In that case, Grable itself had identified the federal law embedded in its state law claim.  But whether a complaint "necessarily raise[s] a . . . federal issue" for purposes of *Grable*'s first prong does not turn on how the plaintiff frames its claim. Plaintiffs may not avoid removal jurisdiction "by artfully casting their essentially federal law claims as state-law claims." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, n.2 (1981) (internal quotation marks, citations, and edits omitted).

Thus, in *Arkansas v. Texas Gas Transmission Corp.*, a case raising issues nearly identical to those the Attorney General raises here, the State of Arkansas filed a state court action seeking to enjoin Texas Gas from transporting "gas and other products" through a pipeline that crossed under the Mississippi River on land "belonging to the State of Arkansas." 171 F. Supp. 413, 415 (E.D. Ark. 1959). The complaint alleged "that the State of Arkansas is the sole owner of the land" on which the defendant "has laid and is maintaining pipelines," and that "defendant's use of said land belonging to the State of Arkansas . . . constitutes a continuing trespass." *Id.* As pled, the complaint simply asserted an ownership claim. The court, however, found in that claim "the rather obvious assertion, that such ownership is paramount and superior to the rights of the United States" under the Constitution and various statutes, including the Submerged Lands Act. *Id.* at 16. Because conflicts between federal law and Arkansas' ownership claim, although not expressly identified in the complaint, were nonetheless "issues apparent from the face of the plaintiff's original petition," the court found "they compel[led] the conclusion that the plaintiff by that pleading has raised a federal question or questions." *Id.* at 417.

Similarly, in *R.I. Fishermen's All., Inc. v. R.I. Dept. of Env't. Mgmt.,* 585 F.3d 42 (1st Cir. 2009), the Fishermen's Alliance challenged the State's regulation restricting the number of lobster traps the Alliance's members could set. Although the complaint alleged only that the regulation violated state law, the court found that under the law on which the plaintiffs based their claims, the State's authority rested on the terms of a federal law and thus, that the complaint raised a federal question. *Id.* at 49 ("[T]he question of whether the [agency] acted outside the scope of [its] authority . . . turns exclusively on the antecedent (and embedded) federal question of whether that act was expressly required by federal law"). *See also Sarauer v. Machinists Dist. No. 10,* 966 F.3d 661, 677 (7th Cir. 2020) (finding the plaintiff's claim that defendants violated state labor and wage and hour laws necessarily required determination whether the defendants' collective bargaining agreement had been "renewed, modified [or] extended" by a certain date, a question committed to federal law).

Because Michigan's control over the Straits of Mackinac that Line 5 traverses depends on the extent to which the State retains property rights under the Submerged Lands Act and the 1977 Treaty, the

complaint's state law claims necessarily raise federal issues. The Attorney General cannot avoid this result through artful pleading.[5]

## B. The scope of interests implicated by this dispute demonstrate that the federal issues are "substantial."

To establish that the federal issue raised by a state law claim is substantial, the "inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole." *Gunn,* 568 U.S. at 260. *See also Mikulski v. Centerior Energy Corp.* 501 F.3d 555, 570 (6th Cir. 2007) (citing *Empire HealthChoice Assurance, Inc. v. McVeigh,* 547 U.S. 677 (2006), as summarizing aspects of a case that "affect the substantiality of the federal interest in that case," including "whether the federal question is important").

The Attorney General asserts that this case does not raise substantial issues of federal concern because she frames the case as one that is fact-bound and situation specific, while ignoring the interstate and international nature of Line 5 and its importance to the economy of the upper Midwest of the United States and the nation of Canada.

---

[5] The fact that this case implicates critical aspects of international relations – an inherently federal subject – also demonstrates the need to apply federal common law.  Brief of Appellees at 50-54.

This case raises a panoply of concerns of critical importance in the federal system. These include, *at a minimum,* whether a single state can unilaterally decide the fate of a pipeline that crosses and provides product to at least four states and two countries; the impact of the state's decision on jobs and on the economic viability of the communities that depend on Line 5; the impact of potential breaches in Line 5 on the environment and the relative rights of states and the federal government to address pipeline safety; and the rights of foreign governments to enforce their treaties and to participate in litigation in the U.S.  The very fact that these issues are raised in this case demonstrates the importance – and thus, the substantiality – of the federal and international questions the Attorney General's complaint raises.

## CONCLUSION

For the reasons stated, North America's Building Trades Unions and the United Steelworkers respectfully ask this Court to affirm the district court's August 18, 2022 Opinion and Order denying the Attorney General's motion to remand this case to state court.

Respectfully submitted,

s/Jonathan D. Newman
Jonathan D. Newman
SHERMAN DUNN, P.C.
900 7TH Street, N.W., Ste 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

*Counsel for North America's Building Trades Unions*

s/David R. Jury
David R. Jury, General Counsel
UNITED STEELWORKERS
60 Boulevard of the Allies, Room 807
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org

*Counsel for United Steelworkers*

November 24, 2023

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 5,900 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

November 24, 2023

s/Jonathan D. Newman

Jonathan D. Newman

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

November 24, 2023

s/Jonathan D. Newman

Jonathan D. Newman