No. 23-1671

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

DANA NESSEL, Attorney General of the State of Michigan, on behalf of the People
of the State of Michigan,

*Plaintiff-Appellant,*

v.

ENBRIDGE ENERGY, LIMITED PARTNERSHIP; ENBRIDGE ENERGY COMPANY, INC.;
AND ENBRIDGE ENERGY PARTNERS, L.P.,

*Defendants-Appellees.*

_____

On Permissive Interlocutory Appeal from the United States District Court for the
Western District of Michigan, Case No. 1:21-CV-01057-jtn-rsk

_____

**BRIEF OF THE CHAMBERS AS *AMICI CURIAE* IN SUPPORT OF
DEFENDANTS-APPELLEES**

_____

Tara S. Morrissey
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337


*Counsel for Amicus Curiae
Chamber of Commerce of the
United States of America*

Elbert Lin
 *Counsel of Record*
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@huntonak.com
(804) 788-7202


*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: <u>23-1671</u>                Case Name: <u>Nessel v. Enbridge Energy, L.P., et al.</u>

Name of counsel: <u>Elbert Lin</u>

Pursuant to 6th Cir. R. 26.1, <u>Chamber of Commerce of the United States of America</u>
*Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No, no publicly held company has 10% or greater ownership in the Chamber.

CERTIFICATE OF SERVICE

I certify that on <u>        November 24, 2023        </u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/<u>Elbert Lin</u>

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1671                    Case Name: Nessel v. Enbridge Energy, L.P., et al.

Name of counsel: Elbert Lin

Pursuant to 6th Cir. R. 26.1, Canadian Chamber of Commerce
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No, no publicly held company has 10% or greater ownership in the Chamber

## CERTIFICATE OF SERVICE

I certify that on _____ November 24, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Elbert Lin

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1671                    Case Name: Nessel v. Enbridge Energy, L.P., et al.

Name of counsel: Elbert Lin

Pursuant to 6th Cir. R. 26.1, Indiana Chamber of Commerce
                                                *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

> No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

> No, no publicly held company has 10% or greater ownership in the Chamber

---

CERTIFICATE OF SERVICE

I certify that on _____ November 24, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Elbert Lin

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1671                    Case Name: Nessel v. Enbridge Energy, L.P., et al.

Name of counsel: Elbert Lin

Pursuant to 6th Cir. R. 26.1, Michigan Chamber of Commerce
                              *Name of Party*
makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No, no publicly held company has 10% or greater ownership in the Chamber

CERTIFICATE OF SERVICE

I certify that on _____ November 24, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Elbert Lin

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: <u>23-1671</u>          Case Name: <u>Nessel v. Enbridge Energy, L.P., et al.</u>

Name of counsel: <u>Elbert Lin</u>

Pursuant to 6th Cir. R. 26.1, <u>Ohio Chamber of Commerce</u>
*Name of Party*
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No, no publicly held company has any ownership in the Chamber

CERTIFICATE OF SERVICE

I certify that on <u>          November 24, 2023          </u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/<u>Elbert Lin</u>

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

**(c)  Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 23-1671            Case Name: Nessel v. Enbridge Energy, L.P., et al.

Name of counsel: Elbert Lin

Pursuant to 6th Cir. R. 26.1, Pennsylvania Chamber of Business and Industry
                                            *Name of Party*
makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

No

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

No, no publicly held company has 10% or greater ownership in the Chamber

CERTIFICATE OF SERVICE

I certify that on _____ November 24, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Elbert Lin

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 23-1671_____   Case Name: Nessel v. Enbridge Energy, L.P., et al.___

Name of counsel: Elbert Lin_____

Pursuant to 6th Cir. R. 26.1, Wisconsin Manufacturers and Commerce_____
                                                          *Name of Party*
makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

> No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

> No, no publicly held company has 10% or greater ownership in the Chamber

---

CERTIFICATE OF SERVICE

I certify that on _____November 24, 2023_____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Elbert Lin_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF *AMICI CURIAE* ....................................................... vi

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 2

I. THE NATIONAL AND INTERNATIONAL CONSEQUENCES OF A LINE 5 SHUTDOWN SUPPORT FEDERAL JURISDICTION ........................................... 2

A. Shutting down Line 5 would lead to severe negative consequences in multiple states ............................................................................................. 2

B. Shutting down Line 5 would also cause harm internationally ............................... 7

II. THE STATE'S EFFORTS TO EVADE FEDERAL JURISDICTION SHOULD NOT BE CONDONED ...................................................... 9

A. The State and its representatives have sought to escape federal jurisdiction through overt gamesmanship ........................................................... 9

B. The State's gamesmanship is wasteful, unbecoming, and inconsistent with the federal courts' "virtually unflagging" obligation to exercise federal jurisdiction where it exists ..................................................................................... 13

CONCLUSION .................................................................................. 17

CERTIFICATE OF COMPLIANCE ................................................... 18

CERTIFICATE OF SERVICE ............................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Acheson Hotels, LLC v. Laufer*, 143 S.Ct. 1053 (2023)...........................................15

*Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Rsrv. v. Enbridge Energy Co., et al.*, Case No. 19-cv-602 (W.D. Wis. 2023) ....................................................................................... i, 6

*Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976)............ 1, 13, 15

*Colt Industries Operating Corp. v. Index-Werke K.G.*, 739 F.2d 622 (Fed. Cir. 1984) .................................................................................... 13

*Doster v. Kendall*, 54 F.4th 398 (6th Cir. 2022) ...................................................... 14

*Estate of Cornell v. Bayview Loan Serv.*, LLC, 908 F.3d 1008 (6th Cir. 2018).......................................................................................................... 2

*Enbridge v. Whitmer*, No. 1:20-cv-1141 .................................................................. 10

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005) ...................................................... 2

*Gunn v. Minton*, 568 U.S. 251 (2013) ....................................................................... 2

*In re Kramer*, 71 F.4th 428 (6th Cir. 2023)............................................................. 14

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298 (2012)......................... 15

*LeChase Constr. Servs., LLC v. Argonaut Ins. Co.*, 63 F.4th 160 (2d Cir. 2023) ........................................................................................................ 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........................................................................................................ 14

*Mata v. Lynch*, 576 U.S. 143 (2015) ....................................................................... 13

*Michigan v. Enbridge*, No. 1:20-cv-01142-JTN-RSK, ECF. No. 80..................... 10

*Reece v. Bank of N.Y. Mellon*, 760 F.3d 771 (8th Cir. 2014) ................................. 16

ii

*Republic Bldg. Co., Inc. v. Charter Twp. of Clinton, Michigan*, 81 F.4th 662 (6th Cir. 2023) ............................................................. 14

*Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) ............................ 2

*Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013) ............................ 13, 14

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................................ 14

*Williams v. Costco Wholesale Corp.*, 471 F.3d 975  (9th Cir. 2006) .................... 15

*William Powell Co. v. Nat'l Indem. Co.*, 18 F.4th 856 (6th Cir. 2021) .............. 1, 14

**Statutes**

28 U.S.C. § 1447(e) ................................................................................................. 15

**Other Authorities**

Agreement between the Government of Canada and the Government of the United States of America Concerning Transit Pipelines, art. 1-2, Jan. 28, 1977, 28 UST 7449, TIAS 8720 ............................................................. 9

Committee on Economic Relationship, statement of Joseph Mancinelli, International Vice-President, Central and Eastern Canada Regional Manager, Laborers' International Union of North America, https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/meeting-5/evidence#Int-11191807 ........................................................ 6

DYNAMIC RISK ASSESSMENT SYSTEMS INC. FOR THE STATE OF MICH., ALTERNATIVES ANALYSIS FOR THE STRAITS PIPELINES, FINAL REPORT, at 4-6, (2017) ............................................................................... 5-6

ENBRIDGE, LINE 5 WISCONSIN SEGMENT RELOCATION PROJECT (2020), https://tinyurl.com/2hwxnbbj ................................................................. 6

*Governor Whitmer Takes Action to Protect the Great Lakes* (Nov. 30, 2021), https://tinyurl.com/yc5cj5hv ................................................................. 11

INTEK, INC., OFF OF ENERGY POL'Y & SYS. ANALYSIS, U.S. DEP'T OF ENERGY, U.S. FUEL RESILIENCY: VOLUME III UNITED STATES FUEL SUPPLY INFRASTRUCTURE VULNERABILITY AND RESILIENCE (2014), https://tinyurl.com/4uda6k5t ................................................................. 2

INTERNAL REVENUE SERVICE NOTICE 2017-30, TEMPORARY RELIEF FOR
    FUEL REMOVALS DUE TO ENERGY EMERGENCIES RESULTING FROM
    WEST SHORE PIPELINE SHUTDOWN, § 2.01 (2017) ............................................... 4

Karen Clay et al., *The External Costs of Transporting Petroleum
    Products by Pipelines and Rail: Evidence From Shipments of Crude
    Oil From North Dakota,* NATIONAL BUREAU OF ECONOMIC
    RESEARCH, Sep. 2017, at 3,
    https://www.nber.org/system/files/working_papers/w23852/w23852.
    pdf .................................................................................................................... 7

*Line 5 and the Great Lakes Tunnel: Fact vs. fiction*, ENBRIDGE,
    https://www.enbridge.com/projects-and-infrastructure/public-
    awareness/line-5-fact-vs-fiction (last accessed Nov. 20, 2023) .......................... 8

M.D. Kittle, *The Pipeline War*, WISCONSINSPOTLIGHT.COM, March 20,
    2022 ................................................................................................................. 5, 8

Mich. Exec. Order No. 2016-10 (May 24, 2016), ................................................... 4

MICH. PUB. SERV. COMM'N, MICH. PETROLEUM SHORTAGE RESPONSE
    PLAN (2013), https://tinyurl.com/29ncwyyu ..................................................... 3

MICH. PUB. SERV. COMM'N, *Michigan Statewide Energy Assessment*
    (2019) ................................................................................................................. 3

Motion to Remand (ECF No. 41), *Michigan v. Enbridge*, 571 F. Supp.
    3d. 851 (W.D. Mich. 2021) ............................................................................... 11

Op. & Order (ECF No. 23), *Nessel v. Enbridge*, 2023 WL 2482922
    (W.D. Mich. 2023) (No. 1:21-cv-1057) ....................................................... 12, 16

Op. & Order (ECF No. 80), *Michigan v. Enbridge*, 571 F. Supp. 3d. 851
    (W.D. Mich. 2021) (No. 1:20-cv-01142-JTN-RSK). ............................. 10-12, 16

Special Committee on the Economic Relationship between Canada and
    the United States, *Enbridge's Line 5: An Interim Report;
    Relationship between Canada and the United States* (Apr. 2021;
    43rd Parliament, 2nd Session), https://tinyurl.com/34h7s9wh .................... 5, 7-8

Tenn. Exec. Order No. 56 (Sept. 16, 2016) ............................................................. 5

*Today in Energy*, U.S. ENERGY INFORMATION ADMINISTRATION (Aug.
    25, 2021), https://tinyurl.com/4ffrbmvd ............................................................. 3

U.S. GOVERNMENT ACCOUNTABILITY OFFICE, OIL AND GAS TRANSP.
(2014) ............................................................................................................. 7

Warren Wilczewski, *Energy Information Administration presentation to
State of Michigan U.P. Energy Task Force* (Nov. 13, 2019)............................. 3

Wis. Exec. Order No. 268 (December 28, 2017). ..................................................... 3

*Wisconsin State Profile and Energy Estimates*, U.S. ENERGY
INFORMATION ADMINISTRATION (Aug. 17, 2023)
https://www.eia.gov/state/analysis.php?sid=WI .................................................. 4

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America, the Canadian Chamber of Commerce, the Indiana Chamber of Commerce, the Michigan Chamber of Commerce, the Ohio Chamber of Commerce, the Pennsylvania Chamber of Business and Industry, and the Wisconsin Manufacturers and Commerce Inc. (collectively, the "Chambers") respectfully submit this *amici curiae* brief in support of Defendants-Appellees (collectively, "Enbridge").

The Chamber of Commerce of the United States of America ("U.S. Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the U.S. Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the U.S. Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Canadian Chamber of Commerce (the "Canadian Chamber") is Canada's largest and most activated business network—representing over 400 chambers of commerce and boards of trade and more than 200,000 business of all sizes, from all

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

sectors of the economy and from every part of the country—to create the conditions for collective success. The Canadian Chamber works to promote business success and a healthier economy. In order to support Canadian business interests domestically and globally, the Canadian Chamber will at times file *amicus curiae* briefs like this one.

The Indiana Chamber of Commerce ("Indiana Chamber") seeks to provide the maximum opportunity for meaningful employment for all the citizens of Indiana by ensuring that a world-competitive business climate exists in the state. The Indiana Chamber does this by advancing thoughtful public policy in the legislature and before Indiana courts. With more than 5,000 member businesses, the Indiana Chamber is the largest broad-based business organization in the state.

The Michigan Chamber of Commerce ("Michigan Chamber") is Michigan's leading state-wide business advocacy organization representing approximately 4,000 members who employ more than 1 million people. Its membership includes businesses big and small, trade associations, and local chambers of commerce representing all 83 Michigan counties and a variety of industries. For over 60 years, the Michigan Chamber has been a champion for good public policy. Using its voice to advance member priorities through legislative, legal, and political action, the Michigan Chamber's ultimate goal is to achieve policies that benefit members, their employees, and in turn the people of the State of Michigan by enhancing the quality of life for Michigan families.

The Ohio Chamber of Commerce ("Ohio Chamber") is Ohio's largest and most

diverse statewide business advocacy organization, representing businesses ranging from small sole proprietorships to some of the nation's largest companies. Founded in 1893, the Ohio Chamber works to promote and protect the interests of its nearly 8,000 business members, while building a more favorable business climate in Ohio by advocating for the interests of Ohio's business community on matters of statewide importance. The Ohio Chamber promotes a pro-growth agenda with policymakers and in courts across Ohio. It seeks a stable and predictable legal system which fosters a business climate where enterprise and Ohioans can prosper. The Ohio Chamber regularly files *amicus* briefs in cases that are important to its members' interests.

The Pennsylvania Chamber of Business and Industry ("Pennsylvania Chamber") is the largest broad-based business association in Pennsylvania. It has close to 10,000 member businesses throughout Pennsylvania, which employ more than half of the Commonwealth's private workforce. Its members range from small companies to mid-size and large business enterprises. The Pennsylvania Chamber's mission is to advocate on public policy issues that will expand private sector job creation, to promote an improved and stable business climate, and to promote Pennsylvania's economic development for the benefit of all Pennsylvania citizens.

Wisconsin Manufacturers & Commerce Inc. ("WMC") is Wisconsin's chamber of commerce and manufacturers' association. With member businesses of all sizes and across all sectors of Wisconsin's economy, WMC is the largest business trade association in Wisconsin. Since its founding in 1911, WMC has been dedicated to

making Wisconsin the most competitive state in the nation in which to conduct business. WMC and its members have a strong interest in this case. WMC has members who rely on the oil and natural gas that Line 5 transports and would be left with no alternative access to this pipeline's affordable and reliable energy if it were shut down.

*Amici* represent businesses throughout the United States and Canada, many of which will be negatively impacted by a shutdown of Enbridge's operation of the Line 5 Pipeline ("Line 5") in the Straits of Mackinac. Shutting down the pipeline would constrain an already disrupted energy supply and harm the economies of the United States and Canada. But this case is about more than an operational pipeline. It's about abuses of government power. The State of Michigan—through various state officials—has filed repeat lawsuits to shut down the pipeline. And those state officials have engaged in transparent attempts to evade federal jurisdiction, even after the federal District Court here held that it had authority over this controversy given the compelling federal interests at stake. Such tactics undermine confidence in government, waste judicial resources, and impose significant costs on litigants. Cases that present issues of great importance to the federal system and to the country's foreign relations belong in federal court. And businesses should be able to access the federal courts when jurisdiction is proper, and count on those courts to reject blatant gamesmanship, particularly from state actors.

## **INTRODUCTION**

Enbridge's brief explains the many reasons why this case belongs in federal court. The Chambers submit this *amici* brief to highlight two policy concerns that further reinforce the propriety of the District Court's order denying remand.

*First*, the proposed shutdown of Line 5 at the Straits of Mackinac would have substantial negative impact across state and national borders. Line 5 is a critical part of an interstate and international market for petroleum and natural gas liquids, which are used to heat homes and businesses, fuel vehicles, and provide a myriad of manufacturing and other uses. Shutting down the pipeline carries tremendous economic, energy, and environmental consequences for business and residents throughout the Midwest and in Canada, and would impact the national economy and foreign relations.

*Second*, the State of Michigan (through various state officials) has engaged in overt gamesmanship not just to avoid federal court, but to effectively nullify a District Court order concluding that federal jurisdiction is proper. Such gamesmanship should not be condoned. It is wasteful and erodes the public's trust in the government. It also contravenes the federal courts' long-recognized and "virtually unflagging" obligation to exercise federal jurisdiction where it has been found to exist. *Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976); *William Powell Co. v. Nat'l Indem. Co.*, 18 F.4th 856, 864 (6th Cir. 2021).

This Court should affirm the District Court's order denying remand.

# ARGUMENT

## I.    THE NATIONAL AND INTERNATIONAL CONSEQUENCES OF A LINE 5 SHUTDOWN SUPPORT FEDERAL JURISDICTION.

The potential negative impact of this suit is difficult to overstate. A shutdown of Line 5 in Michigan will have effects across the Midwest and in Canada, depriving businesses and residents of needed fuel, energy, and jobs, and leaving new economic, environmental, and safety challenges in its wake. This case is indisputably of great importance "to the federal system as a whole," further confirming that it should remain in federal court. *Gunn v. Minton*, 568 U.S. 251, 260 (2013); *Estate of Cornell v. Bayview Loan Serv.,* LLC, 908 F.3d 1008, 1015 (6th Cir. 2018).[2]

### A.    Shutting down Line 5 would lead to severe negative consequences in multiple states.

The petroleum and natural gas markets of individual states in the Midwest are highly interdependent. Businesses that use and supply energy in the Midwest depend critically on resources from across the region. INTEK, INC., OFF OF ENERGY POL'Y & SYS. ANALYSIS, U.S. DEP'T OF ENERGY, U.S. FUEL RESILIENCY: VOLUME III UNITED STATES FUEL SUPPLY INFRASTRUCTURE VULNERABILITY AND RESILIENCE at 26 (2014),

---

[2] The consequences of this case support federal jurisdiction under both theories advanced by Enbridge. First, there is federal jurisdiction because the "state-law claims … implicate significant federal issues." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 312 (2005); *see* Br. of Appellees (ECF No. 35) at PageID 40. Second, under federal common law, "there is federal question jurisdiction over actions having important foreign policy implications." *Republic of Philippines v. Marcos*, 806 F.2d 344, 353 (2d Cir. 1986); *see* Br. of Appellees (ECF No. 35) at PageID 50.

https://tinyurl.com/4uda6k5t.

Take Michigan, for example. Michigan residents consume more propane than any state in the country. MICH. PUB. SERV. COMM'N, *Michigan Statewide Energy Assessment*, at 131 (2019). To feed that demand, businesses in Michigan rely in part on in-state propane facilities but also on propane deliveries from locations in Canada, Illinois, and Ohio. *Id.* at 131; *see also* Warren Wilczewski, *Energy Information Administration presentation to State of Michigan U.P. Energy Task Force*, slide 15 (Nov. 13, 2019). And even the in-state facilities often process their propane from raw materials piped in from out of state. *See* MICH. PUB. SERV. COMM'N, *Michigan Statewide Energy Assessment*, at 130 (2019). When supplies are especially tight—such as in the polar vortex of 2014—Michigan has even received propane by truck from Kansas and as far as the Gulf Coast. *Michigan Statewide Energy Assessment* at 22, 134 (2019). In addition, "the majority of the refined petroleum products used in Michigan are produced at refineries elsewhere, such as Ohio, Indiana and Illinois." MICH. PUB. SERV. COMM'N, MICH. PETROLEUM SHORTAGE RESPONSE PLAN at 3 (2013), https://tinyurl.com/29ncwyyu.

The same is true of Wisconsin. Its residents rank among the highest in the nation in propane consumption. *Today in Energy*, U.S. ENERGY INFORMATION ADMINISTRATION (Aug. 25, 2021), https://tinyurl.com/4ffrbmvd. Wisconsin propane suppliers thus must also turn to sources from across the Midwest, including in Michigan, Minnesota, and Illinois. Wis. Exec. Order No. 268 at 1 (December 28,

2017). Wisconsin likewise plays a part in the interconnected petroleum marketplace. *Wisconsin State Profile and Energy Estimates*, U.S. ENERGY INFORMATION ADMINISTRATION (Aug. 17, 2023) https://www.eia.gov/state/analysis.php?sid=WI. A refinery in Wisconsin receives crude oil from places like Canada and North Dakota by an interstate pipeline that also serves to transport crude oil across Wisconsin to refineries in Illinois and Michigan. *Id.*

This interdependency means that the shutdown of a pipeline in the Midwest will have immediate, negative impacts across the region. For example, the 2016 shutdown of the West Shore Pipeline in Wisconsin created emergency conditions in Michigan. Mich. Exec. Order No. 2016-10, at 1 (May 24, 2016), https://tinyurl.com/y4tyvac5; *see* INTERNAL REVENUE SERVICE NOTICE 2017-30, TEMPORARY RELIEF FOR FUEL REMOVALS DUE TO ENERGY EMERGENCIES RESULTING FROM WEST SHORE PIPELINE SHUTDOWN, § 2.01 (2017). Residents of the Upper Peninsula faced shortages and shipment delays of gasoline and other motor fuel supplies. *Id.* Those products had to come by truck instead—which requires long hours from drivers and many miles driven. In an attempt to overcome at least some of these limitations in the face of an emergency, the Governor of Michigan had to suspend a state law to permit the drivers of those transport trucks to put in longer hours than safety requirements ordinarily allowed. *Id.* at 2.[3]

---

[3] A similar scenario played out in the Southeast during a 12-day shutdown of the Colonial Pipeline in Alabama in September 2016. Energy emergencies were

A Line 5 shutdown would almost certainly be worse from an energy standpoint. Every day, Line 5 transports up to 540,000 barrels of crude oil and natural gas liquids, which are refined into products like propane, gasoline, and jet fuel in refineries and factories in Indiana, Michigan, Ohio, and Pennsylvania.[4] Indeed, "Line 5 delivers more than half the propane and home heating oil consumed in Michigan, and is a vital source of energy for Ohio and Pennsylvania as well . . . ." M.D. Kittle, *The Pipeline War*, WISCONSINSPOTLIGHT.COM, March 20, 2022.

A shutdown would be felt across the Midwest. For example, Michigan predicts that a shutdown of Line 5 would cause a closing of the Rapid River, Michigan processing facility (which receives natural gas liquids from Line 5, extracts propane, and then returns the propane to Line 5 for transport to Sarnia, Ontario). DYNAMIC RISK ASSESSMENT SYSTEMS INC. FOR THE STATE OF MICH., ALTERNATIVES ANALYSIS FOR THE STRAITS PIPELINES, FINAL REPORT, at 4-6, (2017) ("DYNAMIC RISK ASSESSMENT"). But Wisconsin also depends on the Rapid River facility for its propane.

_____

declared in Alabama, Georgia, North Carolina, and Tennessee. *See* Tenn. Exec. Order No. 56, at 1 (Sept. 16, 2016). In Tennessee, gas supplies became so scarce that parts of the state experienced a "run on the pumps," during which sales for gasoline surged to 50% above normal. Ruth Horton, National Ass'n Of State Energy Offices, Integrating Alternative Fuel Vehicles into Emergency Plans: A Toolkit for Tennessee, p. 8.

[4] Special Committee on the Economic Relationship between Canada and the United States, *Enbridge's Line 5: An Interim Report; Relationship between Canada and the United States*, at 3 (Apr. 2021; 43rd Parliament, 2nd Session), https://tinyurl.com/34h7s9wh ("Special Committee Report on Line 5").

ENBRIDGE, LINE 5 WISCONSIN SEGMENT RELOCATION PROJECT at 3, (2020), https://tinyurl.com/2hwxnbbj. To compensate for the loss of the Rapid River processing facility, petroleum products would need to be transported by truck from other locations. DYNAMIC RISK ASSESSMENT at 4-5.

A shutdown would also be crippling for jobs. There would be an estimated annual loss of over 6,000 jobs and $4.82 billion of lost economic output as a result of a Line 5 closure. *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Rsrv. v. Enbridge Energy Co., et al.*, Case No. 19-cv-602, 2023 WL 4043961 (W.D. Wis. Jun. 16, 2023), Decl. of Dr. Corbett Grainger at 2-3 (Dkt. 205:2). And it would not be only pipeline jobs. A wide array of industries—from agriculture to manufacturing—would feel the effects, due to the reliance of these sectors on the energy products transported by Line 5. Committee on Economic Relationship, statement of Joseph Mancinelli, International Vice-President, Central and Eastern Canada Regional Manager, Laborers' International Union of North America, https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/meeting-5/evidence#Int-11191807.

Finally, a shutdown would trigger a cascade of follow-on environmental and safety effects. Again, if products cannot be obtained by pipeline, they will need to come by truck or rail. But "pipelines are relatively safe[r] when compared with other modes, such as rail and truck, for transporting hazardous goods." U.S. GOVERNMENT ACCOUNTABILITY OFFICE, OIL AND GAS TRANSP., at 1 and 18–19 (2014). Trucks and

trains mean more air pollution, more road and rail congestion, and possibly more accidents across the region. Karen Clay et al., *The External Costs of Transporting Petroleum Products by Pipelines and Rail: Evidence From Shipments of Crude Oil From North Dakota*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Sep. 2017, at 3, https://www.nber.org/system/files/working_papers/w23852/w23852.pdf.

### B.    Shutting down Line 5 would also cause harm internationally.

But it is not just the Midwest at stake. The harms resulting from a shutdown of Line 5 would reach into Canada, as the Canadian Government itself has warned repeatedly and in the strongest of terms.[5] Indeed, "the possible shutdown of Line 5 has raised concerns in Canada about the security of energy supplies, job losses and other negative effects."[6]

The fuel system of which Line 5 is a part is not only interstate, but international. Petroleum and natural gas liquids from Line 5 are refined into propane, gasoline, jet fuel, and other products at refineries in Ontario and Quebec. Special Committee Report on Line 5 at 3; *see* Br. of Appellees (ECF No. 35) at PageID 12. *Id.* Some of these

---

[5] In addition to the governmental reports cited and discussed in this brief, the Government of Canada has filed several *amicus* briefs in the District Court below. *See* Br. of Appellees at 4, 10 (referencing Canada Amicus Br., No. 1:20-1142, R. 45, PageID##553-54 and Canada Amicus Br., No. 1:20-cv-01142, R. 45, PageID ## 545-64).

[6] Special Committee Report on Line 5, at 3.

products are used in Canada[7]; some are transported back to the United States for consumption and storage.[8] Thus, a shutdown of Line 5 would undoubtedly threaten the energy market in Canada, too. *See* Brief of Appellees (ECF No. 35) at PageID 11.

In fact, a Special Committee of Canada's House of Commons ("Special Committee") was tasked with analyzing the importance of Line 5 to the Canadian economy and reported that a shutdown would have dire consequences. In its investigation, the Special Committee heard testimony from Canada's Minister of Natural Resources, who explained that "Line 5 supplies four refineries in Ontario and two in Quebec," and that thousands of jobs in both Canada and the United States depend on Line 5. Special Committee Report on Line at 5, 7. The Special Committee also heard from the Canadian Propane Association, which noted that Line 5 is "the only pipeline that supplies propane to southern Ontario" and opined that it would be difficult—if not impossible—to replace the work of Line 5 with other methods, at least in the short term. *Id.* at 6-7; *see also* Br. of Appellees (ECF No. 35) at PageID 12.

Furthermore, a shutdown could strain and possibly damage diplomatic relations. According to the Special Committee, "Line 5 is a significant aspect of Canada's economic relationship with the United States." Special Committee Report on Line 5

---

[7] M.D. Kittle, *The Pipeline War*, WISCONSINSPOTLIGHT.COM, March 20, 2022.

[8] *Line 5 and the Great Lakes Tunnel: Fact vs. fiction*, ENBRIDGE, https://www.enbridge.com/projects-and-infrastructure/public-awareness/line-5-fact-vs-fiction (last accessed Nov. 20, 2023).

8

at 10. The pipeline "contributes to the Canada–U.S. economic relationship, creates opportunities of cross-border trade in energy products, and helps to ensure that consumers in both countries can access these products reliably." *Id.* at 3. A shutdown would plainly be viewed quite negatively by Canadian officials. For example, the Minister of Energy of Alberta, where much of the product transported on Line 5 is sourced, stated that a shutdown of Line 5 would "threaten" Alberta's relationship with Michigan, and potentially other U.S. states. *Id.* And the Special Committee itself went so far as to note that the 1977 Transit Pipelines Treaty prohibits public authorities in the territories of either country from instituting measures that would interfere in any way with the transmission of crude oil or natural gas. *Id.* at 11; Agreement between the Government of Canada and the Government of the United States of America Concerning Transit Pipelines, art. 1-2, Jan. 28, 1977, 28 UST 7449, TIAS 8720. Indeed, in an *amicus* brief to the District Court, the Government of Canada advised that it has formally invoked the 1977 Transit Treaty's dispute resolution provision. Br. of Amicus Curiae Government of Canada (ECF No. 45), No. 1:20-cv-01142-JTN-RSK at 8.

## II. THE STATE'S EFFORTS TO EVADE FEDERAL JURISDICTION SHOULD NOT BE CONDONED.

### A. The State and its representatives have sought to escape federal jurisdiction through overt gamesmanship.

This case is one of two essentially identical cases filed by representatives of the State of Michigan, both seeking to shut down Line 5. This case is the first, brought in

state court by the Michigan Attorney General and requesting a declaration that the 1953 Easement[9] granting Enbridge the right to construct and operate Line 5 in the Straits of Mackinac is void. ECF No. 23 at 1. The suit also seeks a permanent injunction against Enbridge's continued operation of Line 5. *Id.* The parties filed cross motions for summary disposition, which remained pending for around a year.

More than a year later, a second suit—in the name of the State of Michigan, Governor of Michigan, and Michigan Department of Natural Resources—was also filed in state court, seeking effectively the same relief. That suit followed a Notice of Revocation and Termination of Easement (the "Shutdown Order"), which was issued by the State of Michigan and purported to revoke and terminate the 1953 Easement. Op. & Order at 2 (ECF No. 80), *Michigan v. Enbridge*, 571 F. Supp. 3d. 851 (W.D. Mich. 2021) (No. 1:20-cv-01142-JTN-RSK) ("*Michigan v. Enbridge* Order"). The representatives of the State sought a declaration that its Shutdown Order is valid, together with a permanent injunction preventing Enbridge's continued operation of the Line 5 Pipeline. *Id.* at 2-3.[10]

---

[9] The 1953 Easement granted to its grantees and its successors and assigns "the right 'to construct, lay, maintain, use and operate' two 20-inch diameter pipelines for the purpose of transporting petroleum and other products 'over, through, under, and upon' specifically described bottomlands owned by the State of Michigan in the Straits of Mackinac." *Michigan v. Enbridge*, No. 1:20-cv-01142-JTN-RSK (ECF. No. 80) at 2. "The Enbridge Parties are the successor in interest to Lakehead Pipe Line Company, the grantee of the 1953 Easement." *Id.*

[10] A little more than a week later, Enbridge filed suit against Michigan in federal court, seeking declaratory and injunctive relief that the State's Shutdown Order

Enbridge removed the second suit to federal court and defeated a motion to remand. Motion to Remand (ECF No. 41), *Michigan v. Enbridge*, 571 F. Supp. 3d. 851 (W.D. Mich. 2021); *Michigan v. Enbridge* Order.[11] The District Court held that it had jurisdiction, agreeing with Enbridge that "the scope of the property rights the State Parties assert necessarily turns on interpretation of federal law that burdens those rights." *Michigan v. Enbridge* Order at 15. Additionally, the court held that the federal interests in the issues were actually disputed and substantial. *Id.*

Immediately after the District Court's ruling, the State overtly sought to nullify its effect. Its representatives voluntarily dismissed the suit. And the Governor said publicly and unequivocally that the point of the maneuver was to evade an otherwise controlling determination of federal jurisdiction: "[T]he federal court has now decided to keep the lawsuit I filed in November 2020. I believe the people of Michigan, and our state courts, should have the final say . . . After today's action, Attorney General Dana Nessel's lawsuit, filed in June 2019, should now be able to move forward expeditiously in state court." *Governor Whitmer Takes Action to Protect the Great Lakes* (Nov. 30, 2021), https://tinyurl.com/yc5cj5hv.

---

violated federal law. *Enbridge v. Whitmer*, No. 1:20-cv-1141. Enbridge alleged that the Shutdown Order violated a host of federal constitutional and statutory provisions, including the Supremacy Clause, Interstate Commerce Clause, Foreign Commerce Clause, and Foreign Affairs Doctrine.

[11] At this time, the state court proceedings in *Nessel v. Enbridge* were held in abeyance in recognition of the fact that the same controversy was pending before the federal court. Order, Case No. 19-474-CE (Jan. 20, 2021).

But because the District Court had found federal jurisdiction over a materially identical suit, Enbridge then removed this case to federal court too, and it was assigned to the same district judge. ECF No. 1. The Michigan Attorney General moved to remand anyway, which the District Court denied, and that order is now the subject of this appeal. *Id.* at 1.

The State's actions, through its representatives in both cases, are not simply the efforts of a motivated plaintiff to seek what it views *in the first instance* as a more favorable forum. They go further than that. The State's representatives have now repeatedly sought to escape federal court in the face of an order *finding federal jurisdiction proper*. The first time, the Governor admitted as much. Now, the Attorney General tries to distinguish the previous case as "the Governor's case." Br. of Appellants (ECF No. 18) at 60. But that is a distinction without difference. The two suits involve the same underlying facts and law, and seek effectively the same relief. Indeed, even the Attorney General has previously admitted that the two cases are "closely parallel." Br. in Support of Mot. to Remand (ECF No. 11) at PageID.281. As the District Court said below, the reality is that the so-called Governor's case is not materially different from this case, and therefore, "[n]othing has changed since the first order denying remand." Op. & Order at 9 (ECF No. 23), *Nessel v. Enbridge*, 2023 WL 2482922 (W.D. Mich. 2023) (No. 1:21-cv-1057) (*Nessel v. Enbridg*e Order). The Attorney General, like the Governor before, is plainly seeking "to gain an unfair advantage through the improper use of judicial machinery" and "engag[ing] in

12

procedural fencing and forum manipulation." *Id.* at 11.

### B. The State's gamesmanship is wasteful, unbecoming, and inconsistent with the federal courts' "virtually unflagging" obligation to exercise federal jurisdiction where it exists.

At a minimum, the State's gamesmanship crosses the line from zealous advocacy to the kind of wasteful litigation strategy that courts strongly disfavor. There are times where "procedural and semantic gamesmanship [become] abusive of the judicial process and wasteful of resources of the parties and the court." *Colt Industries Operating Corp. v. Index-Werke K.G.*, 739 F.2d 622, 623-24 (Fed. Cir. 1984). This is one of those times. It is one thing to file a motion to remand on a question of federal jurisdiction not yet decided. It is another to voluntarily dismiss that suit after losing the motion. And it is altogether inexcusable to continue to resist federal jurisdiction when the only basis for distinguishing the two suits is the name of the officeholder leading each suit—a fact that has no bearing whatsoever on the question of federal jurisdiction. We certainly should expect more from our public officials, who should be working to encourage trust in our judicial process, not undermine it.

That is not the only problem with the State's actions, however. The State's gamesmanship here runs up against one of the most important duties of the federal judiciary. "[W]hen a federal court has jurisdiction, it also has a 'virtually unflagging obligation ... to exercise' that authority." *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (quoting *Colo. River.*, 424 U.S. at 817). Put simply, it means a court has "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not

given." *Sprint Commc'ns*, 571 U.S. 69, 77 (2013). As this Court has put it, this "obligation is deep-rooted and embedded in the core of American jurisprudence." *In re Kramer*, 71 F.4th 428, 444 (6th Cir. 2023). And it is a mandate the Supreme Court and the lower courts have reaffirmed with increasing frequency. *See., e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014); *Sprint Commc'ns*, 571 U.S. at 77; *Republic Bldg. Co., Inc. v. Charter Twp. of Clinton, Mich.*, 81 F.4th 662, 666 (6th Cir. 2023); *Doster v. Kendall*, 54 F.4th 398, 411 (6th Cir. 2022); *William Powell Co. v. Nat'l Indem. Co.*, 18 F.4th at 864.

Indeed, this unflagging duty has recently caused the Supreme Court to question even its relatively long-standing doctrine of prudential standing. Under that doctrine, courts have declined for decades on purely judge-made grounds to hear cases that are "properly within federal courts' Article III jurisdiction." *Lexmark Int'l, Inc.*, 572 U.S. at 125. That, the Supreme Court has observed, is "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 126 (cleaned up); *see also Doster v. Kendall*, 54 F.4th at 411 ("the Supreme Court has since clarified that courts may not create prudential-standing common law").

Similarly, the Supreme Court and individual justices have increasingly called out tactics that are transparently aimed at depriving the Court of jurisdiction. In *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, the Court held that "maneuvers designed to

14

insulate a decision from review by this Court must be viewed with a critical eye." 567 U.S. 298, 307 (2012). In an opinion for three justices in *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, Justice Alito noted that the Court has "been particularly wary of attempts by parties to manufacture mootness in order to evade review," and expressly tied that vigilance to the Court's "'virtually unflagging' obligation to exercise … jurisdiction where it exists." 140 S. Ct. 1525, 1533 (2020) (Alito, J., dissenting). And during oral argument just a few months ago, the Chief Justice repeated the same concern, wondering "whether or not somebody … can manipulate the Court's jurisdiction … after the Court's granted cert." Transcript of Oral Argument at 13, *Acheson Hotels, LLC v. Laufer*, 143 S.Ct. 1053 (2023).

The lower courts, likewise, have resisted efforts to specially construe removal jurisdiction narrowly or otherwise make it easier to escape a federal forum. This past year, in *LeChase Constr. Servs., LLC v. Argonaut Ins. Co.*, the Second Circuit rejected an "emerging" understanding of 28 U.S.C. § 1447(e)—under which district courts were exercising greater discretion to remand cases to state court—as "sharply at odds with 'the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" 63 F.4th 160, 173 (2d Cir. 2023) (quoting *Colo. River*, 424 U.S. at 817). In *Williams v. Costco Wholesale Corp.*, the Ninth Circuit held that the federal courts' "virtually unflagging obligation" to exercise the jurisdiction conferred on them requires those courts to look at all documents filed post-removal—and not just the removal notice—to discern whether federal jurisdiction exists. 471 F.3d 975,

977 (9th Cir. 2006). And in *Reece v. Bank of N.Y. Mellon*, the Eighth Circuit held that the one-year removal limit in § 1446(c)(1) did not apply to any class actions, because "any other reading . . . would . . . permit[] plaintiffs to evade federal jurisdiction through clever gamesmanship." 760 F.3d 771, 776 (8th Cir. 2014).

Permitting remand here would be in tension with all of this case law. Through its representatives, including its Attorney General in this case, the State of Michigan has transparently and repeatedly fought to evade federal jurisdiction *ever since* the District Court below held that it had authority over this controversy. If this Court were to reverse and remand to state court, it would reward and incentivize the State's efforts to effectively nullify that jurisdictional finding. That simply cannot be squared with the "virtually unflagging" obligation of federal courts to exercise federal jurisdiction *once it has been found to exist*.

For her part, the Attorney General does not dispute the impropriety of "forum manipulation" and "procedural fencing"—the phrases the district court used to describe the tactics undertaken by the State and its representatives. Br. of Appellants (ECF No. 18) at 59; *Nessel v. Enbridge* Order at 11 ("The Court's decision, therefore, is also undergirded by Plaintiff's desire to engage in procedural fencing and forum manipulation."). She merely denies that she or the State engaged in such tactics. Br. of Appellants (ECF No. 18) at 59. But the procedural history of the two cases speaks for itself.

16

## **CONCLUSION**

The Court should affirm the District Court's denial of the Attorney General's motion to remand.

Respectfully submitted,

/s/ Elbert Lin

Elbert Lin
    *Counsel of Record*
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@huntonak.com
(804) 788-8200

*Counsel for Amici Curiae*

Tara S. Morrissey
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for Amicus Curiae*
*Chamber of Commerce of the*
*United States of America*

November 24, 2023

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the word limit imposed by Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,251 words, excluding material exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b)(1).

I further certify that the brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared proportionally spaced, 14-point Times New Roman typeface using Microsoft Word.

## **CERTIFICATE OF SERVICE**

I hereby certify that, on November 24, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Sixth Circuit via the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by that system.

/s/ Elbert Lin
Counsel for *Amici Curiae*